**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., TIMOTHY L. STARK, and MELISA D. STARK,<br><br>*Defendants*. | Civil Action No. 4:17-cv-186 |

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

**I.    INTRODUCTION**

1.    This is a citizen lawsuit, brought pursuant to Section 11(g)(1)(A) of the Endangered Species Act ("*ESA*"), 16 U.S.C. §§ 1531-1544, to address ongoing violations of the ESA and its implementing regulations arising out of Defendants' operation of Wildlife in Need and Wildlife in Deed, Inc. ("*Wildlife in Need*"), located in Charlestown, Indiana.

2.    Wildlife in Need is an unaccredited roadside zoo that confines and exhibits numerous species of animals, including tigers, lions, and hybrids of those animals ("*Big Cat(s)*").

3.    Plaintiff, People for the Ethical Treatment of Animals, Inc. ("*PETA*"), brings suit against Wildlife in Need and its principals Timothy L. Stark and Melisa D. Stark (collectively "*Defendants*") for their ongoing "take" of Big Cats in violation of the ESA and its implementing regulations.

4.    Specifically, Defendants (1) declaw several of the Big Cats in medically unnecessary procedures that amputate each digit at the ultimate joint, thereby wounding,

harming, and harassing them; (2) separate Big Cat cubs from their mothers at too early an age and forcing them into direct contact with members of the public, thereby harming and harassing them; and (3) confine the Big Cats in woefully inadequate enclosures, void of adequate shelter, necessary enrichment, and environmental enhancement, including appropriate substrates on which to walk and adequate space to roam, climb, and swim, thereby harming and harassing them.

5.     These practices "wound," "harm," and "harass" the Big Cats in violation of the ESA's "take" prohibition by causing them physical and psychological injury and distress, and significantly disrupting and impairing them from carrying out their natural behaviors in a manner that is likely to result in significant physical and psychological injury.

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), and has federal question jurisdiction under 28 U.S.C. § 1331.

7.     On July 27, 2017, PETA provided notice of its intent to file suit ("Notice of Intent") to Defendants, the Secretary of the Interior, and the Acting Director of the U.S. Fish and Wildlife Service ("*FWS*"). The Notice of Intent is attached and incorporated as Exhibit A. It was served more than sixty days prior to the filing of this action. 16 U.S.C. § 1540(g)(2)(A)(i).

8.     Defendants have not remedied the violations set out in the Notice of Intent.

9.     The Secretary of the Interior has not commenced an action against Defendants to impose a penalty pursuant to the ESA or its implementing regulations, and the United States has not commenced a criminal prosecution against Defendants to redress a violation of the ESA or its implementing regulations. 16 U.S.C. § 1540(g)(2)(A)(ii)–(iii).

10.     The Court has personal jurisdiction over the Defendants Timothy L. Stark and Melisa D. Stark because they reside in the Southern District of Indiana and conduct their business within this District. This Court also has personal jurisdiction over Wildlife in Need because it is an Indiana Corporation with its principal place of business in this District.

11.     Venue is proper in the Southern District of Indiana because the violations of the ESA alleged in this Complaint have occurred, and continue to occur, within this judicial district. 16 U.S.C. § 1540(g)(3)(A).

## III.    THE PARTIES

12.     PETA is a Virginia non-stock corporation and animal protection charity pursuant to Section 501(c)(3) of the Internal Revenue Code. Its headquarters are located in Norfolk, Virginia.

13.     Defendant Wildlife in Need is an Indiana corporation located at 3320 Jack Teeple Road, Charlestown, IN 47111. On information and belief, Wildlife in Need owns and exhibits the Big Cats that are the subject of this action.

14.     Defendant Timothy "Tim" L. Stark is a resident of Clark County, residing on the premises of Wildlife in Need at 3320 Jack Teeple Road, Charlestown, IN 47111. Mr. Stark is and was at all relevant times the registered agent and principal of Wildlife in Need. On information and belief, Mr. Stark acts on behalf of Wildlife in Need by, among other things, overseeing its day-to-day operations, managing animal care, acting as the primary animal care giver, supervising volunteers, and participating in U.S. Department of Agriculture ("USDA") inspections.

15.     Defendant Melisa D. Stark is the wife of Tim Stark and resides with him on the premises of Wildlife in Need at 3320 Jack Teeple Road, Charlestown, IN 47111. Mrs. Stark is

and was at all relevant times a corporate officer of Wildlife in Need. On information and belief, Mrs. Stark acts on behalf of Wildlife in Need by, among other things, assisting Mr. Stark in overseeing its day-to-day operations, managing animal care, acting as an animal care giver, supervising volunteers, and participating in USDA inspections.

## IV.    STATUTORY BACKGROUND

16.    The ESA defines an "endangered species" as "any species which is in danger of extinction," 16. U.S.C. § 1532(6), and a "threatened species" as "any species which is likely to become an endangered species within the foreseeable future," *id*. § 1532(20).

17.    The ESA prohibits the "take" of any endangered species within the United States. *Id*. § 1538(a)(1)(B); 50 C.F.R. § 17.21. It likewise prohibits the taking of any threatened species within the United States unless otherwise provided by a special rule. 16 U.S.C. § 1538(a)(1)(G); 50 C.F.R. §17.31(a).

18.    The ESA also prohibits additional activities including, among others, importing, exporting, transporting in the course of a commercial activity, and selling or offering for sale in interstate commerce a protected species. 16 U.S.C. §1538(a)(1).

19.    The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

20.    The term "harm" is defined by regulation as an act which "kills or injures" an endangered or threatened animal. 50 C.F.R. § 17.3. The term "harass" is defined by regulation to include an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." *Id*. The term "wound" is

not defined by the ESA or its regulations. Its New Oxford American Dictionary definition, as a verb, is "to inflict an injury on"; as a noun, wound is defined as "an injury to living tissue when caused by a cut, typically one in which the skin is cut or broken."

21.    Under the ESA, it is also illegal to possess any unlawfully taken endangered species, or any unlawfully taken threatened species unless otherwise provided by a special rule. 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d), 17.31(a).

22.    The ESA authorizes the Secretary of the Interior to issue a permit for any act that is otherwise prohibited by 16 U.S.C. § 1538, but only if such act is "for scientific purposes or to enhance the propagation or survival of the affected species" and other strict requirements are met. 16 U.S.C. § 1539(a)(1)(A), (c), (d).

23.    The ESA allows citizens to bring suit to enjoin "any person . . . who is alleged to be in violation" of the "take" provisions of the statute or of a regulation promulgated under the statute. *Id.* § 1540(g)(1)(A).

24.    Tigers are listed as "endangered" under the ESA. 50 C.F.R. § 17.11(h). Lions are listed as either "endangered" or "threatened" depending upon their subspecies—the subspecies *Panthera leo leo* is listed as "endangered" and the subspecies *Panthera leo melanochaita* is listed as "threatened." *Id.* §§ 17.11(h), 17.40(r). PETA does not know the subspecies of the lions at issue; however, the "take" and the possession of unlawfully taken members of both subspecies is equally prohibited by the ESA. *Id.* §§ 17.21, 17.31(a), 17.40(r).

## V.    FACTUAL BACKGROUND

25.    Wildlife in Need is an unaccredited roadside zoo in Charlestown, Indiana. Wildlife in Need confines and exhibits numerous Big Cats and charges the public a fee to

interact with Big Cats from infancy up to approximately twenty weeks of age, and to view juvenile and adult Big Cats confined on the premises.

26.    Defendants do not possess a permit from the Secretary of the Interior to "take" tigers, lions, or hybrids of these animals under 16 U.S.C. § 1539(a)(1)(A). Indeed, Mr. Stark is precluded from obtaining such a permit, *see* 50 C.F.R. § 13.21, because he was previously convicted of violating the ESA, having pled guilty to the unlawful receipt, transport, and shipping of an endangered species in interstate commerce in the course of commercial activity.

27.    When Mr. Stark previously applied to FWS for an ESA permit, he failed to disclose this prior conviction on his application, which he was required to do. In denying Mr. Stark's permit application, FWS also found that Mr. Stark also initially failed to disclose on his application that he was previously charged with obtaining migratory birds without the necessary permit under the Migratory Bird Treaty Act. Additionally, Mr. Stark failed to demonstrate that he had the requisite knowledge and expertise to enhance the survival and propagation of the various species, and FWS noted his many USDA citations for failure to provide adequate veterinary care and to maintain adequate facilities. Finally, FWS noted that Wildlife in Need's activities are associated with the entertainment industry, which is contrary to the purpose of the permitting program, which is to enhance the propagation of protected species.

28.    Over the past five years, the USDA has issued Defendants more than fifty citations for failing to meet minimal requirements for proper care of the animals in their possession under the federal Animal Welfare Act ("AWA"), 7 U.S.C. § 2143(a)(2). The ESA and AWA are separate statutory schemes that apply concurrently and in full to captive members of endangered species. They are distinct but complementary statutes, each with its own scope, purpose, and enforcement mechanism. Although the AWA provides minimal protections for

animals held and exhibited in captivity, the ESA provides additional, heightened protections that apply to specific protected animals, including the Big Cats that are the subject of this litigation.

29.    The USDA's inspection reports detail Defendants' ongoing disregard for the welfare of the Big Cats and demonstrated inability to provide proper care for them. Defendants' chronic and willful disregard for the welfare of the Big Cats led to suspensions of Mr. Stark's AWA license to exhibit animals to the public in 2015 and 2017. These suspensions demonstrate the seriousness of the welfare violations, as the USDA primarily relies upon warnings to enforce the law and suspensions are exceedingly rare, reserved for the worst violations. Defendants continued to unlawfully exhibit the animals during the 2017 suspension period, resulting in a further USDA citation. The USDA also has a pending enforcement action against Mr. Stark and Wildlife in Need over a long list of AWA violations.

30.    Mr. Stark has accumulated numerous USDA citations, including for declawing Big Cat cubs, exposing tiger cubs to rough and excessive handling during public encounters, hitting tigers with riding crops, and failing to obtain adequate veterinary care for several animals, including declawed Big Cat cubs who suffered complications from the procedure and leopards suffering from metabolic bone disease, one of whom Stark beat to death with a baseball bat.

## A.  DEFENDANTS WOUND, HARM, AND HARASS PROTECTED BIG CATS BY DECLAWING THEM

31.    Defendants declaw Big Cat cubs in violation of the ESA, wounding, harming, and harassing them.

32.    Declawing Big Cats is illegal and violates the ESA because it can cause ongoing pain, discomfort, or other pathological conditions in the animals.[1]

---

[1] *See* USDA Animal Care Policy Manual, Policy #3, Veterinary Care (Mar. 14, 2014), https://www.aphis.usda.gov/animal_welfare/downloads/Animal%20Care%20Policy%20Manual.pdf; *see also*,

33.     The American Veterinary Medical Association and the American Association of Zoological Veterinarians likewise "condemn" the declawing of Big Cats because the pain and suffering associated with it may be exacerbated in wild feline species, and welfare concerns associated with declawing are heightened for Big Cats. There is no justification for performing the procedure on Big Cats, except as medically necessary on a per-digit basis, which is exceedingly rare.

34.     To declaw a Big Cat, the animal's toes are amputated at the last joint, a procedure that lacerates the animal's skin and tissue and that can result in permanent lameness, gait abnormalities, abnormal standing conformation, arthritis, or other long-term, chronic injury, and can cause acute and chronic pain in standing or walking. These injuries interfere with the animals' normal behavior including by inhibiting their ability to climb, scratch, and engage in other physical activities.

35.     Complications from declawing may also cause death, as admitted by Wildlife in Need's veterinarian, who stated during a March 17, 2017, USDA inspection that a tiger at the facility had a fifty percent chance of dying from complications resulting from the procedure.

36.     At least twenty wild felines on Defendants' premises at the time of the March 17, 2017, inspection, including many of the Big Cats at issue in this litigation, have been declawed. These animals include weeks-old lion and tiger cubs, juvenile tigers and lion-tiger hybrids, two adult tigers, and other wild felines. The vast majority of the Big Cats have been declawed within the last two years while under the care of and at the direction of Defendants.

---

https://www.aphis.usda.gov/animal_welfare/downloads/big_cat/declaw_tooth.pdf.;
AVMA Executive Board, AVMA now condemns declawing wild and exotic cats, Dec. 31, 2012, https://www.avma.org/news/javmanews/pages/130115l.aspx.

37.    During the March 17, 2017, inspection, the USDA noted one orange and one white tiger cub, then approximately five or six weeks in age, who had been declawed approximately two weeks earlier. At first, Mr. Stark attempted to conceal these cubs from the USDA inspectors according to their inspection reports. The two tiger cubs were brought outside to a deck in a crate that was approximately 24 inches long by 18 inches wide. Neither animal would walk from the crate onto the wooden deck for inspection, and they had to be physically removed from the crate. Each cub had one leg that was bandaged and Mr. Stark told inspectors that there were open wounds under the bandages. Their affected paws were significantly swollen, spotting blood, and the cubs were struggling to walk, appearing very sore.

38.    Both tiger cubs appeared distressed, vocalizing nearly the entire time they were on the deck. The orange tiger cub immediately lied down on the deck and then, after persuasion, moved slowly for only short periods of time before resting in front of the inspectors. After each step, there were spots of blood left on the deck from the front paws. The white tiger cub was very reluctant to move, walking only when prompted, and exhibiting severe lameness, dragging a hind limb and only occasionally bearing very little weight on it. This cub consistently lied down and appeared to be suffering throughout the inspection. Mr. Stark told the inspectors that the declawing of these cubs was "botched," and that he concealed the cubs from the inspectors because he was afraid he would get in trouble, according to the USDA inspection reports.

39.    Additional Big Cat cubs possessed by Defendants have been declawed, including two lion cubs exhibited during public encounters throughout April 2017, who were declawed on the same day as the tiger cubs discussed above. The USDA noted the two declawed lion cubs in its March 17, 2017, inspection report. Approximately a dozen more animals were declawed in

the prior year by the attending veterinarian, including several tigers, lions, and hybrids of those animals.

40.     Defendants declaw Big Cats for their convenience, rather than because it is medically necessary for the animals. According to a March 17, 2017, USDA inspection report, Mr. Stark stated that he declaws Big Cats because he "has money," and "it's easier." As noted above, Mr. Stark's conceded practices are both illegal and in violation of generally accepted husbandry and veterinary practices, including those recognized by the American Veterinary Medical Association, American Association of Zoological Veterinarians, and USDA.

41.     Upon information and belief, Stark declaws the Big Cat cubs so that he can exhibit and display them for profit during interactions with customers, including young children.

42.     According to the March 17, 2017, USDA inspection report, the Big Cats are declawed at Wildlife in Need, rather than at a dedicated surgical site. No Big Cat receives pain medication following the amputations because, as Mr. Stark told the USDA inspector, he does not believe that the animals are in pain. Mr. Stark did not provide inspectors with records of pain management or antibiotics, or any written post-operative care.

43.     The USDA ordered Mr. Stark no longer to declaw wild carnivores, including the Big Cats. On information and belief, Defendants have refused to comply with this order and continue, and will continue, to declaw Big Cats in their custody unless they are enjoined by this Court.

44.     Declawing physically injures the Big Cats, psychologically harms them, creates a likelihood of further injury to them, and annoys them, by significantly disrupting their normal behavioral patterns, in violation of the ESA's "take" prohibition.

**B.  DEFENDANTS HARM AND HARASS PROTECTED BIG CATS BY SEPARATING THEM FROM THEIR MOTHERS, FORCING THEM INTO DIRECT PUBLIC CONTACT, AND HANDLING THEM ROUGHLY**

45.   Wildlife in Need routinely exhibits for profit Big Cat cubs who have been prematurely separated from their mothers at its "Tiger Baby Playtime" events, charging an admission fee and an optional additional photo opportunity fee, and bringing Big Cat cubs into direct contact with the public, including children. Using Big Cat cubs in public-handling sessions such as these constitutes a "take" and contravenes generally accepted husbandry practices in violation of the ESA.

46.   For captive animals such as Wildlife in Need's Big Cats, proximity to, or contact with, humans is a source of stress and can be extremely harmful to animal well-being. Stress in animals compromises immunity, impairs coronary health, alters brain structure and function, impairs reproduction, stunts growth, reduces body weight, shortens lifespan, and increases abnormal behaviors.

47.   Mr. Stark and his staff of untrained volunteers routinely agitate the cubs by, among other things, shaking, biting, and rubbing them, pulling on their tails, dropping them suddenly onto unsuspecting members of the public, making growling sounds at them, and pulling their tongues during photo opportunities while they sit on the laps of members of the public. Mr. Stark has gone so far as to instruct customers to hit the animals if they express distress or react negatively to public handling, and to direct employees and volunteers to hit cubs with riding crops.

48.   Such agitation increases the likelihood of injury to the cubs, thereby harassing them. This conduct significantly disrupts the animals' normal behavioral patterns by making it impossible for them to hide or otherwise seek shelter from fear-inducing stimuli, and not only

causes them psychological injury but is so distressing that it also places the animals at significant risk for physical injury. These species of Big Cats are incapable of understanding the negative punishment of being hit by human hands or struck by riding crops, and cannot know what behavior is expected of them by their human handlers, resulting in confusion and thus further psychological harm. Not only does the direct public contact harm and harass the cubs, but the practice of giving visitors access to a "playroom" and denying the cubs an opportunity to retreat to an area in which they can escape from the public causes significant distress to captive Big Cats.

49.     Further, given that Big Cats normally spend over three-quarters of their day resting and sleeping, physical contact with members of the public forces them to reduce resting time and is therefore inherently disruptive to their normal behavior. The constant use of these cubs in "Playtime" events without periods of sufficient rest between hourly exhibitions exhausts the animals, who often appear lethargic and attempt to sleep even as members of the public surround them and handle them. This creates a likelihood of injury because it disrupts normal sleep and rest behaviors, which are essential to natural development and physical health, thereby harassing and annoying the animals in violation of the ESA.

50.     Wildlife in Need also allows public contact with Big Cats who have open wounds, the severity of which may be exacerbated by allowing bacterial transmission from roomfuls of people who handle the animals, thereby further wounding and harming them in violation of the ESA.

51.     These Tiger Baby Playtime events continue, with new cubs being born or arriving at Wildlife in Need to replace older cubs as they age and grow larger. The cubs are separated from their mothers as infants, well before they are naturally weaned, causing distress to the cubs

and their mothers, and other physical and psychological health problems. In the wild, lions nurse for an exceptionally long time, having been observed suckling at up to fifteen months of age, albeit with decreasing frequency after the first six to eight months of age. Tigers typically wean at approximately six months. But at Wildlife in Need, the Big Cat cubs are separated from their mothers within weeks of birth and not allowed to nurse naturally, instead being bottle fed by human handlers. Maternal separation alters the cubs' normal feeding behaviors and other natural behaviors that, had they been allowed to remain with their mothers, the cubs would have learned from their mothers. This creates a risk of injury in the form of weakened immune systems and abnormal behavioral development.

52.     On January 17, 2014, the USDA found that Mr. Stark had willfully violated numerous AWA regulations, including 9 C.F.R. § 2.131(c)(1), by allowing the public to come into close proximity to tiger cubs who were too large, too strong, and too aggressive to have direct contact with the public with minimal risk of harm to the animals and the viewing public. The citation came after inspectors observed injuries that uncontrolled Big Cat cubs inflicted on the public. The USDA again cited Mr. Stark for this violation on August 20, 2014, and again on September 13, 2015. Nonetheless, the Defendants continue to exhibit Big Cat cubs and plan to have future events involving the Big Cat cubs.

53.     Despite being cited and sued by the USDA, Defendants have not stopped their unlawful behavior. They continue to allow the public, including untrained volunteers, to make physical contact with Big Cat cubs who grow too large, too strong, and become too aggressive to have direct contact with members of the public without risk of injury.

54.     The USDA's observations underscore that public contact harms and harasses the animals. Indeed, several cubs were observed as vocalizing, a well-recognized sign of psychological stress and suffering, while forced to come into direct contact with the public.

55.     The USDA has, on at least two occasions, suspended Mr. Stark's license to exhibit Big Cats to the public at these "Tiger Baby Playtime" events. *See, e.g.*, Complaint, *In re: Timothy L. Stark, et al.*, AWA Docket Nos. 16-0124 and 16-0125 (July 8, 2016) (In 2015, USDA suspended Stark's license for twenty-one days, during which he and Wildlife in Need "nevertheless persisted in holding 'Tiger Baby Playtime' events wherein tigers, non-human primates, and other exotic animals are exhibited to the public together, without any distance or barriers, and respondents' customers are invited to have direct contact with the animals, and instructed to hit the animals if they react negatively to the public handling."). The second suspension came in March of 2017, during which Defendants continued to exhibit Big Cat cubs in direct contact with the public despite being prohibited from doing so by the suspension of its exhibitor license.

56.     Forcing these predators to interact with humans, denying them the opportunity to escape from public interaction, and prematurely separating cubs from their mothers violates AWA regulations and is not a generally accepted animal husbandry practice. This practice harms the animals, creates a likelihood of injury to them, and annoys them, by significantly disrupting their normal behavioral patterns, in violation of the ESA's "take" prohibition.

## C. DEFENDANTS HARM AND HARASS ENDANGERED BIG CATS BY DENYING THEM SAFE, APPROPRIATE HOUSING AND ADEQUATE ENVIRONMENTAL ENRICHMENT

57.     In the wild, tigers' territories range from $7.72mi^2$ to $154.44mi^2$, depending on the availability of prey. Within these ranges, tigers are free to engage in natural behaviors such as swimming, climbing, stalking, and predation. They occupy a variety of habitats, typically

comprising dense vegetative cover, sufficient prey populations, and access to water. Tigers are generally solitary; however, they are known to come together for breeding, feeding, and sometimes to socialize and travel in groups.

58.    Given their natural needs, tigers require large, environmentally rich, natural spaces that allow them to express a wide range of behaviors. Captive environments that do not provide the environmental enrichment necessary to promote the expression of a full range of species-typical behaviors have a detrimental effect on the animals' physical and psychological well-being. Indeed, Big Cats in sterile environments like the one at Wildlife in Need experience long periods of inactivity or mindless activity, which results in permanent long-term changes to the body, brain, neural, and endocrine systems. Psychological distress can often leave Big Cats with higher blood cortisol levels, which can trigger displacement behavior, apathy, learned helplessness, and even severe capture myopathy. Enrichment is necessary to deter harmful behaviors such as self-mutilation and stereotypical behaviors such as pacing, which has been observed in Big Cats at Wildlife in Need. Harmful behaviors such as self-mutilation and pacing, in addition to evidencing psychological distress, can lead to other physical injuries, especially when declawed animals pace on inappropriate substrates. In the wild or in a reputable sanctuary, a Big Cat would have the ability to exercise, explore, and engage in other species-typical behaviors.

59.    Enrichment plans for captive carnivores, including tigers, are difficult to develop due to these animals' natural feeding and hunting behaviors and spatial needs. In inadequate captive conditions, thwarted hunting prospects alone appear to cause carnivores like tigers to suffer stress, which causes physical and psychological injury. Accordingly, enrichment plans should include natural and complex enclosures and environmental enrichment including whole-

carcass feeding, novel toys/objects, scratch logs, introduction of new smells, enclosure rotations, pools, and adequate space to run.

60.    In the wild, a lion's habitat includes open woodlands, thick bush, scrub, and tall grassy areas. Ideal habitats provide sufficient cover to facilitate hunting and denning. Wild lions mainly hunt at night, traversing distances ranging from one to eight miles each night, depending on the availability of food. Female lions do most of the hunting in social groups by stalking and ambushing prey, frequently taking prey much larger than themselves.

61.    Lions are highly social and live in large social groups called prides. For African lions, a typical pride structure includes five to nine related adult females and their offspring plus two to six males who are unrelated to the females but frequently related to each other. Female lions typically stay in their natal prides their entire lives and often develop preferred groupings between close relatives such as mother/daughter or siblings. Despite their social nature, however, lions need to be able to leave a social structure and choose their social grouping.

62.    Meeting the physical and psychological needs of captive lions requires providing them with the opportunity to socialize with compatible lions, and providing them with necessary environmental enrichment so that they are able to express a full range of natural behaviors.

63.    The Association of Zoos & Aquariums ("AZA"), the nation's premier zoological accrediting organization, recommends that captive lions be provided with "large spacious enclosures designed to encourage species appropriate behaviors such as resting, walking, [simulated] hunting, stalking, grooming, playing, breeding, etc." Ass'n of Zoos & Aquariums, *Lion Care Manual* 18 (2012). All enclosures should allow lions to retreat from conspecifics and provide visual privacy from humans "through the use of visual barriers, such as rock outcroppings, hills, and foliage, without limiting an animal's access to food, water, heat, or

shade." *Id.* According to the AZA, the majority of lion exhibits are over 10,000 square feet, which should be considered the minimum size for new exhibits, and the typical tiger exhibit is between 2,500 and 10,000 square feet, with an average of 5,500 square feet.

64.     In addition to providing social privacy, enclosures should provide shade and include "various substrates, surfaces to mark, deadfall for scratching, and other aspects in their enclosure that will change their pathways and create complex behavioral opportunities." *Id.*

65.     Defendants harm and harass protected Big Cats by confining them to small, barren enclosures, denying them appropriate, natural and complex housing, and frustrating their natural instincts. The enclosures lack enrichment and force Big Cats to walk and rest upon inappropriate gravel substrates.

66.     Defendants also harm and harass Big Cats by depriving them of adequate enrichment. Inadequate enrichment thwarts the expression of a range of natural behaviors, including, for example, predatory and investigatory behaviors.

67.     The enclosures at Wildlife in Need do not encourage the Big Cats to engage in instinctual and species-specific behaviors, including simulated natural hunting behaviors such as stalking and predation, and are therefore inadequate to provide for the animals' physiological and psychological well-being.

68.     Some of the Big Cats at Wildlife in Need also have been denied appropriate shelter from the elements. The AWA requires that animals be provided with adequate shelter from inclement weather, 9 C.F.R. § 3.127(b), and sufficient shade from direct sunlight, *id.* § 3.127(a). The USDA has cited Wildlife in Need for failing to provide Big Cats with adequate shelter from winter temperatures and weather. According to a USDA inspection report, "The lack of wind breaks, or shelters that protect the animals from the rain, sleet, direct sun, and snow

can cause possible health issues and discomfort to the . . . animals, that in nature would be able to find appropriate shelter from the elements if able." The inspector noted that snow and rain was blowing into an enclosure and that the temperature had been between seven and twenty-one degrees Fahrenheit for the week prior to the inspection, with two to three inches of snow on the ground during the inspection.

69.     Failure to provide Big Cats with adequate protection from the elements creates a likelihood of injury, including hypothermia and illness, by denying them the ability to engage in normal behaviors such as hiding, resting, and sheltering without exposure to inclement weather, or choosing to find a more suitable location, thereby harassing them in violation of the ESA.

70.     On information and belief, the Big Cats' outdoor enclosures also do not provide them with adequate shade from the sun, contrary to generally accepted animal care standards and AWA regulation. *See* 9 C.F.R. § 3.127(a). Denying captive Big Cats necessities such as appropriate shelter physically harms them, and significantly disrupts their normal behaviors, including sheltering and resting behaviors, in a way that puts their physical and psychological well-being at risk of injury.

71.     Despite the established authority on the environmental needs of Big Cats, Defendants continue to confine them in inappropriate and unsafe environments, without necessary enrichment, and therefore wholly fail to meet their physical, social, and psychological needs. These inadequate conditions cause the Big Cats to suffer psychological injury. The conditions further harm the Big Cats' physical and psychological health by depriving them of the ability to express a full range of natural behaviors such as simulated predatory behaviors, investigatory behaviors, and social avoidance behaviors, including the autonomy to choose to engage with or avoid others, which are central to their physical and psychological well-being.

Further, Defendants harass Big Cats by depriving them the ability to express simulated natural hunting behaviors such as stalking and predation, creating a likelihood of injury to them by annoying the Big Cats to such an extent as to significantly disrupt normal feeding behavioral patterns.

72.     The conditions in which these Big Cats are kept thus constitute, and will continue to constitute, a "take" in violation of the ESA.

## VI.     DEFENDANTS' ACTIONS HAVE FRUSTRATED PETA'S MISSION, PERCEPTIBLY IMPAIRED ITS ACTIVITIES AND PROGRAMS, AND FORCED IT TO DIVERT RESOURCES

### A.     PETA'S MISSION AND PROGRAMS

73.     PETA is dedicated to protecting animals, including protecting exotic animals and other animals (including the Big Cats) used in entertainment from abuse, neglect, and cruelty and from dangerous public encounters.

74.     To achieve its objectives of ending the abuse and neglect of animals used for entertainment, PETA pursues several programs, including educating the public about the very serious harms that animals suffer when used as mere props for photo sessions and public encounters. PETA brings this suit on its own behalf to protect its mission and programs, which have been perceptibly impaired by Wildlife in Need's actions.

75.     By unlawfully wounding, harming, and harassing federally protected Big Cats, Defendants directly frustrate PETA's mission to eliminate the abuse and neglect of animals for entertainment. Unlawfully wounding, harming, and harassing these animals increases the number of animals subject to abuse and neglect in entertainment. If PETA prevails in this action, Defendants will no longer be able to frustrate PETA's mission and maintain federally protected animals in unlawful conditions.

76. Defendants falsely hold themselves out as a rescue facility when, in fact, they actively wound, harm, and harass Big Cats and perpetuate the abuse and neglect of Big Cats for entertainment purposes. By presenting themselves as a refuge for abandoned and unwanted endangered and threatened animals, Defendants create the false and incorrect public impression that the Defendants are providing an essential rescue service and that but for the Defendants' efforts, the federally protected animals at Wildlife in Need would not be adequately provided for.

77. Continuing to wound, harm, and harass the federally protected animals at Wildlife in Need without repercussion under the ESA thus creates the incorrect public impression that Defendants are engaged in conduct that is consistent with animal welfare when they declaw Big Cats, confine them to small, barren enclosures, separate them prematurely from their mothers, and allow the public to make physical contact with apex predators.

78. In addition to creating public misimpressions regarding the propriety of their conduct, Defendants perpetuate highly damaging public encounters with Big Cat cubs and then discard those Big Cat cubs after they grow too large for public encounters, relegating them to inhumane enclosures or to other roadside zoos as part of a vicious cycle in which Big Cats are bred, abused, and discarded to languish in squalid and inhumane conditions—only to be bred again so that their offspring can endure the same harm and harassment. This conduct is not acceptable; not consistent with animal welfare; constitutes animal abuse, mistreatment or neglect; and, as alleged in this Complaint, violates the ESA. This frustrates PETA's mission and core programs by proliferating the abuse of animals in entertainment and making it harder to persuade the public that it should not tolerate or otherwise support these harmful practices. If PETA prevails in this action, PETA will not have to counteract the misimpression and

misrepresentations created by Defendants or otherwise address the cyclical harms caused by their conduct.

**B.  IMPAIRMENT OF PETA'S ACTIVITIES AND DIVERSION OF ITS RESOURCES**

79.    By wounding, harming, and harassing the threatened and endangered Big Cats at Wildlife in Need, Defendants subject animals to abuse and neglect in entertainment, create the incorrect public impression that the conditions in which these animals are kept are humane and lawful. Cubs bred at or obtained by Defendants are exploited for public contact, photography sessions, and the like, then typically discarded to inhumane enclosures, other roadside menageries, or individual owners after they have grown too large, strong, and aggressive to come into contact with the general public. As set forth above, this abuse and proliferation of juvenile and adult Big Cats frustrates PETA's mission of protecting these animals from abuse for entertainment purposes. Based on USDA inspection reports, ESA violations and permit denials, and first-hand observation, Defendants have the worst animal welfare record of any active Big Cat exhibitor in Indiana—and, possibly, the United States.

80.    As a result, PETA has been forced to divert resources in order to try to help the animals at Wildlife in Need by educating the public regarding the harmful nature of the exploitive public encounters that Wildlife in Need perpetuates and counteracting the public impression that Wildlife in Need's practices are consistent with the ESA and animal welfare. Among other activities, PETA has been and continues to be forced to: monitor the Defendants, submit complaints about Wildlife in Need to government agencies, including several requests for investigation to USDA, and requests for investigation to FWS and the Indiana Department of Natural Resources, about the treatment of Big Cats at the facility; submit complaints to the Internal Revenue Service regarding the Tiger Baby Playtime events and Big Cat breeding at

Wildlife in Need, which are not conducted for charitable or tax-exempt purposes, but rather for profit; submit official comments to FWS regarding Mr. Stark's ESA permit application, in which PETA presented evidence of his citations for abusing Big Cat cubs at the Tiger Baby Playtime events, among evidence of other takes of endangered species; post on the PETA.org blog and social media regarding Wildlife in Need's treatment of Big Cats; review and respond to complaints from the public about Wildlife in Need; compile and publish information on PETA's website about Wildlife in Need's history of animal-welfare violations and abuse; campaign to educate the public on the harmful effects of the public encounters that Wildlife in Need perpetuates; and distribute press releases on Wildlife in Need's mistreatment of animals, and pursue this litigation.

81.    PETA's ongoing need to expend resources to investigate and counteract the Defendants' unlawful wounding, harm, and harassment of federally protected Big Cats at Wildlife in Need has perceptibly impaired PETA's ability to advance its mission. Wildlife in Need's activities frustrate PETA's overall mission by perpetuating harmful and exploitative encounters, taking endangered Big Cats in violation of the ESA, and misleading the public about the harms these animals suffer for entertainment purposes. Specifically, the expenses incurred identifying and counteracting the Defendants' illegal activity has forced PETA to divert resources away from campaigns on behalf of other wild animals exploited for entertainment, and from funding animal rescues, among other efforts.

82.    If PETA prevails in this action, the Defendants will no longer be able to maintain the Big Cats in conditions that are inconsistent with the ESA and animal welfare, and PETA will no longer have to divert resources to counteract the incorrect public impression caused by Defendants' unlawful acts or to counteract the unlawful acts themselves.

83.    PETA's ongoing efforts and the resulting expenditures would not be necessary but for Defendants' unlawful taking of federally protected Big Cats.

## VII.    CLAIMS FOR RELIEF

### Count I—Unlawful "Take" of Protected Species

84.    PETA incorporates by reference all allegations of the Complaint.

85.    The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B), (G) and its implementing regulations, 50 C.F.R. §§ 17.21, 17.31(a), prohibit the "take" of "any [listed] species" not otherwise provided for by a Section 4(d) special rule, within the United States without a permit.

86.    Defendants have violated and continue to violate the ESA and its implementing regulations by taking tigers, lions, and hybrids thereof within the meaning of the ESA, without a permit, at Wildlife in Need.

87.    This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and ordering them to relinquish possession of the tigers, lions, and hybrids thereof to appropriate reputable sanctuaries. 16 U.S.C. § 1540(g)(1)(a).

88.    There is ample reason to believe that Defendants will continue to declaw the Big Cats and to use the Big Cat cubs in their "Tiger Baby Playtime" events unless they are enjoined and restrained from such illegal conduct. Indeed, Defendants have repeatedly confirmed that they will declaw the Big Cats and use the Big Cat cubs in the public encounters known as "Tiger Baby Playtime."

89.    PETA has a substantial likelihood of succeeding on the merits.

90.    The harm to the Big Cats and the Big Cat cubs from declawing (i.e., amputation of their digit at the joint) and from the "Tiger Baby Playtime" events (i.e., distress and other

physical and psychological health problems) is permanent and irreparable and substantially outweighs any harm to Defendants (i.e., risk of getting scratched by the Big Cats and not being able to use the Big Cat cubs in their "Tiger Baby Playtime" events) if immediate injunctive relief is not issued.

91.　As a result of Defendants' unlawful conduct, the Big Cats and Big Cat cubs have suffered and will continue to suffer immediate and irreparable physical and psychological harm for which there is no adequate remedy at law.

92.　Defendants, on the other hand, will suffer virtually no harm by simply being ordered to comply with the ESA.

93.　The public interest will be served by enjoining and restraining Defendants' unlawful and improper conduct as it will prevent further violations of the ESA.

94.　PETA is prepared to post any reasonable security for the relief being requested herein in an amount that this Court considers just and proper.

95.　Defendants should therefore be temporarily restrained and preliminarily enjoined from declawing the Big Cats in their possession, custody, and control pursuant to Fed. R. Civ. P. 65.

### Count II—Unlawful Possession of Species Taken in Violation of the ESA

96.　PETA incorporates by reference all allegations of the Complaint.

97.　The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(D), (G) and implementing regulations, 50 C.F.R. §§ 17.21(d), 17.31(a), prohibit the possession, by any means whatsoever, of any species taken in violation of the ESA.

98. Defendants have violated and continue to violate the ESA and its implementing regulations by possessing and continuing to possess unlawfully taken species, including tigers, lions, and hybrids thereof, within the meaning of 16 U.S.C. § 1538(a)(1)(D) and (G).

99. This Court has the authority to issue an injunction prohibiting Defendants from continuing to possess tigers, lions, and hybrids thereof in violation of 16 U.S.C. § 1538(a)(1)(D) and (G) and 50 C.F.R. §§ 17.21(d), 17.31(a), 17.40(r), and ordering them to relinquish possession of these animals to appropriate reputable sanctuaries. 16 U.S.C. § 1540(g)(1)(A).

## Relief Requested

WHEREFORE, PETA respectfully requests that this Court:

A. Declare that Defendants are violating the ESA by illegally taking tigers, lions, and hybrids thereof, 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §§ 17.21(c), 17.31(a), 17.40(r);

B. Declare that Defendants have violated and continue to violate the ESA by possessing tigers, lions, and hybrids thereof, who have been illegally taken, 16 U.S.C. § 1538(a)(1)(D), (G); 50 C.F.R. §§ 17.21(d)(1), 17.31(a), 17.40(r);

C. Temporarily and permanently enjoin and restrain Defendants from continuing to violate the ESA and its implementing regulations with respect to tigers, lions, and hybrids thereof, including the prohibitions on taking a listed species and possessing a listed species that has been unlawfully taken;

D. Temporarily and permanently enjoin and restrain Defendants from owning or possessing endangered or threatened species, or hybrids thereof, in the future;

E. Temporarily and permanently enjoin and restrain Defendants from declawing any of the Big Cats in their possession, custody, or control;

F.      Temporarily and permanently enjoin and restrain Defendants from separating Big Cat cubs from their mothers and publically displaying them in the public encounters known as the "Tiger Baby Playtime";

G.      Enter a permanent injunction against Defendants that terminates all Defendants' ownership and possessory rights with respect to the tigers, lions, and hybrids thereof;

H.      Appoint a special master or guardian ad litem to identify reputable wildlife sanctuaries and to determine the most appropriate placement for the forfeited animals, consistent with the animals' best interests;

I.      Award PETA reasonable attorneys' fees and litigation costs (including expert witness expenses) for this action, 16 U.S.C. § 1540(g)(4); and

J.      Grant PETA such other and further relief as the Court deems just and proper.


Date      September 29, 2017                  Respectfully submitted,

                                            PLAINTIFF PEOPLE FOR THE ETHICAL
                                            TREATMENT OF ANIMALS

                                            By: /s/ Yeny C. Ciborowski
                                                    One of Its Attorneys

                                            Brian Lewis
                                            Paul Olszowka
                                            Yeny Ciborowski
                                            BARNES & THORNBURG LLP
                                            One North Wacker Drive
                                            Suite 4400
                                            Chicago, Illinois 60606
                                            Telephone: 312-357-1313

## VERIFICATION

Under penalties as provided by law, the undersigned certifies that the statements set forth in this Verified Complaint for Injunctive and Other Relief are true and correct, except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true. I declare and verify under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of September, 2017, in Washington D.C.

Brittany Peet