IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., TIMOTHY L. STARK, AND MELISA D. STARK, | ) ) ) ) ) |
| Defendants. | ) |

Case No. 4:17-cv-186

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to Fed. R. Civ. P. 65, Plaintiff People for the Ethical Treatment of Animals, Inc. ("***PETA***"), by and through its counsel, respectfully applies for the immediate issuance of a temporary restraining order prohibiting Wildlife in Need and Wildlife In Deed, Inc., Timothy L. Stark, and Melisa D. Stark (collectively, "***Defendants***") from declawing any lions, tigers, or hybrids of those species (collectively, "***Big Cat(s)***"). In support of this motion,[1] PETA states as follows:

### INTRODUCTION

Defendants are routinely violating the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544 ("***ESA***") by irreparably lacerating the skin, tissues, ligaments, tendons, and blood vessels of infant Big Cats in a procedure equivalent to cutting off a human's fingers and toes at the last joint. This practice not only is illegal—over ten years ago, the United States Department of Agriculture ("***USDA***") made clear in controlling policy guidance that the declawing of Big Cats violates the Animal Welfare Act ("***AWA***")—but also expressly condemned by the American Veterinary Medical Association (AVMA) and American Association of Zoological Veterinarians

---

[1] Pursuant to Local Rule 65-2(a), counsel for the parties have been unable to reach an accord on the issues advanced in this motion.

1

(AAZV). Because Defendants' practice of declawing causes severe, acute injuries and results in a lifetime of chronic physical pain and psychological distress for the animals involved, it falls squarely within the definition of a prohibited "take" under the ESA. To declaw a Big Cat requires the amputation of a portion of the animal's toes, a practice that not only creates a grossly disfiguring wound, but actually changes the mechanics of the paw in a manner that causes severe physical harm in both the short- and long-term, and that disrupts the animal's normal behavioral patterns—including climbing, scratching, self-defense, and other physical activities—in ways that result in further physical and psychological injuries. As the USDA has already documented, Defendants' declawing is so harmful that one cub who was declawed earlier this year had only a fifty percent chance of surviving the injuries caused by the procedure.

Defendants admit that they routinely declaw Big Cats solely for convenience—to make it easier to force the animals to participate in "Tiger Baby Playtime" sessions with members of the public—and not out of medical necessity.[2] According to the USDA, at least twenty (20) wild felines on Defendants' premises as of March 17, 2017, including many of the Big Cats at issue in this litigation, have been declawed, such as weeks-old lion and tiger cubs, juvenile tigers and lion-tiger hybrids, and two adult tigers. What is more, Defendants' long history of shirking their legal obligations (including by attempting to hide declawed animals from federal inspectors) demonstrates that, absent immediate injunctive relief from this Court, they will continue to violate the law and cause irreparable injury to the Big Cats. PETA therefore respectfully requests that this Court enter an order temporarily restraining Defendants from declawing all Big Cats in their custody, possession, or control.

---

[2] Within fourteen days, PETA will also be filing a Motion for Preliminary Injunction seeking to enjoin both Defendants' declawing of Big Cats and their practice of separating tiger cubs from their mothers in order to force the animals to participate in these "Tiger Baby Playtime" sessions. *See* Verified Complaint [Docket No. 1]. In these sessions, members of the public come into direct contact with the cubs, who grow as large as fifty pounds, without protective barriers of any kind. Ciborowski Decl., Ex. A.

## FACTUAL BACKGROUND

**I.     Defendants' Routine Declawing of Big Cats Causes the Animals to Suffer Irreparable Painful, Long-term Physical and Psychological Injuries.**

Defendants amputate the toes of Big Cat cubs at the first joint—a practice commonly termed "declawing"—in order to use these animals in "Tiger Baby Playtime" sessions with the members of the general public at their unaccredited roadside zoo. *See* Ciborowski Decl., Ex. A; *see also* Ciborowski Decl., Ex. B. Once a Big Cat is declawed, the animal will suffer immediate and ongoing injury for the rest of his or her life. *See* Conrad Decl., ¶¶ 10, 13; Pratte Decl., ¶¶ 9, 13.

**A.     Declawing Is Prohibited Because It Irreversibly Injures Big Cats.**

Declawing Big Cats violates the AWA because it can cause ongoing pain, discomfort, or other pathological conditions in the animals. *See* Ciborowski Decl., Ex. C; *see also* Ciborowski Decl., Ex. D.

The USDA's position on this issue is in line with generally accepted husbandry practices within the veterinary medical community, as the AVMA and the AAZV both explicitly condemn the practice. Conrad Decl., ¶ 13; *see also* Ciborowski Decl., Ex. E. The USDA, AVMA, and AAZV acknowledge only one exception to this clear prohibition—that declawing on a per-digit basis may be permitted if a veterinarian prescribes the procedure as treatment for an individual medical problem or injury. *See* Conrad Decl., ¶ 14. The wholesale declawing for the convenience of a roadside zookeeper to display the Big Cats for profit does not come within the narrow parameters of this exception.

Dr. Jennifer Conrad is a veterinarian and the country's leading expert on the declawing of Big Cats. Conrad Decl., ¶¶ 2-4, Appx. A. According to Dr. Conrad, there is no medical justification for performing the procedure on Big Cats, except as needed on a per-digit basis as medically

3

necessary, which is exceedingly rare. Conrad Decl., ¶ 14. Declawing Big Cats condemns them to a lifetime of pain and suffering. Conrad Decl., ¶¶ 10, 11, 13.

To declaw a Big Cat, the animal's toes are amputated at the last joint, a procedure that lacerates the animal's skin, tissues, ligaments, tendons, and blood vessels. Conrad Decl., ¶¶ 9, 16; Pratte Decl., ¶ 9. The amputations can result in permanent lameness, gait abnormalities, abnormal standing conformation, arthritis, or other long-term, chronic injury, and can cause acute and chronic pain in standing or walking. Conrad Decl., ¶¶ 10, 12, 16.

According to Jay Pratte, an expert animal behaviorist with substantial experience in Association of Zoos and Aquariums-accredited zoos, these injuries significantly interfere with the animals' normal behavior, such as inhibiting their ability to climb, scratch, and engage in other physical activities. Pratte Decl., ¶ 12. The Big Cats will continue to want to engage in typical behaviors that they cannot, because the ways in which they interact with the world has been permanently altered. Pratte Decl., ¶ 13. This will cause chronic distress for the rest of the Big Cats' lives. Pratte Decl., ¶ 13. Declawing Big Cats also removes one of their primary defense mechanisms, causing them to be more likely to bite when compared the Big Cats who have not been declawed, which poses additional risks to other Big Cats and to the public that interacts with them. Conrad Decl., ¶ 15; Pratte Decl., ¶ 12.

After removing part of each digit at the distal phalanx, the rest of the Big Cats' body must compensate for the missing joint, including the elbows, hips, and multiple muscles and tendons. Conrad Decl., ¶ 12; Pratte Decl., ¶ 11. Declawing can result in bone fragments remaining following the surgery, which can lead to pain, aggression, or other adverse outcomes; excessive inappropriate urination, removing the animals' own hair, and not wanting to be touched or to interact. Conrad Decl., ¶¶ 12, 15; Pratte Decl., ¶ 10.

4

While declawing itself constitutes an immediate and severe injury and some animals will have instantly visible complications from the procedure, as was the case when the Defendants performed this procedure in early 2017, it may be many months or years before other damaging effects of declawing become obvious. Conrad Decl., ¶ 10. The stresses caused by the abnormal posture and movement that result from declawing amputations may produce arthritis in the legs, which, in turn, may cripple the cat further and cause the animal more suffering. Conrad Decl., ¶¶ 10, 12. In addition, bone fragments may contain remnants of nail-forming tissue that may continue to grow deep within the foot, causing infection. Conrad Decl., ¶ 12. In more severe and particularly heartbreaking cases, the mutilation of declawing may cause so much tenderness or pain that the animal can move only by walking on his or her bones from the wrists to the elbows. Conrad Decl., ¶ 12. Complications from declawing surgery may also cause death, as admitted by Defendants' veterinarian, who stated during a USDA inspection that a tiger cub at the facility had a fifty percent chance of dying from complications resulting from the procedure. Ciborowski Decl., Ex. B.

Further, the USDA's inspection report stated that recent declawing by the Defendants resulted in such severe injuries to the Big Cat cubs that even Defendant Tim Stark acknowledged that the procedures were "botched" and that the Defendants tried to conceal the cubs and their injuries from the USDA inspectors to avoid getting in trouble. Ciborowski Decl., Ex. B. The USDA reports also stated that these cubs exhibited severe injuries including swollen paws, bleeding, and the inability to walk. *See* Ciborowski Decl., Ex. B.

Declawing big cats is an irreversible procedure that permanently removes the distal phalanx and severs nerves, ligaments, tendons, and blood vessels. There is no surgical procedure that can fully restore what a human has removed from declawed big cats. The animals will never

5

have the full, normal function of an animal with intact claws, and years of abnormal function may have caused and are likely to cause irreversible arthritic changes and/or chronic pain. Conrad Decl., ¶ 16.

### B. Defendants Routinely Declaw Big Cats for Convenience.

At least twenty (20) wild felines on Defendants' premises as of March 17, 2017, including many of the Big Cats at issue in this litigation, have been declawed, such as weeks-old lion and tiger cubs, juvenile tigers and lion-tiger hybrids, and two adult tigers. Ciborowski Decl., Ex. B. The vast majority of the Big Cats have been declawed within the last two years while under the care of and at the direction of Defendants; approximately one dozen were declawed in 2016. *Id.* Defendants declawed two lion cubs they exhibited during public encounters in March 2017. *Id.*

During its March 17, 2017, inspection of Wildlife in Need, the USDA noted one orange and one white tiger cub, then approximately five or six weeks in age, who had been declawed approximately two weeks earlier. Ciborowski Decl., Ex. B. Defendants deliberately left these cubs off the facility's records; only after the inspectors stated they knew more cubs were on site than they had been shown did Defendants admit they had hidden them from inspectors. *Id.*; Ciborowski Decl., Ex. F.

The two tiger cubs were brought outside to a deck in a crate that was approximately twenty-four inches long by eighteen inches wide. Ciborowski Decl., Ex. F. Both animals had to be physically removed from the crate because neither would walk from the crate onto the wooden deck. *Id.* Each cub had one leg that was bandaged, and Mr. Stark told inspectors that there were open wounds under the bandages. *Id.* The cubs' affected paws were significantly swollen, spotting blood, and the cubs were struggling to walk, appearing very sore. *Id.* Both tiger cubs appeared distressed, vocalizing nearly the entire time they were on the deck. *Id.* The orange tiger cub

6

immediately laid down on the deck and then, after persuasion, moved slowly for only short periods of time before resting in front of the inspectors. *Id.* After each step, there were spots of blood left on the deck from the front paws. *Id.* The white tiger cub was very reluctant to move, walking only when prompted, and exhibiting severe lameness, dragging a hind limb and only occasionally bearing very little weight on it. *Id.* This cub consistently laid down and appeared to be suffering throughout the inspection. *Id.*

Defendants declaw Big Cats for convenience, rather than because it is medically necessary for the animals. Mr. Stark stated that he declaws Big Cats because he "has money," and "it's easier." Ciborowski Decl., Ex., B. He explained, "If I have the opportunity then yes I do declaw any babies we have born here or we acquire." *See* Schiff Decl., ¶7. He also stated, "I choose to declaw them simply due to the fact it's much easier to handle them because I've learned over the years that they have a tendency to snag you with them." *Id.* As noted above, Defendants' conceded practices violate the AWA and are in violation of generally accepted husbandry and veterinary practices, including those recognized by the AVMA, AAZV, and USDA. Conrad Decl., ¶¶ 4, 13.

According to the March 17, 2017, USDA inspection report, the Big Cats are declawed at Wildlife in Need, rather than at a dedicated surgical site. Ciborowski Decl., Ex. F. Mr. Stark stated that no Big Cat receives pain medication following the amputations. *Id.* Defendants did not provide inspectors with records of pain management, antibiotics, or any written post-operative care. *Id.* The failure to provide pain medication under these circumstances falls far below the accepted standard of veterinary care and further harms and harasses the Big Cats. Conrad Decl., ¶ 18.

Defendants continue to advertise "Tiger Baby Playtime" events with a new group of Big Cat cubs, *see* Schiff Decl., ¶ 8, who have apparently been declawed. Conrad Decl., ¶ 19. Thus, there is

a substantial likelihood that Defendants will receive new cubs (by birth or acquisition) and continue to declaw them for their convenience.

## ARGUMENT

"The standard for the issuance of a TRO is the same standard applied for the issuance of a preliminary injunction." *Cmty. Pharmacies of Ind., Inc. v. Ind. Family & Soc. Servs. Admin.*, 801 F. Supp. 2d 802, 803 (S.D. Ind. 2011). "A plaintiff seeking a [TRO or] preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), *accord United States v. NCR Corp.*, 688 F.3d 833, 837 (7th Cir. 2012).[3]

### I.  PETA Is Likely to Succeed in Proving That Defendants Are Violating the ESA.

In moving for a TRO, "the threshold for demonstrating a likelihood of success on the merits is low." *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016). The movant "must only show that his chances to succeed on his claims are 'better than negligible.'" *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). Thus, a TRO may be entered "even though a plaintiff has less than a 50 percent chance of prevailing on the merits." *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir. 1988).

To prevail in this case, PETA must prove that Defendants have unlawfully taken the protected Big Cats in violation of the ESA. The ESA prohibits the take of any endangered or threatened species, 16 U.S.C. § 1538(a)(1)(B), (G); 50 C.F.R. §17.31(a), and makes it unlawful to possess any endangered or threatened species that has been unlawfully taken, 16 U.S.C. §

---

[3] Defendants' counsel has been served with the Motion for Temporary Restraining Order and this Memorandum in Support of Plaintiff's Motion for Temporary Restraining Order.

1538(a)(1)(D); 50 C.F.R. §17.31(a). Tigers and lions are both protected by these prohibitions. *See* 50 C.F.R. § 17.11(h) (listing tigers as "endangered" and lions as either "endangered" or "threatened" depending upon their subspecies). Congress defined the term "take" in the "broadest possible manner," *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704–05 (1995) (citing S. Rep. No. 93-307, p. 7 (1973)), to include actions that "harm," "harass," or "wound" endangered or threatened animals. 16 U.S.C. § 1532(19). By routinely declawing Big Cats without *any* medical necessity, Defendants are harming, harassing, and wounding endangered animals in violation of the ESA's take prohibition. Conrad Decl., ¶¶ 8, 13, 20.

### A. Defendants Harm Big Cats in Violation of the ESA.

Defendants are actively harming Big Cat within the meaning of the ESA. "Harm" is broadly defined as "an act which actually kills or injures wildlife," including "by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Any act which injures a protected animal constitutes 'harm' within the definition of 'take' in the Endangered Species Act." *Kuehl v. Sellner*, 161 F. Supp. 3d 678, 716 (N.D. Iowa 2016). In *Kuehl*, the plaintiffs proved that a roadside zoo harmed tigers by failing to provide them with adequate veterinary care, which "delayed or prevented adequate treatment, thus resulting in 'injury' to the tigers." *Id.* Here, Defendants subject Big Cats to a far more direct and serious injury.

Defendants regularly declaw any babies that are born in their facility or that they acquire. *See* Schiff Decl., ¶7. This permanently and irreparably injures the Big Cats by causing acute and chronic pain, lameness, gait abnormalities, abnormal standing conformation, premature arthritis, infection stemming from lodged bone fragments, or other long-term, chronic injury. Conrad Decl.,

¶¶ 10-12, 16. These physical injuries also cause chronic psychological injury and impaired behavioral patterns for the rest of the Big Cats' lives. Pratte Decl., ¶¶ 9, 10, 13, 20. These injuries have already been documented by the USDA, which found that two Big Cat cubs declawed by Defendants earlier this year could not even walk due to the severity of their injuries, which may even have been fatal—one of the cubs had only a fifty-percent chance of surviving the injuries caused by Defendants' declawing. Ciborowski Decl., Ex. B. Thus, Defendants' routine declawing of Big Cat unequivocally harms the animals in violation of the ESA.

### B. Defendants Harass Big Cats in Violation of the ESA.

Defendants' conduct also harasses the Big Cats in violation of the ESA. The term "harass" is also broadly defined as an "act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns . . . ." 50 C.F.R. § 17.3. This definition is "less demanding" in that it requires only a likelihood of injury to the endangered animal—as opposed to proof of an actual injury. *See Hill v. Coggins*, 867 F.3d 499, 511 (4th Cir. 2017) ("To elaborate, the regulatory definition of harass contains requirements that are less demanding for Plaintiffs—whose suit centers on behavioral interference evidence—than are the requirements contained in the regulatory definition of harm."). Harassment "do[es] not require direct applications of force." *Babbitt*, 515 U.S. at 701.

In *Kuehl*, a roadside zoo harassed animals at its facility by neglecting to provide them with clean water and sanitary conditions, failing to "timely remove excessive excreta" from enclosures, and not providing environmental enhancement to promote the animals' psychological well-being. 161 F. Supp. 3d at 711-13, 717. Likewise, a zoo can harass animals in violation of the ESA "by providing an enclosure with inadequate shade and shelter from the sun" or a

10

"substrate [that] is 'species-inappropriate.'" *Graham v. San Antonio Zoological Soc'y*, No. SA-15-CV-1054-XR, 2017 WL 2533531, at *30 (W.D. Tex. June 8, 2017).

By declawing Big Cat cubs, Defendants are unequivocally harassing these animals in violation of the ESA. Declawing results in a number of chronic and permanent injuries and significantly disrupts normal Big Cat behavior, by inhibiting the animal's ability to climb or scratch and depriving the animal of his primary defense mechanism—his claws. Conrad Decl., ¶ 15; Pratte Decl., ¶ 12. Because the Big Cats will continue to want to engage in normal behaviors that they cannot, they will experience chronic distress for the rest of their lives. Pratte Decl., ¶ 13.

Declawing Big Cats is neither a "generally accepted" husbandry practice nor compliant with the AWA, and it is "likely to result in injury," and therefore it is not exempted from the definition of the term "harass" under the ESA. *See* 50 C.F.R. § 17.3. Routine, non-medically necessitated declawing in no way meets or exceeds the accepted standard of care for these animals. The AVMA expressly "condemns" declawing Big Cats because it is so bad for the animals' welfare, *see* Pratte Decl., ¶ 14, and the USDA maintains that "declawing of any wild or exotic carnivore does not constitute appropriate veterinary care [under the AWA] unless prescribed by the attending veterinarian for treatment of individual medical problems of the paws." Ciborowski Decl., Ex. C. Thus, Defendants' routine declawing to make it "easier to handle" the Big Cat cubs violates both the AVMA's guidance and the minimal requirements of the AWA. Schiff Decl., ¶ 7.

C.   **Defendants Wound Big Cats in Violation of the ESA.**

It is undisputed that Defendants wound the Big Cats by declawing them. Under the ESA, the term "wound" covers "the piercing or laceration of skin." *Graham v. San Antonio Zoological Soc'y*, No. SA-15-CV-1054-XR, 2017 WL 2533531, at *22 n.15 (W.D. Tex. June 8, 2017) (quoting *Babbitt*, 515 U.S. at 721 (Scalia, J., dissenting)); *see also Mut. Life Ins. Co. of N.Y. v.*

*Schenkat*, 62 F.2d 236, 238 (7th Cir. 1932) ("In legal medicine the word 'wounds' means injuries of every description that affect either the hard or soft parts of the body, and it comprehends bruises, contusions, fractures, luxations, etc." (citation omitted)).

By declawing the Big Cat cubs, Defendants are surgically amputating the animals' toes at the last joint in a manner that lacerates the animal's skin, tissues, ligaments, tendons, and blood vessels. Conrad Decl., ¶ 9; Pratte Decl., ¶ 9. This painful wounding results in severe injury and permanently inhibits the animal's ability to engage in species-appropriate behaviors. Conrad Decl., ¶¶ 10-12; Pratte Decl., ¶ 10-13, 20. The USDA has already documented the severe wounds caused by Defendants' declawing, finding that declawed Big Cat cubs had "open wounds" and significant swelling in their amputated paws. Ciborowski Decl., Ex. F. The cubs had not been given any pain medication, struggled to walk, appeared sore, and their paws left spots of blood on the floor. *Id.* Thus, Defendants are unequivocally wounding Big Cat cubs in violation of the ESA.

**II.     Taking an Endangered Species Results in Irreparable Harm for Which There Is No Adequate Remedy at Law.**

This Court defines irreparable harm as "harm which cannot be repaired, retrieved, put down again, atoned for. The injury must be of a particular nature, so that compensation in money cannot atone for it." *GoodCat, LLC v. Cook*, 202 F. Supp. 3d 896, 917 (S.D. Ind. 2016) (quoting *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 296 (7th Cir.1997)). This harm need not "be certain to occur before a court may grant relief on the merits." *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017).

In analyzing whether the plaintiff has demonstrated "irreparable harm" in an ESA case, the district court must modify its traditional inquiry in light of "[t]he plain intent of Congress in enacting this statute …" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Thus, "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species … establishing

irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015), cert. denied, 137 S. Ct. 293 (2016).

The plaintiff need only demonstrate a reasonable likelihood that endangered animals will be taken if relief is not granted. *See Sierra Club v. Von Kolnitz*, No. 2:16-CV-03815-DCN, 2017 WL 3480777, at *6-7 (D.S.C. Aug. 14, 2017) ("The court is satisfied that plaintiffs have established a likelihood of irreparable harm by proving that future similar takings will continue if the status quo is maintained."); *Kuehl v. Sellner*, No. 16-CV-2078-LRR, 2016 WL 9114915, at *2 (N.D. Iowa July 21, 2016) ("Dr. Ross states that 'the African lioness appears thin, has poor body condition, and displays an abnormal posture which could be indicators of compromised wellbeing.' Based on the affidavits, Plaintiffs have sufficiently demonstrated that irreparable injury may occur." (internal citations and alterations omitted)); *Red Wolf Coal. v. N.C. Wildlife Res. Comm'n*, No. 2:13-CV-60-BO, 2014 WL 1922234, at *9 (E.D.N.C. May 13, 2014) ("Certainly money damages cannot remedy the red wolf mortalities brought about by coyote hunting . . . .").

Under the ESA, "[i]t is the incalculability of th[is] injury that renders the 'remedies available at law, such as monetary damages[,] inadequate." *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1090 (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). Perhaps for this reason, the ESA's citizen-suit provision, which PETA invoked in filing the present action, does not even permit a prevailing plaintiff to recover monetary damages. *See* 16 U.S.C. § 1540(g)(1)(A) (authorizing injunctive relief only). Thus, it would be impossible to compensate for the harm caused by Defendant's declawing at the conclusion of this litigation.

Here, the protected Big Cat cubs at Wildlife in Need will continue to experience harm, harassment, and wounding if Defendants' conduct is not restrained and enjoined. Conrad Decl., ¶

13

19. Dr. Conrad and Mr. Pratte have explained that the physical and psychological injuries inflicted on the Big Cat cubs are both permanent and irreversible. Conrad Decl., ¶ 20; Pratte Decl., ¶ 21. PETA and the Big Cats will therefore experience irreparable harm if Defendants are not enjoined from declawing Big Cat cubs.

### III. The Balance of Equities and Public Interest Tip in Favor of Enjoining Further Harm, Harassment, and Wounding of the Big Cats.

After the court finds a likelihood of success on the merits and the potential for irreparable harm, movants normally must demonstrate that "the balance of equities tips in their favor, and issuing an injunction is in the public interest." *United States v. NCR Corp.*, 688 F.3d 833, 837 (7th Cir. 2012). In passing the ESA, however, "Congress has spoken in the plainest of words, making it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities . . . ." *Tenn. Valley Auth.*, 437 U.S. at 194 (1978). Thus, "Congress ha[s] foreclosed the exercise of the usual discretion possessed by a court of equity." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).

"The actual balancing of these interests" is "already prescribed by the specific terms" of the ESA, *State of Wis. v. Weinberger*, 745 F.2d 412, 425-26 (7th Cir. 1984), and "the equities and public interest factors always tip in favor of the protected species." *Cottonwood Envtl. Law Ctr.*, 789 F.3d at 1091. Thus, "[a]lthough it is generally true in the preliminary injunction context that the district court is required to weigh and balance the relative harms to the non-movant . . . , in the context of ESA litigation, that balancing has been answered by Congress' determination that the balance of hardships and the public interest tips heavily in favor of protected species." *Strahan v. Coxe*, 127 F.3d 155, 171 (1st Cir. 1997) (internal citations omitted).

Even if the ESA had not dispensed with these traditional balancing tests, PETA can easily carried its burden. "In this balancing, each party's potential injury must be adjusted for the

14

probability that that party will prevail on the merits." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 824 (7th Cir. 1998). Thus, "the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "The aim is to minimize the costs of a wrong decision." *Id*.

Mr. Stark has conceded that he declaws the animals strictly as a matter of convenience—to make them "much easier to handle." *See* Schiff Decl., ¶7. Any alleged minor inconvenience associated with not declawing Big Cats is clearly outweighed by the irreparable and serious harm caused to the Big Cats by the declawing procedure. Conrad Decl., ¶ 14; Pratte Decl., ¶¶ 16-20. Thus, the balance of hardships tilts heavily in PETA's favor under a traditional balancing test.

Moreover, it is clearly in the public interest to protect endangered and threatened animals from future takes, in light of "Congress' clear expression of the ESA's broad purpose to protect endangered and threatened wildlife." *Babbitt*, 515 U.S. at 700; *see also Hill*, 437 U.S. at 174 ("Congress intended endangered species to be afforded the highest of priorities."). The temporary relief PETA seeks is therefore clearly in the public interest. Accordingly, PETA has carried its burden in proving that the balance of equities and public interest tip in favor of enjoining further harm, harassment, and wounding of Big Cats.

## CONCLUSION

For the reasons set forth above, PETA respectfully requests that this Court immediately restrain and enjoin Defendants from declawing Big Cat cubs pursuant to Fed R. Civ. P. 65(b).

Dated: September 29, 2017

Respectfully Submitted,

*/s/ Yeny C. Ciborowski*
Brian W. Lewis
Paul Olszowka
Yeny C. Ciborowski
BARNES & THORNBURG LLP
One North Wacker Drive
Suite 4400
Chicago, Illinois 60606
Telephone: 312- 357-1313
*Attorneys for People for the Ethical Treatment of Animals, Inc.*