UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 4:17-cv-00186-RLY-DML |
| WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., TIMOTHY L. STARK, and MELISA D. STARK, | ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**I.  Introduction**

On September 29, 2017, Plaintiff, People for the Ethical Treatment of Animals, Inc. ("PETA" or "Plaintiff"), filed a complaint for injunctive relief against Defendants, Wildlife in Need, Wildlife in Deed, Inc. ("WIN"), Timothy L. Stark, and Melisa D. Stark (collectively "Defendants"), alleging violations of the Endangered Species Act of 1973, 16 U.S.C. § 1531 *et seq.* ("ESA").  On October 4, 2017, the court issued a Temporary Restraining Order restraining Defendants from declawing any of their captive lions, tigers, and hybrids ("Big Cats").  PETA then filed the present Motion for Preliminary Injunction on December 19, 2017.  The court held a hearing on January 24, 2018, in which the court heard evidence and argument.  For the reasons stated below, the court **GRANTS** Plaintiff's motion for preliminary injunction.

1

## II. Background

Before going further, the court pauses to highlight the unusual posture of this case. After the court granted Plaintiff's TRO, Defendants produced very little during discovery. Responding to a motion to compel, Defendants filed a motion to stay, which the Magistrate Judge denied. After a second motion to compel was filed, the Magistrate Judge ordered Defendants to supplement the limited discovery that had been produced. The Defendants did not respond. They also did not respond to Plaintiff's Motion for Preliminary Injunction. It was not until the Magistrate Judge ordered Defendants to respond that they actually responded—unsatisfactorily. Because Defendants constantly spurned Plaintiff's discovery requests and this court's orders, the Magistrate Judge sanctioned Defendants: they were not able to produce any evidence at the hearing including testimony that was not produced in discovery. The court highlights this background because in deciding this motion, the court had very little, if any, evidence to consider on behalf of Defendants. Though it is not their burden to prove a negative (that no violation of the ESA occurred), their unwillingness to produce any discovery (including sit for depositions) leaves the court with only Plaintiff's evidence to consider. With those comments out of the way, the court proceeds to the case.

### A. The Parties

WIN is an Indiana corporation located in Charlestown, Indiana. (Filing No. 1, Verified Complaint at 3, ¶ 13).[1] WIN owns and exhibits the Big Cats that are the subject

---

[1] All of the facts cited in this paragraph and alleged in the Complaint were admitted to by Defendants in their Answer. (*See* Filing No. 23, Answer at 1, ¶ 1).

2

of this litigation. (*Id.*) WIN is operated and overseen by its manager, Mr. Stark, and his wife, Ms. Stark (*Id.* ¶¶ 13 – 15). Specifically, Mr. Stark oversees the day-to-day operations, manages the animal care, acts as the primary care giver for the animals, supervises volunteers, and participates in USDA inspections. (*Id.* ¶ 14). Ms. Stark assists Mr. Stark with all of the tasks. (*Id.* at 3 – 4, ¶ 15). Both Mr. and Ms. Stark reside on the premises of WIN. (*Id.* ¶¶ 14-15).

Plaintiff is a non-stock corporation and animal protection charity incorporated and headquartered in Virginia. (*Id.* at 3, ¶ 12). Plaintiff is dedicated to protecting animals, used in entertainment from abuse, neglect, cruelty, and dangerous public encounters. (*Id.* at 19, ¶ 73; Filing No. 76-1, Declaration of Delcianna Winders at 2, ¶ 4). To achieve its objectives of ending abuse and neglect, Plaintiff pursues several programs, including educating the public about the serious harms that animals suffer when used in public encounters. (Winders Dec. at 2, ¶ 5).

**B.     WIN's Operations**

WIN, among other things, exhibits to the public numerous Big Cats on the premises and charges the public a fee to directly interact with Big Cat Cubs, whose ages range from infancy up to approximately twenty weeks. (Complaint at 5-6, ¶ 25). These encounters are called "Baby Tiger Playtimes" or "Tiger Baby Playtimes." (Filing No. 46-1, Transcript of the October 19, 2017 TRO hearing at 6:6-10, 52:6-7).

Tiger Baby Playtimes are held typically on Fridays, Saturdays, or Sundays. (*Id.* at 52:13-16). Defendants derive a significant amount of operating capital from Tiger Baby Playtime events as they are WIN's single busiest and most lucrative fundraising event.

3

(*Id.* at 100:18-23). Members of the public are asked to donate a fee of $25 per person. (*See* Plaintiff's PI Ex. 8K, USDA Inspection Report January 17, 2014 at 1). This fee allows them to enter a caged room approximately fifteen feet by twenty feet where one to three Big Cat Cubs will be released and allowed to play. (*Id.*). On average, there are about thirty to thirty five people per session. (*Id.*). Defendants' tax records from 2016 indicate that WIN "conduct[s] events and present[s] programs to educate the public about the importance of preservation and conservation of all wildlife and habitats. *These programs reached 32,546 individuals* during 2016." (Plaintiff's Preliminary Injunction Ex. 14G, Defendants' Tax Records at 3) (emphasis added). Big Cat Cubs are exhibited in Tiger Baby Playtimes frequently. (*See* Plaintiff's PI Ex. 8H, USDA Report September 13, 2015 at 2). For example, on September 12 (presumably 2015), Big Cat Cubs were exhibited in eleven thirty-minute sessions with a one-hour break, and some were used for individual photo opportunities outside of the session. (*Id.*).

As an exhibitor of animals, Mr. Stark is required to be, and currently is, licensed by the USDA under the Animal Welfare Act. (*See* Complaint at 6-7, ¶¶ 28-30; *see* TRO Transcript at 32:9-22); (*see also* Filing No. 41-1, License Renewal at 3). However, over the past five years, Mr. Stark has been cited more than fifty (50) times for failing to meet minimum requirements under the AWA. (Complaint at 6, ¶ 28). By way of example, Mr. Stark has been cited for inadequate enclosures (*see* Plaintiff's PI Ex. 35, USDA Inspection Report, February 29, 2012), inadequate feeding, (*see* Plaintiff PI Ex. 34, USDA Report July 27, 2015), and improper handling of animals (*see* Plaintiff's PI Ex. 33, USDA Report September, 13, 2015). In an inspection on March 31, 2017, Mr. Stark

4

was cited for refusing to allow USDA inspectors to inspect the property. (Plaintiffs PI Ex. 14L, USDA Report March 31, 3017). Twice Mr. Stark's license has been suspended, once in 2015, and again in 2017. (Complaint at 7, ¶ 29).

Defendants routinely declaw the Big Cats in their possession. (*See* TRO Transcript at 35:2-6, 93:18-23). In 2016 alone, Mr. Stark declawed "about a dozen cubs." (*Id.* at 85:1-2). Mr. Stark admitted that he declaws tigers because it makes them easier to handle, (TRO Transcript at 84:23-25), and because he "has money," (*see* Plaintiff's PI Ex. 8F, USDA Report March 17, 2017 at 2). Defendants do not declaw Big Cats out of medical necessity. (TRO Transcript at 86:10-13). In its inspection reports, the USDA has noted a number of concerns with Defendants' declawing practice. (*See* Plaintiff PI Ex. 8F, USDA Report March 17, 2017 at 1-2). One USDA report read:

> According to [Mr. Stark] the attending veterinarian completes the declaw surgeries at the facility and not at a dedicated surgical site. The attending veterinarian has a mobile practice. [Mr. Stark] stated that no animal that is declawed receives medication for pain because he doesn't think they are in pain. No record of any pain management or antibiotics were provided by [Mr. Stark]. No written post-operative care was provided to [Mr. Stark]. . . .

(Plaintiff's PI Ex. 8E at 3 ¶ 3). The two Big Cat Cubs, discussed in the report, who had complications from declawing died two months later. (*See id.* at 2-3; Plaintiff's PI Ex. 14A, WIN's Records of Animals on Hand, at 5, lines 4, 5 (identifying two tigers born at WIN on 2/10/17 as deceased on 5/8/17 and 5/9/17, respectively)). Mr. Stark testified at the TRO hearing that the cub did not die from the declawing procedure,[2] (TRO Transcript

---

[2] At the TRO hearing, Plaintiff had not yet been presented with Defendants' Records and thus apparently did not know of the other cub's death.

5

at 79:13-15), but no necropsies were produced to Plaintiff during discovery, (s*ee* Plaintiff PI Ex. 14, Interrogatories at 7). Moreover, Defendants' attending veterinarian explained in the March 17, 2017 USDA report that he believed one of the cubs had a 50 percent chance of living due to the complications. (*See* Plaintiff's PI Ex. 8F at 2).

Defendants have been directed to cease declawing from the USDA. (Plaintiff's PI Ex. 8F at 2 ("Declawing wild/exotic carnivores must no longer be performed.")). However, Dr. James William McDonald, Jr. testified that he declawed five tigers for Defendants in July of 2017.[3] Mr. Stark also testified that if he got authorization to declaw in the future, he would do so. (TRO Transcript at 82:10-11).

C. **Plaintiff's Expert Witnesses**

1. **Jennifer Conrad, D.V.M.**

Jennifer Conrad, D.V.M. is a doctor of veterinary medicine practicing in Los Angeles, California. She holds a Doctorate of Veterinary Medicine from the University of California, Davis, School of Veterinary Medicine. Based on her credentials as outlined in her Declaration (Filing No. 7, Dec. of Jennifer Conrad) and over objection by Defendants at the hearing, the court found Dr. Conrad was qualified as an expert on declawing and the treatment of Big Cats.

Dr. Conrad explained that "declawing" is a surgical procedure, also called onychectomy, in which the animal's distal interphalangeal joints are amputated. (Filing

---

[3] Dr. McDonald also testified that Defendants did not tell him that they had been cited by the USDA and told not to declaw tigers and lions. He further testified that he has no intention or plan to declaw tigers in the future.

No. 7, Dec. of Jenifer Conrad at 3, ¶ 9). It is an irreversible procedure that permanently removes the distal phalanx and severs nerves, ligaments, tendons, and blood vessels. (*Id.* at 12, ¶ 16). When Big Cats are declawed, the last bone of the digit is surgically removed or partially removed so that the claw cannot regrow. (*Id.* at 4, ¶ 9). Dr. Conrad testified that in order to declaw a cat, the bone must actually be removed because cats' claws grow from bone as opposed to human nails which grow from skin. Declawing is ordinarily done by the use of a scalpel blade or laser, but Dr. Conrad explained that both have the same problems because the bone is amputated. Additionally, the use of a laser risks fourth-degree burns to the second phalanx, which not only causes acute pain but may result in osteomyelitis or necrotic bone tissue. (Filing No. 56, Second Declaration of Dr. Conrad, at 4 ¶ 10). She does not know of any literature that supports the proposition that laser declawing is pain or disability free. Dr. Conrad admitted that there is very little difference between declawing a Big Cat and declawing a house cat.

With respect to the effects of declawing, Dr. Conrad testified that animals that have been declawed are in jeopardy of suffering a lifetime of pain. Declawing likely will result in permanent lameness, arthritis, abnormal standing conformation, and other long-term complications. (Conrad Dec. at 5, ¶ 10). Dr. Conrad explained that declawing "robs" animals of comfort and their natural behaviors. She also opined that routine declawing violates acceptable veterinary medical standards, generally accepted husbandry practices, and the medical guidance as developed by the USDA.

Dr. Conrad also explained that in her review of WIN's Medical Treatment Logs, she observed that several of the Big Cats suffer from ringworm, noting that at least four

Big Cats had died from ringworm or from being given an improper does of medicine to treat ringworm. (Conrad Second Dec. at 4, ¶ 11). She testified that ringworm is a fungus and can spread very easily. She described it as an "opportunistic infection." Ringworm is transmitted through open wounds or anomalies in the skin barrier. (*Id.* at 5, ¶ 12). As such, Dr. Conrad testified that declawing could possibly exacerbate the risk of contracting ringworm. She also explained that ringworm, and likewise Big Cats infected with ringworm, could pose health threats to the public during Baby Tiger Playtimes.

2. **Jay Pratte, M.S.**

Jay Pratte, M.S. is the behavioral husbandry and welfare manager at Omaha's Henry Doorly Zoo and Aquarium in Omaha, Nebraska. He has a Bachelors in zoology from the University of Alberta in Canada and a Masters of Interdisciplinary Studies from George Mason University. Based on his 25 years of experience, education, and knowledge, the court found Mr. Pratte was qualified as an expert in animal husbandry and behavior.

Mr. Pratte submitted two declarations and testified regarding the harms Big Cats may suffer from declawing and being exposed during Baby Tiger Playtimes. With respect to declawing, Mr. Pratte explained that Big Cats are born with a set of behaviors, predispositions, and expectations. When they are declawed, the Big Cats experience trauma that causes different stress responses. Over time, the stress responses cause irreparable changes to the animal's physiology, brain, and hormone system, which affects the Big Cats' behaviors. Mr. Pratte opined that Big Cats that have been declawed could have the following behaviors impaired or even eliminated: walking, running, jumping,

8

climbing, and scratching. (Filing No. 8, Declaration of Jay Pratte at 5, ¶ 12). Declawed Big Cats are also limited in defending themselves in social situations or confrontations because they no longer have a natural defense mechanism. (*See id.*).

Mr. Pratte testified and opined on the effects of separating Big Cat Cubs from their mothers. He explained that ordinarily Big Cat Cubs stay with their mothers for at least two years following birth. In these two years, they are nursing, learning, and developing life skills. When the Big Cat Cubs are separated from their mothers, there is an initial trauma followed by the inability to develop appropriate life skills. Mr. Pratte also testified that Big Cat Cubs separated from their mothers can develop more aggressive responses to what would otherwise be normal stimuli. Based on these opinions, Dr. Pratte ultimately concluded that separating Big Cats Cubs from their mothers is not a generally accepted husbandry practice and violates industry standards. (Filing No. 55, Second Declaration of Jay Pratte at 8-9, ¶¶ 20, 23).

Lastly, Mr. Pratte testified and explained in his declaration that Baby Tiger Playtimes adversely affect the behavior of Big Cat Cubs. (*Id.* at 8-18). According to Mr. Pratte, when Big Cat Cubs are subjected to Baby Tiger Playtime, they are subjected to abnormal external stressors of extreme frequency, intensity, and duration. (*Id.* at 9, ¶ 22). Based on his review of the videos taken during Tiger Baby Playtimes, Mr. Pratte observed that the Big Cat Cubs were physically abused and restrained for engaging in completely normal behaviors. (*Id.* at 10, ¶ 24). Mr. Pratte testified that the Big Cat Cubs were clearly distressed, unable to remove themselves from an unnatural situation, and inexpertly and inappropriately handled by Mr. Stark and his staff. (*See id.* at 11). Based

9

on his observations, Mr. Pratte opined that these practices are both long-term and repeated. (*Id.* at 13). He ultimately concluded that Mr. Stark and his staff demonstrate a lack of knowledge of appropriate care and handle the animals inconsistently with generally accepted husbandry practices. (*Id.* at 14-15, ¶¶ 27-29).

## III. Discussion

### A. Legal Standard

"A preliminary injunction is an extraordinary remedy." *Whitaker By Whitaker v. Kenosha Unified School District No. 1 Board of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017) (citation omitted). In order to obtain a preliminary injunction, the plaintiff must show that (1) there is a reasonable likelihood of success on the merits; (2) there are no adequate remedies at law; and (3) irreparable harm will result absent the issuance of a preliminary injunction. *See id.* If the plaintiff is able to carry the burden of the first three elements, then the court will engage in a balancing analysis to determine the harm faced by either party. *Id.*

#### 1. Likelihood of Success on the Merits

There is no requirement that the plaintiff show absolute success on the merits, but there must be a showing that the chances at success are "better than neglible." *Whitaker*, 858 F.3d at 1046 (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999)). This is a relatively low standard to meet. *Id.*; *see also Curtis v. Thompson*, 840 F.2d. 1291, 1296 (7th Cir. 1988).

Section 9 of the ESA makes it unlawful for any person "to take" any endangered species within the United States. 16 U.S.C. § 1538 (a)(1)(B); *People for the Ethical*

*Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.*, No. 17-2148, 2018 WL 434229, at *3 (D. Md. Jan. 16, 2018). "Take" under the ESA means "*harass*, *harm*, pursue, hunt, shoot, *wound*, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (emphasis added). The allegations in the present case focus on whether Defendants harass, harm, or wound the Big Cats.

Regulations promulgated by the U.S. Fish and Wildlife Service ("FWS") [4] further define the terms "harm" and "harass." "Harm" means "an act which actually kills or injures wildlife." 50 C.F.R. § 17.3. "Harm" also includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.* "Harass" is defined as:

> an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. *This definition, when applied to captive wildlife, does not include generally accepted*:
>
> *(1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act*,
>
> (2) Breeding Procedures, or
>
> (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

---

[4] The FWS and the National Marine Fisheries Service ("NMFS") share responsibility in administering the ESA. *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 651 (2007). The parties agree that since the Big Cats at issue are subject to the jurisdiction of the Secretary of Interior, the regulations promulgated by the FWS apply. *See People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F.Supp.3d 1327, 1344 (S.D. Fla. 2016).

11

*Id.* (emphasis added).

Plaintiff alleges two separate "takes" under the ESA: 1) Defendants violate the ESA when they declaw the Big Cats, and 2) Defendants violate the ESA when they use Big Cat Cubs in public encounters, including but not limited to, Tiger Baby Playtime events.

### a) Defendants' Declawing of the Big Cats

Plaintiff has a better than negligible chance to succeed on showing that Defendants harm, harass, and wound the Big Cats by declawing them.

Dr. Conrad explained that declawing permanently removes the distal phalanx and severs nerves, ligaments, tendons, and blood vessels, and she testified that animals that have been declawed are in jeopardy of suffering a lifetime of pain. There is evidence that declawing likely will result in permanent lameness, arthritis, abnormal standing conformation, and other long-term complications. Moreover, Mr. Pratte explained that declawing alters the normal behavior of Big Cats. He explained that declawed Big Cats are not able to climb normally and are also limited in defending themselves in social situations or confrontations because they no longer have a natural defense mechanism.

All of this shows that, at least on this record, declawing "harms" the Big Cats because it actually injures wildlife. *See Kuehl v. Sellner*, 161 F.Supp.3d 678, 716, 718 (N.D. Iowa 2016) (finding the failure to provide timely and appropriate veterinary care to tigers constitutes a "harm" under the ESA); *Graham v. San Antonio Zoological Society*, 261 F.Supp.3d 711, 751 (W.D. Tex. 2017) (finding issue of fact as to whether zoo

harmed elephant by providing enclosure with inadequate shade and shelter from the sun). Moreover, declawing "harasses" the Big Cats because it creates the likelihood of an injury that sufficiently disrupts normal behavioral patterns. *See Kuehl*, 161 F.Supp.3d at 718 (finding social isolation, lack of environmental enrichment, and inadequate sanitation constitutes harassment); *Graham*, 261 F.Supp.3d at 751 (finding issue of fact as to whether zoo harassed elephant by providing enclosure with inadequate shade and shelter from the sun).[5] While "wound" is not defined in the act, it would include the piercing or laceration of skin. *Graham*, 261 F.Supp.3d at 741 n.15. The evidence before the court shows that declawing, at the very least, wounds the Big Cats insofar as declawing lacerates nerves, ligaments, and tendons.[6] Accordingly, because Plaintiff has shown declawing harms, harasses, and wounds the Big Cats, the court finds that Defendants have committed a "take" within the meaning of the ESA.

### b) Defendants' Public Encounters and Tiger Baby Playtimes

---

[5] In *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 879 F.3d 1142, 1149-50 (11th Cir. 2018), the Eleventh Circuit applied a somewhat heightened standard to "harm" and "harass." Specifically, the court held that under the ESA, harm or harassment "is only actionable if it poses a threat of serious harm." *Id.* at 1150. Without deciding if that is the proper standard, the court finds that the evidence presented meets that standard as well especially considering declawing contributed, at least in part, to the deaths of two Big Cat cubs.

[6] Although Defendants did not respond or present evidence at the hearing, Mr. Stark testified at the TRO hearing that he abides by his "Blue Book" (the Animal Welfare Act) and nowhere in the book prohibits declawing. (TRO Transcript at 97:3-25, 98:1). However, the USDA Animal Care Policy Manual, which is publically available, denounces declawing. (*See id.* at 89-90). Moreover, USDA inspection reports direct Mr. Stark to cease declawing and state that "[o]ngoing pain, discomfort, or other pathological conditions may further result from declawing. . . ." (Plaintiff's PI Ex. 8f at 2).

Plaintiff is likewise likely to succeed in showing the Defendants' Tiger Baby Playtimes "harass" the Big Cat cubs within the definition of take in violation of the ESA.

Mr. Pratte testified that when the Big Cat Cubs are separated from their mothers, such as in Baby Tiger Playtimes, they can develop more aggressive responses to what would otherwise be normal stimuli. Based on his review of the videos taken at WIN, Mr. Pratte observed that the Big Cat Cubs were physically abused and restrained for engaging in completely normal behaviors. There is evidence that the Big Cat Cubs were clearly distressed, unable to remove themselves from an unnatural situation, and inexpertly and inappropriately handled by Mr. Stark and his staff. Mr. Pratte ultimately concluded that Mr. Stark and his staff demonstrate a lack of knowledge of appropriate care and handle the animals inconsistently with generally accepted husbandry practices.

The USDA reports indicate that the Big Cat Cubs were physically abused during Tiger Baby Playtimes. (Plaintiff's PI Ex. 33, USDA Report September 14, 2015 at 2). The USDA reports show that Big Cat Cubs were subjected to Tiger Baby Playtimes without adequate rest. As a result, Big Cat Cubs were dragged around because they were too tired. (*See id.*). The reports are evidence that Defendants do not meet generally acceptable husbandry practices when handling or subjecting the animals to Tiger Baby Playtimes.

The evidence shows, again, at least on this record, that Defendants significantly disrupt the Big Cat Cubs' normal behavioral patterns by subjecting them to Tiger Baby Playtimes. *See Kuehl*, 161 F.Supp.3d at 713 (social isolation, lack of environmental enrichment, and inadequate sanitation constitutes "harassment" with the taking provision

14

in violation of the ESA); *see also In re Stearns Zoological Rescue & Rehab Center, Inc.*, AWA Docket No. 15-0146, 2017 WL 1330877, at *3 (Feb. 15, 2017) (USDA Decision) (ordering "baby tiger swim" program to cease and desist because it is not consistent with regulations that provide young or immature animals shall not be exposed to rough or excessive public handling). Accordingly, Plaintiff has shown a likelihood of success in proving Defendants' "take" the Big Cat Cubs by subjecting them to Tiger Baby Playtimes.

### 2. No Adequate Remedies at Law

A plaintiff is further required to show that there are no adequate remedies at law, which can be satisfied by showing that any award would be deficient in light of the harm that will be suffered. *Whitaker*, 858 F.3d at 1046.

Here, Plaintiff does not seek damages, and in fact, as Plaintiff points out, there is no damages remedy available under the ESA for a prevailing plaintiff. Moreover, the court believes that no other adequate remedy at law exists since any other award would be deficient in light of the harm caused by declawing and Tiger Baby Playtimes. *See Whitaker*, 858 F.3d at 1046.

### 3. Irreparable Harm

Irreparable harm requires more than just a mere possibility of harm. *Whitaker*, 858 F.3d at 1045. Harms that are difficult or impossible to reverse meet the definition of irreparable. *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). At least one court has held that "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them,

15

establishing irreparable injury should not be an onerous task for plaintiffs." *Cottonwood Environmental Law Center v. United States Forest Service*, 789 F.3d 1075, 1091 (9th Cir. 2015).

Plaintiff has shown that absent an injunction, irreparable harm will occur. As explained by Dr. Conrad, declawing is an irreversible procedure that permanently removes the distal phalanx and severs nerves, ligaments, tendons, and blood vessels. There is no way to "undo" the surgery once it has been completed. She also testified that declawed animals suffer a lifetime of pain and "robs" them of their natural behaviors. Mr. Pratte testified that declawing impairs normal behaviors such as walking, running, and jumping. The USDA cited Defendants for declawing and directed them to cease declawing, but those directions have gone unanswered. In fact, from what limited medical records were provided, it appears that two Big Cat Cubs died in 2017, and declawing, at least, contributed to their deaths. Despite Defendants' contentions otherwise, and at least on the present record before the court, Plaintiff has made a sufficient showing of irreparable harm.

### 4. Balance of Harms

Ordinarily, a court must balance the harms between the parties at the fourth step of the preliminary injunction analysis. However, in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978), the Supreme Court held that the ESA foreclosed the usual discretion of the district court in deciding the balance of harms. *See also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982); *Cottonwood*, 789 F.3d at 1090 (quoting *Hill*) ("*Hill* held that courts do not have discretion to balance the parties' competing interests in

16

ESA cases because Congress 'afforded first priority to the declared national policy of saving endangered species.'"); *State of Wisconsin v. Weinberger*, 745 F.2d 412, 425-26 (7th Cir. 1984).

Even if that were not the case, Plaintiff has demonstrated significant harms should the injunction not issue. For fear of repeating itself, the court notes that declawing cannot be reversed, and there is evidence that Tiger Baby Playtimes adversely affect the Big Cats' behaviors. With respect to Defendants, at this point, it is difficult to say exactly what the harm is to Defendants because they simply did not present any evidence. Even if there is some harm to the Defendants, at this point, there is plentiful evidence that such harm is outweighed by the harm that would be suffered by Plaintiff, should the court decline Plaintiff's request.

## IV. Conclusion

Accordingly, Plaintiff's Motion for Preliminary Injunction (Filing No. 46) is **GRANTED**.

Defendants are preliminarily **ENJOINED** from declawing any Big Cats during the pendency of this action. For purposes of this Entry, "declawing" means a procedure, surgical or otherwise, also called onychectomy, in which an animal's toe is amputated at the distal interphalangeal joint. Defendants may petition the court for an order permitting the declawing of a specific digit of a Big Cat provided there is a medical necessity for the declawing. In the event that Defendants file such a petition, they must supply the court with a written competent opinion of a veterinary medical doctor attesting to the medical necessity of the declawing.

Defendants are preliminarily **ENJOINED** from using any Big Cat Cubs in public encounters or from prematurely separating Big Cat Cubs from their mothers without medical necessity. In the event of a medical necessity, Defendants must notify the court of the premature maternal separation and must supply the court with a written competent opinion of a veterinary medical doctor attesting to the medical necessity for the separation which may be prepared after the fact in case of an emergency. Defendants, including their employees and volunteers, shall not (a) conduct any "Tiger Baby Playtime" events or (b) otherwise publicly display any Big Cat cub under eighteen months of age in their custody, possession, or control. For purposes of this Entry, "publicly display" includes (a) permitting a person who is not a Defendant or employee to have any physical contact with a Big Cat Cub or (b) a Defendant or employee presenting or handling a Big Cat Cub in any demonstration or presentation.

**SO ORDERED** this 12th day of February 2018.

> RICHARD L. YOUNG, JUDGE
> United States District Court
> Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.