UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
New Albany Division

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,

        Plaintiff

v.                                  Civil Action No. 4:17-cv-00186-RLY-DML

WILDLIFE IN NEED AND WILDLIFE
IN DEED, INC., TIMOTHY L. STARK,
and MELISA D. STARK,

        Defendants

**DEFENDANTS WILDLIFE IN NEED AND WILDLIFE IN DEED, INC.'S,
MELISA STARK'S and TIM STARK'S JOINT RESPONSES
TO PETA'S MOTION FOR SANCTIONS, MOTION FOR CONTEMPT
AND MOTION FOR ORDER REGARDING OWNERSHIP OF BIG CATS**

Now comes the Defendants, Wildlife in Need and Wildlife in Deed, Inc. ("WIN") and

Melisa Stark, by and through the undersigned counsel, and Tim Stark, individually, (jointly

"Defendants"), and submit this Joint Response to *PETA's Motion for Sanctions* [Doc. 218],

*Motion for Contempt* [Doc. 219], *Motion for Order Regarding Ownership of Big Cats* [Doc. 220]

and *PETA's Motion for Order to Show Cause Regarding Jeff Lowe* [Doc. 221].  In support of

their Response the Defendants offer the following.

Because each motion is based upon Mr. Stark's transfer of the Big Cats at issue in this

lawsuit, the response to each overlaps.  For efficiency, Defendants file this single response which

addresses each motion.  Plaintiff's Omnibus Brief is set out in multiple sections.  For consistency

and clarity of the Response Defendants will caption and respond in a like manner.

Further, because portions of Mrs. Stark's, WIN's and Mr. Stark's arguments are

consistent with one another, the Defendants have filed this joint response.  Where a particular

1

Defendant's interests are divergent or inapplicable to the others, the response clearly identifies the individual or entity for which the response should be attributed.  As a *pro se* litigant, Mr. Stark has reviewed this response and concurs in its factual assertions and arguments.

## PRELIMINARY STATEMENT AND REQUEST FOR RELIEF

As a preliminary point of fact, neither Mrs. Stark nor WIN currently have nor have ever had any ownership interest in the Big Cats at issue in this litigation.  As pointed out in their Response to Plaintiff's *Motion for Clarification* [Doc. 205], all of the animals exhibited by WIN were possessed under a USDA license held by Mr. Stark.[1]

Plaintiff's brief referenced back to Defendants' *Answer* [Doc. 23], particularly to Defendants' response to *Complaint* ¶13 [Doc. 1].  The paragraph states, "Defendant Wildlife in Need is an Indiana corporation located at 3320 Jack Teeple Road, Charlestown, IN 47111.  On information and belief, Wildlife in Need owns and exhibits the Big Cats that are the subject of this action."  It is reasonably understood that at the time PETA filed its *Complaint* it assumed that WIN owned the animals in question.  It is also understandable it relied upon WIN's answer which admitted that statement.  Unfortunately, that response was made in error by prior counsel without the input of Defendants.[2]  In point of fact, "Wildlife in Need is a 501c3, nonprofit organization in Charlestown, Indiana dedicated to the rehabilitation & release of indigenous wildlife & provision of safe harbor to an array of exotic & endangered species."[3]

In its *Complaint* Plaintiff stated that Mrs. Stark resided with Mr. Stark at 3320 Jack Teeple Road, Charlestown, IN 47111 and was an officer of WIN, and that is true.  It went on to state that "on information and belief, Mrs. Stark acts on behalf of Wildlife in Need by, among

---

[1] Culotta Declaration Exhibit A – Tim Stark USDA license.
[2] It was not until receiving Plaintiff's Reply brief [Doc. 222] that Defendants realized the error of the response. WIN has consulted with counsel as to what is required to file an Amended Answer.
[3] Culotta Declaration Exhibit B – WIN webpage.

other things, assisting Mr. Stark in overseeing its day-to-day operations, managing animal care, acting as an animal care giver, supervising volunteers, and participating in USDA inspections." That is also true, but what it correctly does not mention is that Mrs. Stark had no ownership interest in the Big Cats. She did not then, does not now, nor has she ever had an ownership interest in the Big Cats.

During these proceedings, through written discovery, through depositions and in response to various motions, Defendants have repeatedly addressed the point that neither Mrs. Stark nor WIN does not now or has ever had any legal authority over those animals. Indeed, any effort on their part to exert ownership or control and engage in the activities alleged by Plaintiff would violate 7 U.S.C.A. § 2131 *et seq*.

On April 11, 2019, when the Big Cats were transferred, neither Mrs. Stark nor WIN possessed a USDA license. All of the ownership and transfer documents regarding the Big Cats in question identify Mr. Stark as the licensed owner. A review of the April 11, 2019, transfer forms clearly indicates that Tim Stark, not WIN or Mrs. Stark, transferred the Big Cats to Jeff Lowe.[4]   Indeed, Plaintiff's Omnibus Brief acknowledges this very fact.[5]

PETA is not without experience in these matters. It has a long history of bringing litigation against private owners and the U.S. Government regarding exotic animals.[6]  Thus, Plaintiff is clearly aware that in order for Mrs. Stark or WIN to have engaged in the activities it asserts against them in its motions - conspiracy, unlawful transfer, willful violation and contempt

---

[4] Culotta Declaration Exhibit C – transfer forms.
[5] Doc. 223, p.1, ¶3.
[6]  *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium,* 189 F.Supp.3d 1327 (S.D. Fla. 2016); *Missouri Primate Foundation v. People for Ethical Treatment of Animals, Inc.,* WL 1420239, Not Reported (E.D. Mo. 2018); *People for the Ethical Treatment of Animals v. United States Department of Agriculture,* 861 F.3d 502 (4th Cir. 2017); *People for the Ethical Treatment of Animals, Inc. v. United States Department of Agriculture, 194 F.Supp.3d 404* (E.D. N.C. 2016); *People for the Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of Western Maryland, Inc.,* WL 434229 Not Reported (D. Md. 2018); *People for Ethical Treatment of Animals, Inc. v. Miami Seaquarium,* 879 F.3d 1142 (11th Circuit 2018).

- not only would they have needed to be licensed pursuant to 7 U.S.C.A. § 2131 *et seq*., but they would also have needed to be the actual owners of the Big Cats.

The Preservation Order required Defendants to "preserve all tangible and documentary evidence relating to (and including) the tigers, lions, and hybrids thereof in their possession, custody and control."  Throughout this litigation PETA has tried to define words or have the law interpreted in the manner it believes should be done, regardless of their actual meaning or interpretation.  The Merriam Webster definition of "preserve" is:

1. to keep safe from injury, harm, or destruction : PROTECT

2a : to keep alive, intact, or free from decay

b : MAINTAIN[7]

Black's Law Dictionary defines "preservation" as "keeping safe from harm; avoiding injury, destruction, or decay; maintenance."[8]

For his part, Mr. Stark contends that Plaintiff errs at the very outset of all its four connected motions by setting their foundation upon a fundamental mistaken belief that Mr. Stark's "transfer of title to all the Big Cats in Defendants' possession to Mr. Lowe" is an "attempt to purge the central evidence in this case."  The transfer was not an "attempt to purge evidence," nor was it a violation of this Court's actual September 18, 2017 *Consent Order Preserving Evidence and Withdrawing Rule 27 Petition* [Doc. 89].  Whatever evidence the animals at issue are here remain preserved.  Plaintiff's motions must all fail as a unit because their underlying premise, that Mr. Stark did not preserve the Big Cats, is unsupportable by the facts.

---

[7] Merriam Webster Dictionary online
[8] Black's Law Dictionary, Sixth Edition

Defendants have continued to take care of the Big Cats. They have been preserved at the Jack Teeple address, and PETA had access and preformed a site inspection on March 22, 2019. The animals remain cared for by the WIN Big Cat team to keep them, as the definition states, free from injury, harm or destruction. The animals have not been destroyed or compromised in any way. Indeed, they are loved and protected by their caregivers as if they were a family pet. That said Mr. Stark did not believe he was and had no intention of violating the Court's Order. If required, Mr. Stark would accept back the Big Cats if the Court instructed him to do so.

Plaintiff's feinted hysteria should not be rewarded by granting its requested relief.[9] Defendants stated in their *Response to Plaintiff's Emergency Motion to Suspend the Case Management Plan* [Doc. 215], that the Big Cats in question remain within the jurisdiction of the Court at the Jack Teeple Road address in Charlestown, IN. The transfer documents state that the Big Cats "will be moved at a later date."[10] Mr. Lowe confirmed to Plaintiff's counsel that he will not move the Big Cats until after this Court has authorized him to do so.[11]

Plaintiff's factual background makes several misleading assertions, as if they were fact, with regard to the care of the Big Cats in Defendants' custody. PETA's agenda is to impose its radical beliefs regarding animal ownership on the United States and the world.[12] Among its intentions is to stop what *it* believes is the exploitation of animals.[13] It seeks to have the Big Cats

---

[9] Defendants will address each request for relief in order of appearance in the omnibus brief as it is raised within this response.
[10] Culotta Declaration Exhibit C.
[11] Culotta Declaration Exhibit D – Lowe letter.
[12] It is likely these beliefs which led the USDA to identify PETA as a "domestic special interest terrorist organization."
[13] Culotta Declaration Ex. E – PETA website pages.

transferred to a reputable wildlife sanctuary; however, several "reputable wildlife sanctuaries" touted by PETA have had their fair share of problems.[14]

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Defendants Do Not Have a Pattern of Obstruction and Defiance

Plaintiff runs off a list of events where Defendants were cited by the Court for prior acts of misconduct in this matter.  Defendants do not dispute that they got off to a rocky start in this litigation.  They were without experience in litigation such as this; they did not understand the process, what they needed to do or why they needed to do it.  As has been noted, Defendants had a poor working relationship with their prior counsel; however, since Mrs. Stark and WIN retained new counsel the Defendants have worked with Plaintiff to resolve many of the differences which existed in the discovery process.  Indeed, until the events giving rise to these motions, the parties had worked together diligently to address each issue and question which arose.

Plaintiff suggests that because Defendants did not seek the Court's clarification of the Preservation Order that somehow they knowingly violated its terms.  As Defendants noted in their *Joint Response to Plaintiff's Motion for Clarification* [Doc. 205], they believed the plain language of the Order spoke for itself.  Plaintiff argues both sides of the argument here.  First it states that the plain language of the Order was clear, but then further in its brief it argues that there were apparent multiple interpretations which necessitated Defendants to seek clarification. The "interpretation" to which PETA sought Defendants to agree, and now this Court to adopt, included provisions not contemplated by the Preservation Order. [15]  Defendants simply refused to allow PETA to impose its will through these clearly bad faith and heavy-handed tactics.

---

[14] This issue will be further briefed if the issue becomes more relevant.
[15] Culotta Declaration Exhibit F – PETA counsel's letter, April 4, 2019

As to the Court's February 12, 2018, Preliminary Injunction [Doc. 89], it prohibited the Defendants from declawing Big Cats, from prematurely separating a cub from it mother without medical necessity and from conducting Tiger Baby Play Time or otherwise displaying a cub younger than eighteen (18) months of age. "Publicly display" was to include "(a) permitting a person who is not a Defendant or employee to have any physical contact with a Big Cat Cub. . . ."[16] Mrs. Stark and WIN have not violated the Preliminary Injunction. Even with the one incident in which Mr. Stark separated a cub as the result of abandonment, there was no allegation that Mrs. Stark or WIN was involved in that incident.

Mr. Stark addressed why he transferred the Big Cats in the *Response to PETA's Emergency Motion to Suspend the Case Management Plan* [Doc.215]. On April 11, 2019, at 2:00 a.m., subsequent to Plaintiff's counsel's overtly aggressive and repugnant and manipulative seven hour plus deposition of Mr. Stark, he understandably succumbed to the extreme stress of such a harsh proceeding and nearly died of a massive heart attack that same evening. He was airlifted to Denton Texas Hospital for emergency surgery. The following day he did what any responsible animal owner would do; he took reasonable steps to ensure his Big Cats would be cared for and managed by a qualified person with access to competent veterinary care. He signed over legal ownership of them to preserve and facilitate that protection of the animals.

Mr. Stark was also under stress, again caused by PETA, to find a new veterinarian for the Big Cats. Mr. Stark believes that Plaintiff tampered with and intimidated two veterinarians, Dr. Richard Pelphrey and Dr. Kurt Oliver, who provided services to the Big Cats. The USDA does not require its own veterinarians to have specialties; however, PETA argues and presses this

---

[16] In its brief Plaintiff defined these acts as "takes" under the ESA, but the Court did not go so far in its Preliminary Injunction to answer the ultimate question which goes to the merits of this case.

Court to adopt that dangerous precedent.[17]  In its Decision and Order regarding Terranova

Enterprises, Inc., a Texas corporation d/b/a Animal Encounters, Inc., The Secretary of

Agriculture noted that "the regulations [referring to 9 C.F.R. §§ 2.40(a) and (b)(2)] do not

specify that a veterinarian must be experienced with the species being examination in order to be

qualified." [18]  Because the tigers had been examined by a licensed veterinarian, the Secretary

determined that the APHIS complaint failed to meet the burden of proving "Violations of 9

C.F.R. §§ 2.40(a) and (b)(2), alleging failure to have Tubbs examined by a qualified veterinarian

at the Fair."[19]

PETA initiated time consuming and expensive litigation against Dr. Pelphery solely for

the purpose, despite what PETA may claim, to intimidate a key witness in this case.[20]  The

litigation was initiated following the institution of the TRO [Docs. 19 & 25] and the preliminary

injunction [Doc. 89] in this case; therefore, no prohibited declawing procedures were occurring.

In exchange for dismissing the action, PETA coerced a Consent Judgment.[21]  The Judgment

enjoins Dr. Pelphrey from providing "any form of veterinary or other medical or surgical care to

any lions, tigers, or hybrids or any other felidae listed as Endangered or Threatened under the

Endangered Species Act ("ESA").[22]  This directly conflicts with the holdings and beliefs of the

United States Department of Agriculture which is tasked with the oversight of the ESA.  PETA

knows this is a stretch and is using this Court to further its fraudulent agenda that only

veterinarians with specialized training have the requisite ability to provide care to Big Cats.  That

---

[17] Culotta Declaration Exhibit G - USDA website
[18] Culotta Declaration Exhibit H - *In re: Terranova Enterprises, Inc., a Texas corporation d/b/a Animal Encounters, Inc., et al.*, United States Department of Agriculture Before the Secretary of Agriculture, Docket Nos. 09-0155 and 10-0418 at p. 53.
[19] Id. at p. 68.
[20] 4:18-cv-00163 RLY-DML
[21] Ex. I – Doc. 9
[22] *Id.*

is simply a falsity PETA hopes to perpetuate so that in cases such as this one it can convince courts like this one that specialized training is necessary.  It is not nor is it required.

Then, following the engagement of Dr. Oliver he was subpoenaed for deposition on March 21, 2019.  While it was with Plaintiff's right to subpoena Dr. Oliver, as with Dr. Pelphrey, it perpetuated the falsity that he was not qualified to care for Big Cats.  Since that date Dr. Oliver has been unresponsive to efforts to contact him.  Both acts were clearly intended to have a chilling effect on the doctors.  Due to his health issues and PETA's actions against his veterinarians, Mr. Stark reluctantly transferred his Big Cats on April 11, 2019.[23]  Mrs. Stark and WIN had no knowledge of the transfer until the drafting of the Response to the Motion for Clarification, and, as noted above, they had no ownership or control over the Big Cats to prevent the transfer.

Plaintiff insinuates that Mr. Stark gave false and misleading testimony during the hearing for a Temporary Restraining Order because at the hearing he testified that he does not purchase lions and tigers, but in his deposition he acknowledged that he has purchased hybrids.  The particularly important distinction is hybrids.  Unlike tigers and lions, the law places no restrictions on Mr. Stark regarding the purchase of hybrids.

### B.       Defendants and Mr. Lowe Do Not Lack Credibility

Plaintiff makes multiple statements regarding the character of Mr. Lowe and Mr. Stark. It makes no allegations regarding Mrs. Stark, and the only thing that Plaintiff can reference regarding WIN is two website postings.  It notes that "Defendants and Mr. Lowe share a deep disdain for PETA."   It is apparent from PETA's website that the feeling is mutual.[24]  The articles are based less in fact and more in salacious propaganda designed to create fervor within its

---

[23] Culotta Declaration Ex. C – Transfer documents.
[24] Culotta Declaration Exhibits J – PETA website articles

membership.  It constantly refers disparagingly to WIN and Mr. Lowe's facility as "roadside

zoos."  PETA calls upon its members to target these institutions and their owners.

It misstates or takes matters out of context for the purpose of placing Defendants in a bad

light before this Court, such as those expressed in footnote four, which feeds the bad blood and

ill will Defendants have toward PETA.  The USDA Complaint referenced is a pending matter

involving Mr. Stark and WIN before the Secretary of Agriculture.  Mrs. Stark is not a party to

that action.  Mr. Stark and WIN dispute all of the allegations.  A hearing has occurred and a

briefing schedule has been issued, but the Secretary has not ruled on the allegations.  Despite

these facts, Plaintiff addresses the matter as if an adverse ruling has been issued against Mr.

Stark and WIN.  Mr. Stark and WIN reasonably believe they will prevail in that matter.

### C.    Defendants and Mr. Lowe Did Not Willfully and Knowingly Violated this Court's Preservation Order.

Plaintiff correctly states that Mr. Stark transferred title of the Big Cats to Mr. Lowe on

April 11, 2019, but once again it intentionally attributes their ownership to all Defendants.

Regardless of how many times Plaintiff wants to repeat the knowingly false statement that all

Defendants owned the Big Cats it still does not make it so.  It is analogous to one individual

laying claim to another's car.  The title and registration evidence the true owner.  In this case,

carrying through with the analogy, the title and registration of all the Big Cats in question was

held by Mr. Stark under his USDA license.  As addressed above and presented *ad nauseam* to

Plaintiff, only Mr. Stark had ownership of the Big Cats and only Mr. Stark had the ability and

right to transfer them.  It has also been addressed above that the answer to Complaint ¶ 13 is not

correct.  Defendants intend to seek leave of court to correct the record.

The transfer documents were originally attached to Defendants' May 14, 2019, Response

for Clarification of the Preservation Order [Doc. 205-19] and formally produced to Plaintiff on

May 23, 2019.  Mrs. Stark and WIN acknowledge that the forms are difficult to read, but they have produced all that they have in their possession.  And while the forms are difficult to read, they clearly evidence that Mr. Stark, not Mrs. Stark or WIN, transferred the animals.  Further, while the forms are difficult to read, it is clear from Plaintiff's filing that they were legible enough for PETA to discern that they included all 23 Big Cats owned by Mr. Stark.  Plaintiff correctly reads the transfer forms to state that the animals "will be moved at a later date."

PETA further speculates where they may go, but that is up to Mr. Lowe.  Plaintiff knows that no Big Cat has been physically transferred.  It disingenuously neglects to acknowledge the importance of this fact; instead, PETA artificially and without support predicts that the animals "would be transferred to Oklahoma" due to the new owner's license restrictions.  The USDA allows licensees to own an animal that resides elsewhere for among other reasons on loan for exhibition or for breeding.  Moreover, according to Mr. Lowe's letter, he is more than willing to patiently and responsibly wait for the Court's express ruling on any specific issue about the Big Cats.  The animals continue to remain well cared for and in good condition within this Court's jurisdiction.

For all of Plaintiff's dramatic exhortations, no fact finder has ever actually determined in this case that any animal has ever been harmed in any manner.  Defendants adamantly deny that allegation and believe at trial the evidence would prove to the contrary - that the Big Cats are happy, healthy, loved, provided for, and perfectly safe, bonded to their caretakers.

Plaintiff intentionally misstates the bases upon which Mr. Stark transferred the Big Cats. It is true that Mr. Stark has recently experienced significant health issues, specifically a heart attack on April 11, 2019.  However, it's further statement because "Defendants' failure to employ an attending veterinarian to care for the Big Cats" is a complete misstatement of the

explanation provided in Doc. 205 at 9.  Plaintiff makes the broad sweeping statement that "Defendants concede that they are unable to provide the Big Cats with adequate care." Defendants concede nothing.  Plaintiff does not elaborate on what it considers to be "adequate care" because it knows what it wants and what the USDA requires are two different things.  This is how PETA attempts to impose its beliefs on society, by making such broad statements and then trying to control the dialogue.

Also, as explained in their Response to Plaintiff's Motion to Clarify [Doc. 205], while Dr. Oliver has been difficult to reach, he has not resigned his position as the veterinarian for the Big Cats.  Further, as in the past, WIN has relationships with other veterinarians who have and can provide care if necessary.  Additionally, while it is true that Mr. Stark and Mr. Lowe have spent time in Oklahoma, Mr. Lowe has a relationship with a veterinarian who he could send to Indiana if necessary to provide on the spot care.[25]

Finally, WIN has a Big Cat team which provides daily care for the animals.  If something were observed which needed a veterinary consult or visit, the team has the resources to get the Big Cats the attention they need.

### D.      Mr. Lowe's Control Over the Big Cats Does Not Threaten Their Safety and Well-Being.

Defendants cannot speak for Mr. Lowe, but Plaintiff's characterization of Mr. Lowe as a "Big Cat hoarder" is clearly intended to taint the Court against him as if he is incapable of taking care of his Big Cats simply by the volume of those in his possession.  PETA has already acknowledged that Mr. Lowe has a disdain for it, and it is apparent from events in this and prior litigation that PETA feels the same towards him.[26]  At the same time PETA calls Mr. Lowe an animal hoarder it touts the placement of Big Cats following the Dade City case.  Those animals

---

[25] Culotta Declaration Exhibit K – Lowe email to APHIS representative.
[26] Culotta Declaration Exhibit J

12

were sent to the Wild Animal Sanctuary operated by Pat Craig.  According to his website, Mr. Craig has over 450 tigers, lions, wolves and bears, far more than Mr. Stark or Mr. Lowe combined.[27]

PETA raises a concern that it would have to create "an extensive photographic inventory from publicly available photographs" of the Big Cats in this matter if they were transferred to Oklahoma.  In addition to the undercover operatives PETA sent to WIN, Plaintiff conducted a four plus hour site inspection during which it had a videographer and still photographer presumably document every aspect of the Big Cats.  If at any point Plaintiff seeks additional access to the Big Cats for this reason, that request should be denied.

Despite PETA's claim that Mr. Lowe is "highly motivated to transfer the Big Cats to Oklahoma," he has made clear to both PETA and the Court that he will not move the animals until the Court grants him permission to do so.[28]

Defendants will not weigh in on whether or not Mr. Lowe would be able to qualify for a license.  However, Defendants take offense at PETA's clear effort to disparage them before this Court.  As pointed out before, PETA raises the USDA Complaint as if the allegations have been proven true.  They have not, and Mr. Stark and WIN dispute every allegation.  WIN contends that its facility will be found in compliance with USDA requirements and that the allegations will be dismissed in their favor.

PETA expresses concern for the care and safety of the Big Cats, and argues here that declawing causes harm and is a "take" under the Endangered Species Act.  And yet, PETA advocates for or at least has no objection to the spay and neuter of Big Cats, an act which not

---

[27] Culotta Declaration Exhibit L – The Wild Animal Sanctuary website.
[28] Culotta Declaration Exhibit D – Lowe letter

only requires an extremely invasive procedure, but is also guaranteed to speed the course of extinction.[29]

## ARGUMENT

In essence, *PETA's Motion for Sanctions* [Doc. 218], its *Motion for Contempt* [Doc. 219] and its *Motion for Order Regarding Ownership of the Big Cats* [Doc. 220] are all variations of contempt motions with the same proposed sanction.[30]  Plaintiff seeks the Court find Defendants in contempt and as a sanction issue a default judgment and order removal of the Big Cats. Because Defendants' arguments against the motions will overlap, as did Plaintiff's arguments in support, unless referenced separately, Defendants will address each in a cumulative fashion.

A reading of *PETA's Emergency Motion for Preservation Order* [Doc. 216] and its *Motion for Order to Show Cause Regarding Jeff Lowe* [Doc. 221] appear directed only to Mr. Lowe.  Per the Court's Order [Doc. 227] Defendants filed a *Joint Response to Plaintiffs Emergency Motion for Preservation Order* [Doc. 229] on May 31, 2019.  Defendants will not provide any further response to that motion or to the Motion to Show Cause other than to say that they take issue with any allegations of wrongdoing on their parts, and as necessary they will address those allegations.  Further, Defendants want to make clear that they will comply with any order of the Court.

### I. Defendants Should Not Be Sanctioned for Willfully Violating the Preservation Order and Jeopardizing the Integrity of these Proceedings.

Mrs. Stark and WIN have not individually or collectively engaged in any act of "contempt," "conspiracy" or "willful violation" of "this Court's Consent Order Preserving Evidence and Withdrawing Rule 27 Petition, in *PETA v. Wildlife in Need and Wildlife in Deed,*

---

[29] Culotta Declaration Exhibit M – T. Stark email to PETA counsel.
[30] Doc. 223, p. 2

*Inc., et al.*, Case No. 4:17-mc-00003-RLY-DML ECF No. 27 (S.D. Ind. Sept. 18, 2017)

("Preservation Order")."

For his part, Mr. Stark does not believe his transfer of the Big Cats was a violation of Preservation Order.   For the reasons expressed herein, Mrs. Stark, WIN and Mr. Stark do not believe that individually or collectively they have acted in a manner which would subject them to a contempt order and sanctions.

### A.     The Court May Issue a Default Judgment to Sanction Defendants' Bad Faith, Willful Misconduct Under Its Inherent Authority.

Defendants are aware that the district court's inherent powers include the authority to fashion an appropriate sanction for conduct which abuses the judicial process.[31] Defendants acknowledge that while the Court has had to weigh in on the discovery process due to their actions, they argue that the actions were not the result of willfulness, bad faith or a disregard for their responsibilities in this litigation.

Plaintiff argues that Mrs. Stark and WIN have not been candid with it or the Court, withholding evidence of the transfer while it engaged in costly pre-trial preparation.  None of the examples Plaintiff cites, with the exception of an opinion offered by Mrs. Stark during her deposition, relate to Mrs. Stark or WIN.[32]  Mrs. Stark and WIN have remained in Indiana while Mr. Stark is working in Oklahoma.  They have no independent knowledge of the information sought by Plaintiff through its Second Set of Interrogatories and based their responses upon questions to and information they received from Mr. Stark.[33]  Even when asked to speculate, Mrs. Stark testified that she had no knowledge or information regarding Red River Safari.[34]

---

[31] *Fuery v. City of Chicago*, 900 F.3d 450, 452 (7th Cir. 2018) citing Goodyear *Tire & Rubber Co. v. Haeger*, —U.S. —, 137 S.Ct. 1178, 1186, 197 L.Ed.2d 585 (2017) (internal citations omitted).
[32] Doc. 223, p. 13 and fn 11.
[33] Culotta Declaration Exhibit N – M. Stark depo. p. 42, ll. 3-8.
[34] Culotta Declaration Exhibit N – M. Stark depo. p. 23, 24, 29, 40, 42 and 43.

Further, Mr. Stark has not provided any information regarding Red River Safari to the WIN Board of Directors.[35]  Even a search of the Oklahoma Secretary of State website retrieves no filings for an entity called Red River Safari.  Plaintiff is simply frustrated that Mrs. Stark and WIN will not accept what it presents to them and agree to the existence of an entity called Red River Safari.   Contrary to what Plaintiff wishes to believe regarding the communication between Mr. and Mrs. Stark, he has discussed nothing of Red River Safari or the transfer with her.

Mr. Stark argues that his transfer in no way impairs Plaintiff's experts' ability to prepare their reports.  It does not affect Plaintiff's core purpose of the litigation, that he committed "takes" in violation of the ESA and PETA's effort to remove the Big Cats from his possession.  The purpose of the experts remains the same; thus the scope of their reports and testimony remains unchanged by the transfer.  Mr. Lowe did in fact bring transfer documents to the hospital.  There is nothing sinister in that fact.  Mr. Lowe's business involves Big Cats.  He is licensed to own Big Cats.  He is a friend of Mr. Stark and agreed to accept them in an effort to help him out.

The Seventh Circuit has a well-established policy favoring a trial on the merits over a default judgment.[36]  It further has a policy that default judgment should be of last resort and it is appropriate only when a party willfully disregards the pending litigation.[37]  Default judgment is an "extreme sanction that should be used only as a last resort."[38]  Before imposing the sanction of a default judgment, the Seventh Circuit requires a finding of willfulness, bad faith, or fault.[39]  Even if the court makes such a finding, the sanction chosen must be proportionate to the

[35] Culotta Declaration Exhibit N – M. Stark depo. p. 24, ll. 23-25, p. 25, ll. 1-8.
[36] *C.K.S. Eng'rs, Inc. v. White Mountain Gypsum Co.,* 726 F.2d 1202, 1205 (7th Cir.1984).
[37] *Sun v. Bd. of Trustees of Univ. of IL,* 473 F.3d 799, 811 (7th Cir. 2007).
[38] *Robinson v. Champaign Unit 4 Sch. Dist.,* 412 F. App'x 873, 877 (7th Cir.2011).
[39] *In re Thomas Consol. Indus. Inc.,* 456 F.3d 719, 724 (7th Cir.2006).

circumstances.[40]  For these reasons, a default judgment should be used only in extreme situations, or when other less drastic sanctions have proven unavailing.

Plaintiff's statement, "[H]ere, to deny PETA a significant portion of the remedy it seeks, Defendants enlisted Mr. Lowe to assume legal control of the evidence that the Court has ordered preserved," sounds of its desire to inflict punishment rather than seek justice.  A substantial element of PETA's prayer for relief was to removal the Big Cats from Mr. Stark.  That has occurred.  Now it appears that PETA may be concerned that following the appointment of a special master or guardian ad litem, as it has also requested, and following a review of Mr. Lowe's credentials and facility, his maintaining of the Big Cats may be determined to be in their best interest.

**B.  Defendants' Have Not Defied the Court's Order, Thus No Sanction is Necessary.**

In this section of its Omnibus Brief Plaintiff suggests that "Defendants" could purge themselves of contempt by simply taking back the Big Cats.  As has been addressed, and will continue to be so, Mrs. Stark and WIN have no ability to engage in the course of action suggested.  Even if it were to be considered, neither Mrs. Stark nor WIN has a USDA license under which they could accept the animals.

As for Mr. Stark, while he certainly is "determined to deny PETA the relief it seeks," his intent is to demonstrate that it is not entitled to the requested relief after a trial on the merits of the claims.

Plaintiff repeats the statement that "Tim Stark is unable to provide care for the Big Cats because of his health," and while it is true that Mr. Stark suffered a heart attack, as pointed out above, WIN has capable volunteers who love and have bonded with the Big Cats that will continue to care for them.

---

[40] *Collins v. Illinois,* 554 F.3d 693, 696 (7th Cir.2008).

17

**C.**     **The Court Should Not Order the Big Cats Transferred to Reputable Sanctuaries.**

As pointed out above, PETA comments disparagingly that Mr. Lowe is a self-proclaimed animal hoarder, but according to its website The Wild Animal Sanctuary owned and operated by Pat Craig has over 450 tigers, lions, wolves and bears.[41]  Other "sanctuaries" for which PETA has expressed support likewise have troubled pasts which will be addressed further if and when it becomes necessary to do so.

**D.**     **Defendants Should Not Be Required to Compensate PETA for All Costs Incurred Since the Unlawful Transfer Through the Adjudication of this Motion.**

In this section Plaintiff seeks reimbursement for fees and expenses it chose to incur following the transfer of the Big Cats.  As has been addressed above, neither Mrs. Stark nor WIN had the ability to transfer or stop the transfer of the Big Cats.  Indeed, again contrary to what PETA wishes to believe, Mrs. Stark and WIN were completely without knowledge of the transfer until they were preparing their response to Plaintiff's Motion for Clarification.

In addition to legal fees, Plaintiff also seeks expert expenses possibly expended.  As addressed above and in their *Response to Plaintiff's Emergency Motion to Suspend the Case Management Plan* [Doc. 215], the purpose for which the experts have been retained is unchanged with the transfer of ownership from Mr. Stark to Mr. Lowe.  Plaintiff's claim was that Tiger Baby Playtime, the declawing and the public interaction were all "takes" under the Endangered Species Act.  Those three issues along with Plaintiff's intended relief, the removal of the Big Cats, remain unchanged.  Should this matter proceed to a trial on the merits, as Defendants hope that it will be allowed to do, Plaintiff's burden remains the same.  Their experts will still be required to prove that Tiger Baby Playtime, declawing and the public interaction all are "takes" under the Act.

---

[41] Culotta Declaration Exhibit L – The Wild Animal Sanctuary website.

PETA claims that the payment of expert fees would compensate it for the "spoliation of evidence central to this suit." In order for spoliation to occur the evidence must cease to exist or be altered to such a degree that it can no longer be used for the purpose for which it is needed. Indiana courts define spoliation as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence, usually a document."[42] Crucially distinct from the erasure or deletion of a computer file, or the burning or disassembly of a vehicle or record, the animals here have not been "destroyed," nor has Mr. Stark "failed to preserve" any animal. Indeed, the reason Mr. Stark never moved to clarify or set aside the Preservation Order was because he intended and has followed it.

PETA cites several cases it claims stand in opposition Mr. Stark's argument that his transfer has no impact on Plaintiff's goal and that the transfer spoliated evidence. Unfortunately for Plaintiff, in reviewing each case they are factually distinguishable. *Monsanto Prod. Supply LLC v. Rosentreter* addressed discovery issues in which Rosentreter destroyed the evidence he was ordered to preserve and to which Monsanto had been ordered access.[43] Here, not only have the Defendants preserved the Big Cats, PETA has conducted a site inspection for the purpose of observing the animals. Likewise, in *Cooper v. United Vaccines, Inc.*, pre-litigation the plaintiff destroyed vaccines which she contended failed to protect her mink herd. The Court determined that without the ability to test the very item which the plaintiff alleged caused the harm she had failed to preserve evidence essential to her claim.[44] Again, the Big Cats remain where they have always been, on Jack Teeple Road in Charlestown, Indiana.

---

[42] *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005), quoting *Cahoon v. Cummings,* 734 N.E.2d 535, 545 (Ind.2000) (quoting Black's Law Dictionary 1409 (7th ed.1999)).
[43] No. 3:16-cv-3038, 2016 WL 4197573, at *3-*6 (C.D. Ill. Aug. 9, 2016)
[44] 117 F. Supp. 2d 864, 874 (E.D. Wis. 2000)

PETA's *ad hominem* speculation does not satisfy the standard of showing willfulness or confirm that the allegedly relevant evidence, namely the Big Cats, were "destroyed," out of a specific malicious intent to put all beyond the reach and inquiry of the fact-finder.  Hyperbole alone cannot substitute for the direct evidence required to demonstrate such malicious intent.

When bringing a claim of spoliation, it is the movant's burden to prove the intentional destruction, mutilation, alteration, or concealment of evidence.[45]  It is not Mr. Stark's burden to prove that he did not spoliate evidence.  Here, PETA has offered no evidence which can carry its burden.  The Big Cats have not been destroyed.  They remain preserved at the Jack Teeple address, within the jurisdiction of this Court.  Further, PETA has had access and performed a site inspection on March 22, 2019.  The animals remain in the loving care of the WIN Big Cat team. With the exception of the transfer from Mr. Stark to Mr. Lowe, nothing regarding the Big Cats has changed between September 29, 2017, when Plaintiff filed its Complaint, and the date of this Response, June 5, 2019.  There has been no spoliation.

## II.     This Court Should Not Hold Defendants in Contempt Or Order Mr. Lowe to Show Cause Why He should Not Be Held In Contempt.

### A.     Defendants Should Not Be Held In Contempt for Violating the Court's Preservation Order.

Plaintiff seeks the Defendants be held in contempt for failing to comply with the Preservation Order.  "This circuit's case law requires the party seeking sanctions to demonstrate that the opposing party is in violation of a court order by clear and convincing evidence."[46]  In this instance, PETA would have to present clear evidence that 1) the Preservation Order presented an unambiguous command, 2) that Mrs. Stark, WIN and Mr. Stark violated that command, 3) that the violation was significant, and 4) that they failed to take steps to reasonably

---

[45] *Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013)
[46] *Bailey v. Roob*, 567 F.3d 930, 934–35 (7th Cir. 2009), citing *SEC v. Homa*, 514 F.3d 661, 676 (7th Cir.2008).

and diligently comply with the Order.[47]  Under this standard there can be no showing that the

Defendants engaged in activity which would evidence contempt.

    For their parts, neither Mrs. Stark nor WIN offers that the Preservation Order does not

apply to them.  Indeed, for their part they have complied with the Order to its fullest.  While Mr.

Stark has been in Oklahoma Mrs. Stark and WIN have preserved the health and safety of the Big

Cats.  They have made sure that the Big Cats are fed and that any health or other needs are

addressed.  Additionally, per the Order, they have maintained all tangible and documentary

evidence related to the Big Cats that is in their care, custody and control.

    To go back to the car ownership analogy, unlike a simple piece of paper, video or other

forms of documentary or tangible evidence, the Big Cats are owned pursuant to a license.

Neither Mrs. Stark nor WIN had the ability to affect the transfer.  Had they known about it at the

time it was occurring they may have been able to address it with Mr. Stark and he may have

decided differently, but PETA cannot mistake influence as equating to control.  Neither Mrs.

Stark nor WIN controls the ownership of the Big Cats.

    Plaintiff argues that "Mr. Stark is the executive officer of the corporate defendant." That

is true, but Mr. Stark needed neither Mrs. Stark's or WIN's assistance or approval to make the

transfer.  The Big Cats were Mr. Stark's sole property to do with what he wished.  For the things

they can control, Mrs. Stark and WIN have complied with the Preservation Order by maintaining

all tangible and documentary evidence related to the Big Cats.  Even since the transfer Mrs. Stark

and WIN have preserved the Big Cats as the term was defined *supra*.

    Contrary to PETA's position that WIN is all about exploiting the Big Cats, its mission is

much greater.  WIN's purpose is to "promote wildlife welfare, safe handling and educat[ion]."[48]

During her deposition Mrs. Stark was asked:

---

[47] *Id.*

21

```
18        Q     If WIN's animals were moved, would you need
19   the board of directors to tell you whether that would
20   affect WIN or not?
21        A     Well, WIN has its own mission.
22        Q     What is WIN's mission?
23        A     We believe in education to the public.
24        Q     How does WIN provide that education?
25        A     In many different forms.

1         Q     What are those forms?
2         A     Public outreach, phone services for animals in
3    need, educational programs with schools, and boy scouts,
4    girl scouts, churches, nursing homes, adult disability
5    living residences.  There's lots of different things.
6    Lots of different things.
7         Q     Do these programs involve WIN's animals?
8         A     Sometimes yes, sometimes no.  It depends on
9    what the program is centered around.[49]
```

Mr. Stark reasonably believes that his actions were not in violation of the Court's

Preservation Order.  The Big Cats continue to be preserved and maintained at the Jack Teeple

location within the Court's jurisdiction.

### 1.    The Preservation Order Did Not Unambiguously Required Defendants to Retain Possession, Custody, and Control Over the Big Cats They Possessed When the Order Was Issued.

One thing Plaintiff states is correct, "the Preservation Order could not be clearer."[50]  The

Preservation Order required Defendants to "preserve all tangible and documentary evidence

relating to (and including) the tigers, lions, and hybrids thereof in their possession, custody and

control."  Contrary to PETA's intentional misstatement of the Order, it does not state that Mr. Stark

must "retain possession," i.e., ownership, of the Big Cats.  That could equate to an onerous burden if,

as in this case, Mr. Stark's health complications resulted in his death, and if that were to occur,

neither Mrs. Stark nor WIN would have the legal ability to maintain the animals.  Once again, as it

has tried to do throughout this litigation, Plaintiff has taken plain language and tried to manipulate

---

[48] Culotta Declaration Ex. B – WIN website page.
[49] Culotta Declaration Exhibit N – M. Stark deposition p. 26, l 18-25, p. 27, ll. 1-9.
[50] Doc. 223, p. 17, ¶4

and morph it into something PETA wants it to say and mean.  It is clear that Plaintiff's desire is to modify the plain language of the Order rather than see it clarified.

The Seventh Circuit has an established rule that when:

> deciding whether a motion is in substance one to clarify or to modify an injunction we should consider whether it raises new substantive issues or material which has not been argued or presented rather than merely repetitive arguments stemming from a motive to relitigate issues which have been decided. *United States v. City of Chicago,* 534 F.2d 708, 711 (7th Cir.1976); *Squillacote,* 534 F.2d at 750; *see also Merrell-National Labs,* 579 F.2d at 791.[51]

Here it is clear that PETA seeks the Court to modify its prior Orders by expanding the language beyond its original scope to comport with what Plaintiff wants it to read.  Plaintiff's draft proposed order attached to its Motion to Clarify [Doc. 201-1] sought a modification.  This expansion, to include retaining ownership, goes even further beyond the four corners of the Order.

Plaintiff cites *F.T.C. v. Trudeau* for the proposition that willfulness is not a requirement of contempt; rather, it may be found if a "party has not been reasonably diligent and energetic in attempting to accomplish what was ordered."[52]  As the definitions of "preserve" and "preservation" make clear, the Order requires Defendants to keep the Big Cats safe from injury, harm or destruction. That is what they have done.

Plaintiff insinuates that because Defendants did not ask the Court for modification or clarification of the Preservation Order that somehow they acted with peril.  Again, neither Mrs. Stark nor WIN could cause or prevent the transfer from occurring.

Mr. Stark believed he was acting within the Order when he transferred the Big Cats.  Mr. Stark believes that animals, unlike documents, photos or other evidence cannot be considered tangible evidence because they cannot be maintained in a static state.  They are ever changing

---

[51] *Buckhanon v. Percy*, 708 F.2d 1209, 1213 (7th Cir. 1983)
[52] *F.T.C. v. Trudeau*, 579 F.3d 754,763 (7th Cir. 2009).

and thus what is available in one state today will not be that way tomorrow.  Case in point is a

cub growing through juvenile to adulthood.  The *Monsanto* and *Cooper* cases PETA cites, and

addressed above, are not comparable to the case at bar.  Mr. Stark did not destroy evidence.  He

has preserved it as the Order required.  The Big Cats remain safe within the Court's jurisdiction.

### 2.    Defendants Did Not Violate the Preservation Order

In this section Plaintiff acknowledges what it has known all along, that at the time the

Preservation Order was entered the Big Cats were held under Mr. Stark's license.  Only Mr.

Stark had the authority and right to transfer the animals.  Regardless, the Big Cats' health and

safety has been preserved since the Order was issued on September 18, 2017.

### 3.    Defendants' Have Not Violated the Preservation Order

Once again, Plaintiff seeks to expand the true meaning of the Preservation Order to

include ownership.  Mrs. Stark and WIN have complied with the Order to its fullest by

preserving the health and safety of the animals.  Plaintiff argues that Mrs. Stark and WIN should

have demanded that Mr. Stark not transfer the Big Cats, that if they had demanded somehow it

would have made a difference.  That is simply not the case, especially since they did not become

aware of the transfer until several weeks after it had occurred.  And, contrary to Plaintiff's

assertion that after learning from PETA about what it had gleaned from Facebook postings, Mrs.

Stark and WIN did inquire of Mr. Stark the nature of Red River Safari, that also is not true.  Mrs.

Stark was asked about that conversation in her deposition, and over the objection of counsel she

stated:

```
14        Q     Has Tim Stark ever spoken to you about
15   Red River Safari?
16            MR. CULOTTA:  I'm going to object to the extent
17        that it invokes or that it may get into issues
18        regarding the marital privilege.  If she wants to
19        answer, she can. But it might -- the line of
20        questioning may go somewhere where we get into
21        privileged information, but you can answer if you
```

24

```
22          choose to.
23          A    Can you repeat the question?
24   BY MR. SMITH:
25          Q    Has Tim Stark ever discussed Red River Safari
 1   with you?
 2          A    Very little.
 3          Q    What has he said?
 4               MR. CULOTTA:  I'm going to object to the extent
 5          that it -- this is all trying to get into possibly
 6          privileged communications.  Can we go off for a
 7          minute and I can explain to her -- step out for a
 8          second and I can explain to her what that all means,
 9          and she can decide how she wants to approach?
10               MR. SMITH:  Off the record.
11               VIDEOGRAPHER:  The time is 10:35.  We are --
12                        (OFF THE RECORD)
13               VIDEOGRAPHER:  It's 10:38.  We are back on the
14          record.
15          A    Can you ask her to read it back?
16   BY MR. SMITH:
17          Q    Sure.
18               MR. SMITH:  I'm going to ask the court reporter
19          to read back the prior question.
20               (REPORTER PLAYS BACK REQUESTED TESTIMONY)
21          Q    What has Tim Stark told you about Red River
22   Safari?
23          A    That it doesn't exist.
24          Q    Is that the sum total of his communications to
25   you about Red River Safari?
 1          A    Pretty much.
 2          Q    Is it entirely the sum?
 3          A    Well, like when I got notification of a post,
 4   you know, I inquired and his response was, "It doesn't
 5   exist."
 6          Q    Those exact words?
 7          A    Yes, sir.
 8          Q    Any other words?
 9          A    No.
10          Q    Do you have any involvement in this operation?
11          A    No.[53]
```

As pointed out, even as of the filing of this Response the Oklahoma Secretary of State's Office

has no listing of any entity called Red River Safari.[54] Having found nothing from the Secretary

of State evidencing that the entity exists, and having directly inquired of Mr. Stark about the

existence of Red River Safari, Plaintiff now suggest that there was even more that Mrs. Stark and

---

[53] Culotta Declaration Exhibit N – M. Stark deposition p. 22, l18 through p. 24, l 11.
[54] Culotta Declaration Exhibit O – Oklahoma Secretary Of State web search for "Red River Safari."

WIN could and should have done to prevent the ownership transfer.  Mrs. Stark and WIN ask what Plaintiff proposes they should have done – lock Mr. Stark in a room with no contact with the outside world?  Mrs. Stark and WIN understand that PETA is trying to paint them as having enabled the transfer, but the argument is simply nonsensical given the nature of how these transactions take place. It was a paper transfer.  It is not as if someone pulled a truck up to 3320 Jack Teeple Road and began loading the animals.

For his part, Mr. Stark has complied with the Order by insuring that if something should happen to him that the health and safety of the Big Cats was preserved.

Plaintiff's point with regard to Mr. Lowe's actions is undermined by his representation to Defendants, PETA and the Court that he will not move the Big Cats until the Court has granted him authorization to do so.[55]

**4.      Defendants Have Not Failed to Take Steps to Comply with the Preservation Order.**

Neither Mrs. Stark nor WIN is in contempt of the Preservation Order.  As set forth above, since the entry of the Order, they have preserved the Big Cats health and safety, and all related tangible and documentary evidence related to them, even after the animals were transferred to Mr. Lowe.

For his part, Mr. Stark has complied with the Order by insuring that if something should happen to him that the health and safety of the Big Cats was preserved.

**B.      Mr. Lowe Should Not Be Required to Show Cause Or Be Held In Contempt for Aiding and Abetting.**

This portion of Plaintiff's brief addresses exclusively actions it attributes to Mr. Lowe.  It was presumably intended to support PETA's May 22, 2019, *Emergency Motion for Preservation Order* [Doc. 216] and its *Motion to Show Cause directed to Jeff Lowe* [Doc. 221].  Per the

---

[55] Culotta Declaration Exhibit D – Lowe letter.

Court's Order [Doc. 227] Defendants filed a *Joint Response to Plaintiffs Emergency Motion for Preservation Order* [Doc. 229] on May 31, 2019.  While it does not appear that either motion is directed at Defendants, and thus responses are not necessary, Defendants nevertheless take offense to Plaintiff's continued use of the terms "unlawful transfer," "conspire" and "willful violation" in this and all of its motions.[56]  As has been fully addressed above, Mrs. Stark and WIN were without knowledge of the transfer until the preparation of their response to Plaintiff's Motion for Clarification.  Additionally, neither Mrs. Stark nor WIN had the authority to effectuate the transfer or stop it.

To the extent Wildlife in Need and Wildlife in Deed, Inc., Melisa Stark, and Tim Stark are required to respond, they request that the Court deny *PETA's Emergency Motion for Preservation Order* and *PETA's Motion for Order to Show Cause Regarding Jeff Lowe*.

Wherefore, Wildlife in Need and Wildlife in Deed, Inc., Melisa Stark, and Tim Stark pray that this Court denies *PETA's Motion for Sanctions* [Doc. 218], its *Motion for Contempt* [Doc. 219], its *Motion for Order Regarding Ownership of the Big Cats* [Doc. 220], its *Motion for Order to Show Cause Regarding Jeff Lowe* [Doc. 221] and that the Court will reinstate the dates set forth in the Case Management Plan so that this matter can proceed to a trial on the merits.

Respectfully Submitted:

---

[56] See Docs. 218, 219, 220 and 221

Date:  June 5, 2019

*s/J. Clayton Culotta*
J. Clayton Culotta
Bar No. 26733-11
815 E. Market Street
New Albany, IN 47150
Telephone No. (812) 941-8886 Ext. 24
Facsimile No. (812) 941-8883
clayculotta@culottalaw.com
Counsel for Defendants Wildlife in Need
and Wildlife in Deed, Inc. ("WIN") and
Melisa Stark

Reviewed, Approved and Agreed to by:

*Melisa Stark per Timothy Stark*
*per his authority*

Timothy L. Stark
3320 Jack Teeple Road
Charlestown, IN 47111
Wildlifeinneed@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of June 2019, a copy of the foregoing was provided to

counsel for the Plaintiff at the address below via the Court's electronic filing system:

Brian W. Lewis
Paul T. Olszowka
Barnes & Thornburg, LLP
One North Wacker Drive
Suite 4400
Chicago, IL 60606
Brian.lewis@btlaw.com
paul.olszowka@btlaw.com

*s/J. Clayton Culotta*
J. Clayton Culotta