# Exhibit 1

# Filed Manually

# Exhibit 2

# Filed Manually

# Exhibit 3

**AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS**

Clay Culotta
815 E. Market Street
New Albany, IN 47150

Tim Stark
3320 Jack Teeple Road,
Charlestown, IN 47111

**Via email to clayculotta@culottalaw.com; wildlifeinneed@aol.com**

May 12, 2020

Re:    *PETA v. Wildlife In Need and Wildlife in Deed, et al.*
       Court No: 4:17-cv-0186

Dear Messrs. Culotta and Stark,

We are aware that two Big Cats—a female lion, Nera, and a male tiger, Jomba—died, or were near death, at Wildlife in Need ("WIN") this week. We write with a number of concerns.

First, PETA is distressed that Mr. Stark, Ms. Lane, and WIN (collectively, "WIN Defendants"), in Mr. Stark's words, "could not provide veterinary care." If this is the case, the parties should immediately meet and confer regarding reputable sanctuaries that are willing and able to provide necessary care to the Big Cats at WIN.

In addition, if the above is true, your prior discovery responses regarding Dr. Kurt Oliver are no longer accurate and your failure to provide an update is discovery misconduct. *See* ECF Nos. 51 and 113 (ordering Defendants to respond without objection to PETA's first set of interrogatories and discovery requests) and 47-1, at 6 (requesting, in Interrogatory No. 5, information regarding the Big Cats' attending veterinarian). *See also* Fed. R. Civ. P. 26(e)(1)(A) (requiring parties to supplement interrogatories "in a timely manner").

As such, please let PETA know by **Thursday, May 14, 2020** whether you have an attending veterinarian for the Big Cats. These disclosures must include any attending veterinarian's name, business address, and telephone number. Please also propose a range of available dates and times for a meet and confer.

Second, it is disturbing that PETA has not received any information about Big Cat deaths from WIN Defendants or counsel. As you are surely aware, you are obligated, under court order, to update PETA with respect to Big Cat deaths and causes of death. *See* ECF Nos. 51 and 113 and 47-1, at 7 (requesting, in Interrogatory No. 7, information regarding whether each Big Cat that has ever been in Defendants' possession, custody, or control is alive or deceased, including the cause of death). *See also* Fed. R. Civ. P. 26(e)(1)(A).

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

**Washington, D.C.**
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

**Los Angeles**
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

**Norfolk**
501 Front St.
Norfolk, VA 23510
757-622-PETA

**Berkeley**
2855 Telegraph Ave.
Ste. 301
Berkeley, CA 94705
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

Third, PETA is aware that, although Jomba's deterioration was apparent, Mr. Stark announced that he did not intend to have Jomba euthanized. PETA is also aware that neither Nera nor Jomba received veterinary care and that Mr. Stark decided not to have necropsies performed.

Your decision not to perform necropsies is disturbing. Failing to perform necropsies violates generally accepted husbandry practices. *See, e.g.*, U.S. Department of Agriculture, *USDA Animal Care Inspection Guide*, § 4.12.5.7 (explaining that failure to perform necropsies in the event of "unexplained mortality" may be inadequate veterinary care under 9 C.F.R. § 2.40); AZA, *2020 Accreditation Standards & Related Policies*, § 2.5.1 (2020) ("Deceased animals should be necropsied to determine the cause of death for tracking morbidity and mortality trends"). These concerns are all the more pronounced given guidance from the Centers for Disease Control and Prevention ("CDC") that SARS-CoV-2 "can spread from people to animals." *See* CDC, *COVID-19 and Animals*, Coronavirus Disease 2019 (COVID-19) (April 30, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/animals.html.

Failure to perform necropsies is also spoliation of evidence. *See* Consent Order Preserving Evidence and Withdrawing Rule 27 Petition, *PETA v. Wildlife in Need and Wildlife in Deed, Inc., et al.*, No. 4:17-MC-00003-RLY-DML (S.D. Ind. Sept. 18, 2017), ECF No. 27 (requiring WIN Defendants to preserve all tangible evidence, including Big Cats); ECF No. 239 (reiterating that Big Cats are "tangible" evidence).

PETA's concerns about the means by which you may or may not have euthanized these Big Cats are similarly well founded. Mr. Stark has a history of using cruel and illegal methods to euthanize animals. *See, e.g.*, Deposition Transcript of Tim Stark, at 329:16-331:9 ("I've used a baseball bat. I've used guns. I've used whatever. . . . Your job is to euthanize it. You know what that end result is? F*ckin' death. So it does not matter how.").

PETA insists that you have necropsies performed as soon as possible by a reputable veterinarian. Please let PETA know by **Thursday, May 14, 2020** who will be performing these necropsies. In addition, please (1) affirm that you will have immediate necropsies performed in the event of future Big Cat deaths and (2) let PETA know when it can expect to receive copies of any necropsy reports pursuant to PETA's Request for Documents No. 5. *See* ECF No. 47-1, at 6.

Your disclosures concerning causes of death must include a description of the euthanasia practices used, if any.

Finally, PETA is also aware that Mr. Stark has made a number of threatening statements regarding PETA and counsel. These include the statement that "I will slice every f*cking one of their goddamn throats. I will put them under. The same way they're destroying my family, here I come." Such threats are illegal,

and must cease immediately. *See, e.g.*, 18 U.S.C. § 875(c). To the extent that they are directed at PETA personnel identified on PETA's Preliminary Witness List, *see* ECF No. 152-1, these statements are witness tampering. *See* 18 U.S.C. § 1512(a)(2) (making it a federal crime to use "the threat of physical force against any person . . . to . . . cause or induce any person to . . . withhold testimony").

We expect to hear back shortly. We reserve all rights.

<u>/Asher Smith/</u>

Asher Smith
AsherS@petaf.org

# Exhibit 4



**Culotta** and **Culotta** LLP

May 14, 2020

ELECTRONIC MAIL TRANSMISSION

Mr. Asher Smith
1536 16th St. N.W.
Washington, D.C. 20036

RE: *People for the Ethical Treatment of Animals v. Wildlife in Need and Wildlife in Deed, LLC et al.*; Civil Action No. 4:17-cv-00186-RLY-DML

Dear Mr. Smith:

I am in receipt of your May 12, 2020, letter and discussed it with Mr. Stark. Generally I will address some of the issues you raised in your letter; however, as to your specific questions I am providing you the answer I received from him, and he has asked me to provide you with his telephone number to contact him directly if you continue to have any questions.

Initially, as to your question regarding a veterinarian to provide medical services to the big cats, Mr. Stark advised me that he has a veterinarian. He did not identify that person or their contact information to me, but as to the meet and confer he advised that you can contact him at (502) 905-2287 to further discuss the issue. Because he is *pro se* I have no right to prevent your direct communication with him or to speak on his behalf.

As I mentioned in my email to you yesterday, I learned of the two big cat deaths on Monday and Tuesday respectively. As I also indicated, it was my intent to notify you of the deaths when I had the paperwork to share with you. I am attaching the documentation regarding Nera; however, I do not yet have anything on Jomba.[1]

As to the necropsy of either animal, Mr. Stark advised me that he does not intend to perform the test on either animal. The reference guides you identify are not policies and procedures to which Mr. Stark is required to adhere. He did state that if there was another death that he would have to test conducted if the symptoms are the same.

As to the failure to perform necropsies being spoliation of evidence, I do not believe that the Order to preserve all tangible evidence, including Big Cats, extended to Mr. Stark being obligated to perform a necropsy on a deceased animal. The Preservation Order extends to the animals themselves, but to suggest that the failure to conduct a voluntary test is spoliation extends beyond that which the order contemplated. It is certainly silent on the issue.

---

[1] The first page says 1 of 3; however, I was advised that there are only 2 pages.

815 E. Market Street, New Albany, IN 47150  •  tel: 812-941-8886 fax: 812-941-8883
www.culottalaw.com

Mr. Asher Smith
May 14, 2020
Page 2

Finally, I have not seen or heard the video to which you reference Mr. Stark making threats against any specific PETA individual or their counsel. I agree that any direct threat to a witness cannot be tolerated, but I will reserve my own personal opinion regarding whether Mr. Stark has attempted to tamper with witnesses until I have seen and/or heard the comments to which you refer.

As I indicated above, I am only addressing the general issues associated with the broader scope of the litigation. If you have any more particular questions regarding the two cats which passed Mr. Stark advised me to refer you directly to him to meet and confer on those topics.

Sincerely,

J. Clayton Culotta

Cc:    Brian Lewis
       Tim Stark
       Paul Olszowka

# WIN Medical Treatment Log

Species: _____ Lioness _____    Name: _____ Nera _____

page _1_ of _3_

| Date: | am/pm | Treatment Provided: | Notes/Observations | Person Administering Medication: |
|---|---|---|---|---|
| 4/30/2020 | pm | 10cc MaxiB-Vitamin B | Low appetite, Lethargic | Tim Stark |
| 5/1/2020 | pm | 10 cc MaxiB-Vitamin B | No appetite, dehydrated, lethargic, abnormal gait, heavy breathing | Tim Stark |
| | | 1000 electrolyte solution | *Will be offered additional food and baby formula daily in addition to normal meat portions to stimulate appetite. | |
| | | 500 cc Lactated Ringer's | Refusing food | |
| | | 12 cc Penject | | |
| | | 3.5 cc Depo-Medrol | *Some interest in formula | |
| | | *Quarantined in lockdown building for easier care and allow to rest | | |
| 5/2/2020 | am-pm | 10 cc MaxiB-Vitamin B | Some appetite improvement, Hydration improved, | Tim Stark |
| | | 1000 electrolyte solution | | |
| | | 500 cc Lactated Ringer's | | |
| | | 12 cc Penject | | |
| | | 3.5 cc Depo-Medrol | | |
| 5/3/2020 | am-pm | 12 cc Penject | Good hydration | Tim Stark |
| | | 3.5 cc Depo-Medrol | Appetite increase, up to get drinks throughout day | |
| | | | Increased social interest | |
| 5/4/2020 | am-pm | 3 cc Depo-Medrol (am) | Improvements noted | Tim Stark |
| | | | Playful demeanor | |
| | | | Normal posturing and gait | |
| | | | Social | |

| | | | | |
|---|---|---|---|---|
| | | | Good appetite/Interest in food immediately when offered | |
| 5/5/2020 | am-pm | No medication administered 5/5/2020 | lethargic, heavy breathing, Refusing food | Tim Stark |
| 5/6/2020 | am-pm | 12 cc Penject<br>3.5 cc Depo-Medrol<br>10 cc Maxi-B | Same-no change | Tim Stark |
| 5/7/2020 | am-pm | *all day monitoring<br>12 cc Penject<br>3.5 cc Depo-Medrol<br>10 cc Maxi-B | No change | Tim Stark |
| 5/8/2020 | am-pm | *all day monitoring<br>2.5 cc Exceed<br>3 cc Depo-Medrol<br>8 cc Maxi-B | No Change | Tim Stark |
| 5/9/2020 | am-pm | No medication administered<br>*all day monitoring | Increased lethargy<br>Contd. food refusal | Tim Stark |
| 5/10/2020 | am | Tim checked am-condition not improved | Passed-mid afternoon | Tim Stark |

# Exhibit 5

**PETA** FOUNDATION

AN INTERNATIONAL ORGANIZATION DEDICATED TO PROTECTING THE RIGHTS OF ALL ANIMALS

Clay Culotta
815 E. Market Street
New Albany, IN 47150

Tim Stark
3320 Jack Teeple Road,
Charlestown, IN 47111

**Via email to clayculotta@culottalaw.com; wildlifeinneed@aol.com**

May 15, 2020

Re:    *PETA v. Wildlife In Need and Wildlife in Deed, et al.*
       Court No: 4:17-cv-0186

Dear Messrs. Culotta and Stark,

        We are in receipt of Mr. Culotta's May 13, 2020 email and his May 14, 2020 letter. We still have a number of questions. Given the urgency of these issues, we request that you provide certain further responses—detailed below—by close of business on **Monday, May 18, 2020**. We also request that you include proposed dates and times for a meet and confer on Monday or Tuesday.

        First, we do not know what to make of Mr. Culotta's statement that "Mr. Stark advised me that he has a veterinarian. He did not identify that person or their contact information." Mr. Stark is legally required to have an attending veterinarian for the Big Cats. This individual is required to have signed on to a written program of veterinary care. 9 C.F.R. § 2.40(a)(1). There is no reason for this individual's identity to be a mystery. There is also no basis for corporate counsel to cease investigation and pass off responsibility to Mr. Stark. Mr. Culotta is counsel to WIN. Mr. Stark is WIN's president and primary decision-maker. WIN Defendants, and their counsel, are accountable all aspects of this litigation.[1]

        If Dr. Kurt Oliver is no longer the attending veterinarian for the Big Cats, then that should have already been disclosed. The last PETA heard with respect to Dr. Oliver is that "Dr. Oliver has not resigned his position and remains WIN's Big Cat veterinarian. . . . [I]f medical care was necessary, Dr. Oliver would be contacted to perform those services." ECF. No. 215, at 3.

---

[1] We note that Mr. Culotta's letter referred to a video that appears to have been published to a private social media page. To the extent Mr. Culotta, Mr. Stark, Ms. Lane, or WIN is aware of the existence of references to PETA, or of photographs, videos, or other depictions or descriptions of the Big Cats, on social media accounts they manage or that are otherwise in their possession, custody, or control, these must be immediately produced. *See* ECF Nos. 51 and 113 and 47-1, at 5-8 (requests for production pertaining to depictions and descriptions of the Big Cats, including photos and videos, and pertaining to "social media posts, comments, videotapes, recordings, or documents relating to any animal protection groups, including without limitation, PETA").

PEOPLE FOR
THE ETHICAL
TREATMENT
OF ANIMALS
FOUNDATION

**Washington, D.C.**
1536 16th St. N.W.
Washington, DC 20036
202-483-PETA

**Los Angeles**
2154 W. Sunset Blvd.
Los Angeles, CA 90026
323-644-PETA

**Norfolk**
501 Front St.
Norfolk, VA 23510
757-622-PETA

**Berkeley**
2855 Telegraph Ave.
Ste. 301
Berkeley, CA 94705
510-763-PETA

PETA FOUNDATION IS AN
OPERATING NAME OF FOUNDATION
TO SUPPORT ANIMAL PROTECTION.

AFFILIATES:
• PETA U.S.
• PETA Asia
• PETA India
• PETA France
• PETA Australia
• PETA Germany
• PETA Netherlands
• PETA Foundation (U.K.)

PETA would also be entitled to any documents pertaining to the care provided to the Big Cats by a new veterinarian. *See* ECF Nos. 51 and 113 and 47-1, at 5-7 (requests for production pertaining to the Big Cats and their veterinary care).

As such, please provide the name of the Big Cats' attending veterinarian by **Monday, May 18, 2020**. This disclosure should include a description of this individual's credentials; their place of business and contact information; their written program of veterinary care; their availability to WIN in emergencies; and an explanation of why they do not appear to have been called to treat or euthanize either Nera or Jomba. *See, e.g.*, May 14, 2020 letter from C. Culotta, at 3-4 (listing Mr. Stark as the person administering medication to Nera between April 30, 2020 and her death on May 10, 2020). This is no more than is already required by the Animal Welfare Act ("AWA"). 9 C.F.R. §§ 2.40(a)(1)-(5), (b)(1)-(5) (requiring that an attending veterinarian have sufficient credentials and training or experience in the species being attended, that the attending veterinarian provide adequate treatment and euthanasia, and that the attending veterinarian be available in case of emergencies).

Mr. Culotta's responses are also silent regarding the precise causes of death of Nera and Jomba and the methods of euthanasia used, if any. As noted, PETA is entitled to this information by court order. *See* ECF Nos. 51 and 113 and 47-1, at 7 (Interrogatory No. 7). Please provide this information by **Monday, May 18, 2020** as well.

PETA also cannot accept Mr. Stark's refusal to perform necropsies. Mr. Culotta is mistaken that necropsies are not required. All Defendants are required to provide adequate veterinary care under the AWA. 9 C.F.R. § 2.40(a). The decision and order revoking Mr. Stark and WIN's license to exhibit animals found respondents' numerous failures to seek necropsies to be inadequate veterinary care. *See* Decision and Order, *In re Timothy L. Stark, et al.*, AWA Docket Nos. 16-0124 and 16-0125, at 42-46, 156-157. The USDA's Animal and Plant Health Inspection Service ("APHIS"), which is responsible for administering the AWA, considers failure to perform necropsies in the event of "unexplained mortality" indicia of inadequate veterinary care. *See* USDA, *USDA Animal Care Inspection Guide*, § 4.12.5.7. *See also* Transcript of USDA Hearing, at 2121:5-7 (L. Gage) ("When a young animal dies, I think it's important to do a necropsy on any young animal that just shows up dead.").

PETA also disagrees that avoiding necropsies—especially in the event of the sudden and unexplained death of a young animal—is not spoliation. Tissue degradation occurs rapidly after death. Defendants are required to preserve all tangible evidence, including the Big Cats and any evidence pertaining to causes of death. *See* Consent Order Preserving Evidence and Withdrawing Rule 27 Petition, *PETA v. Wildlife in Need and Wildlife in Deed, Inc., et al.*, No. 4:17-MC-00003-RLY-DML (S.D. Ind. Sept. 18, 2017), ECF No. 27; ECF No. 239. Forgoing a necropsy where it would otherwise be required is a deliberate choice to evade

discovery. *See People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Maryland, Inc.*, 424 F. Supp. 3d 404, 413-422 (D. Md. 2019) ("Defendants violated generally accepted standards of care even after some of the animals at issue died. Performing a necropsy is a basic standard of care, especially on an animal protected under the ESA. . . . Defendants chose not to perform a necropsy on Bandit, even though [Defendant] has kept Bandit's body, wrapped in a trash bag, in a freezer on zoo grounds and for reasons not altogether clear to the Court. . . . The Court does not credit that Bandit died of 'cancer.'" (citations omitted))

We await your prompt response.

Sincerely,

/Asher Smith/

Asher Smith
AsherS@petaf.org

# Exhibit 6

**From:** wildlifeinneed@aol.com <wildlifeinneed@aol.com>
**Sent:** Friday, May 15, 2020 1:31 PM
**To:** Asher Smith <AsherS@petaf.org>
**Subject:** Re: PETA v. Wildlife In Need, et al. - Court No: 4:17-cv-00186

Dear Asher,
If you would like to have a conference call I'm pretty much available anytime,all you have to do is let me know when.
To state for the record I am required to have an attending veterinarian, but that is strictly through USDA, not PETA !!!!!
PETA is suing me concerning the endangered species act, not the animal welfare act. So what is required or not required under the animal welfare act is none of your all's business. I only report to them concerning my license. PETA is not entitled to anything. I have not or am not doing anything illegal. As far as any vet needing certain credentials for any certain species are nothing more than total lies created by PETA. The only credentials any vet needs to take care of any animal is a simple thing called a veterinarian degree !!!!!
Now to the next subject, necropsies are not mandatory at any given time for any reason. The USDA suggests that you do necropsies for unexplained deaths. Now if I have another big cat come down with the same symptoms and die, then I WILL at that time choose to have a necropsy done. Or not. It's still my choice. So quit trying to convince the courts or anyone else that I am illegally doing anything. Just because PETA says it is illegal, does not make it illegal. They are not a governing agency !!!!!! Also the USDA decision is just that, a decision. It is not final. It is under appeal so therefore I will not tolerate you or anyone else applying that I am guilty of any of those charges. Anything that I've ever been written up for is also nothing more than a write. That doesn't make me guilty !!!! As far as me reporting to PETA concerning the death of either one of these two cats, it happened. Nera was unexplained. Simple as that !!!! No necropsy will be performed. She has already been buried. As far as Jomba is concerned, he was 22 years old. He died of old age, end of discussion !!!! Burying these two cats is in no way spoliation of evidence. No matter how anyone tries to say any different, animals are NOT tangible evidence. When these two cats passed away, am I in contempt of court because I could not keep them alive or in the exact same condition they were in last week, last month, or last year ? Now I come to some dumbass issue you brought up about Bandit. Are you even aware what Bandit was ? He was a dog !!! I am not licensed for dogs. Also, he was immediately buried at the time of his death. He was not put in

1

any freezer or anything of that nature. So check your resources of where your getting your so called facts !!! Now while I have time I will also address the issue of me making personal threats to anyone because I have not. Just because your clients think they can get away with all of their terroristic tactics and bully and intimidate everyone and threaten me by using the court system as their weapon does not scare me. The truth will prevail. I don't give a rats ass if they don't like having death threats or anything else thrown at them. Thanks to them, I have dozens and dozens of death threats on a weekly basis.<sub>Mail</sub>

Get the new AOL app: [mail mobile.aol.com](mail mobile.aol.com)

On Friday, May 15, 2020, Asher Smith <[AsherS@petaf.org](mailto:AsherS@petaf.org)> wrote:

Clay; Mr. Stark,

Please see the attached reply.

Thanks,

Asher

**Asher Smith** | Litigation Manager

**PETA Foundation**

1536 16th St. NW

Washington, DC 20036

M: (516) 528-3109

[AsherS@petaf.org](mailto:AsherS@petaf.org)

Admitted to practice law only in New York.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

**From:** Clay Culotta <[clay@culottalaw.com](mailto:clay@culottalaw.com)>
**Sent:** Thursday, May 14, 2020 4:12 PM
**To:** Asher Smith <[AsherS@petaf.org](mailto:AsherS@petaf.org)>
**Cc:** Lewis, Brian <[Brian.Lewis@btlaw.com](mailto:Brian.Lewis@btlaw.com)>; Olszowka, Paul <[Paul.Olszowka@btlaw.com](mailto:Paul.Olszowka@btlaw.com)>; Melisa Stark

<wildlifeinneed@aol.com>
**Subject:** Response to 5/12/20 Letter

Asher,

Please see the attached response.

Clay

J. Clayton Culotta



815 E. Market Street

The Hess House
New Albany, Indiana 47150
office - (812) 941-8886 ext. 24
fax - (812) 941-8883

1615 L Street, NW
Suite 1350
Washington, D.C.  20036

www.culottalaw.com

<u>**Confidentiality Notice**</u>

This email and any documents accompanying this email transmission contain confidential information. The information is intended only for the use of the individual(s) or entity named above. If you are not the intended recipient, you are notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this emailed information is not permissible. If you have received this telecopy in error, please immediately notify us by telephone at the above number to arrange for the return of the email and documents to us at our expense.

# Exhibit 7



**Culotta** and **Culotta**
LLP

May 18, 2020

ELECTRONIC MAIL TRANSMISSION

Mr. Asher Smith
1536 16th St. N.W.
Washington, D.C. 20036

RE:  *People for the Ethical Treatment of Animals v. Wildlife in Need and Wildlife in Deed, LLC et al.*; Civil Action No. 4:17-cv-00186-RLY-DML

Dear Mr. Smith:

I am in receipt of your May 15, 2020, letter.  As I addressed in my May 14th letter, I can speak to some of the more general issues in your letter; however, as to your specific questions, particularly with regard to the identity of the veterinarian, I still do not have that information and at this point you will need to bring that up directly with Mr. Stark.  I have my clients updating their discovery responses, and any veterinarian information responsive to those requests will be produced.

As to the video(s) you reference in your footnote, my understanding is that Mr. Stark posted something with and/or about Nera and Jomba.  I have not seen it, but I am obtaining a copy and will provide it to you.  And as to the cause of death of either cat, it is still my understanding that Nera's cause of death is unknown and that Jomba's was simply old age.  Again, Mr. Stark is the best source to get more specific detail.

With regard to the issue of the necropsies, 9 C.F.R. § 2.40(a) states that "[e]ach dealer or exhibitor shall have an attending veterinarian who shall provide adequate veterinary care to its animals in compliance with this section."  The phrase "adequate veterinary care" is not specifically defined, but 9 C.F.R. § 2.40(b) identifies the following as likely contemplated by the term:

> (1) The availability of appropriate facilities, personnel, equipment, and services to comply with the provisions of this subchapter;

> (2) The use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care;

> (3) Daily observation of all animals to assess their health and well-being; Provided, however, That daily observation of animals may be accomplished by

Mr. Asher Smith
May 18, 2020
Page 2

someone other than the attending veterinarian; and Provided, further, That a
mechanism of direct and frequent communication is required so that timely and
accurate information on problems of animal health, behavior, and well-being is
conveyed to the attending veterinarian;

(4) Adequate guidance to personnel involved in the care and use of animals
regarding handling, immobilization, anesthesia, analgesia, tranquilization, and
euthanasia; and

(5) Adequate pre-procedural and post-procedural care in accordance with
established veterinary medical and nursing procedures.

All of the terms set forth in those five categories refer to types of care and attention directed to
living animals, not dead ones. "Necropsies" are not specifically mentioned nor are pathology
procedures even implied generally in any of the categories. Conducting a necropsy, while it
might well be part of "adequate veterinary care" in the personal opinion of some veterinarians, it
is not a legal requirement of the AWA or the ESA.

The original Preservation Order [Doc. 27] and the *Entry on Plaintiff's Motions Regarding the
Preservation of Evidence* [Doc 239] are completely devoid of any reference to post-mortem
testing as a requirement of preservation of evidence. Specifically, the Preservation Order states
in relevant part:

The Respondents shall preserve all tangible and documentary evidence relating to
(and including) the tigers, lions, and hybrids thereof in Respondents' possession,
custody, and control;

Regarding the preservation of evidence. The relevant portion of Doc. 239 states:

## A. The Preservation Order Prevents Defendants from Transferring the Big Cats

The court's Preservation Order requires Defendants to "preserve all tangible and
documentary evidence relating to *(and including)* the tigers, lions, and hybrids
thereof in [their] possession, custody, and control." (Preservation Order at 1)
(emphasis added). The plain language within the parenthesis brings the Big Cats
within the scope of the order, and so Defendants are required to preserve the Big
Cats throughout this litigation. *See Black's Law Dictionary* (11th ed. 2019)
(defining "include" as "[t]o contain as a part of something"). This means that
Defendants must protect and maintain the Big Cats in their current state absent a
court order that says otherwise. *See Merriam-Webster's Collegiate Dictionary*

Mr. Asher Smith
May 18, 2020
Page 3

(11th ed. 2006) (defining "preserve" as "protect" and "maintain"). This also
means that Defendants or any party acting in concert with Defendants must not
transfer, move, or relocate any Big Cat before this litigation comes to an end. *See
Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008)
(noting courts can issue sanctions when a party violates the duty to preserve
evidence where it knows litigation was imminent).

Defendants argue that the Big Cats are not "tangible" evidence. But they are
"tangible" because they are capable of being touched. *Merriam-Webster's
Collegiate Dictionary* (11th ed. 2006) (defining "tangible" as "capable of being
perceived especially by sense of touch"). Moreover, the purpose of the
preservation order was to preserve the animals—themselves. It makes little sense
to conclude otherwise especially since this case is about the alleged harm suffered
by the Big Cats. Accordingly, Defendants shall abide by the Preservation Order.

Thus it is very clear from both documents that the Court contemplated the preservation of live
animals and that they should not be moved, transferred or relocated during the pendency of this
litigation.

PETA believes that Mr. Stark is incapable of caring for his bid cats. Its original and amended
complaints [Docs. 1 & 285] seek to remove the big cats from Mr. Stark's custody. The failure to
perform necropsies on deceased cats has no bearing on PETA's goal in this litigation. Arguably,
the reverse could be true. A necropsy could show that the cats were well cared for and simply
died of old age and/or a congenital defect which could not be diagnosed or treated. In that event
the test would have an adverse effect on PETA's case and support Mr. Stark in his argument that
he is capable of providing appropriate care to the animals.

Finally, as to your citation of *People for the Ethical Treatment of Animals, Inc. v. Tri-State
Zoological Park of W. Maryland, Inc.* (citation omitted), while the general facts may be similar,
as pointed out above, I am not persuaded that either of the ESA or the AWA mandate that a
necropsy be performed following the death of an animal.

Sincerely,

J. Clayton Culotta

Cc:    Brian Lewis
       Tim Stark
       Paul Olszowka

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | Case No. 4:17-cv-00186-RLY-DML |
| | ) | |
| WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., TIMOTHY L. STARK, AND MELISA D. STARK, AND JEFF LOWE | ) ) ) ) ) ) | |
| Defendants. | ) | |

**DECLARATION OF ASHER SMITH**

I, Asher Smith, hereby state as follows:

1.  I am counsel for Plaintiff People for the Ethical Treatment of Animals, Inc. ("**PETA**") in this action. I submit this declaration to record, based on my present recollection while it is fresh in my memory, a May 19, 2020 telephonic meet and confer with Defendants Wildlife in Need and Wildlife in Deed, Inc. ("**WIN**"), Tim Stark, and Melisa Stark (collectively, "**WIN Defendants**"). Present on WIN Defendants' behalf were counsel for WIN and Ms. Stark (Clay Culotta), Mr. Stark, and Jessica Amin, a WIN staff member responsible for providing care to lions, tigers, and hybrids thereof ("**Big Cats**"). Present on behalf of PETA were Caitlin Hawks, Gabriel Walters, Paul Olszowka, and myself.

2.  At the start of the call, Mr. Stark asked that it not be recorded. To the best of my knowledge, no one present on the call on behalf of PETA recorded the call. I do recall the discussion in detail. I believe the statements contained within quotation marks below to be true and accurate transcriptions of Mr. Stark's statements, with the exception that I have censored expletives.

3.  I began the meet and confer by asking WIN Defendants if they currently have an attending veterinarian for the Big Cats and, if so, their identity. Mr. Stark responded that it was "none of your d*mn business." When I asked Mr. Stark if Dr. Kurt Oliver was still the attending veterinarian for the Big Cats, he stated: "Not answering that." Mr. Stark also refused to state whether anyone had fulfilled the legal requirement of signing a written program of veterinary care for the Big Cats. Specifically, he stated that it was "[n]one of your d*mn business," and asked, "Do you understand you can kiss my a*s?"

4.  After I informed Mr. Stark that he was required to disclose this information subject to orders of this Court requiring WIN Defendants to respond without objection to PETA's discovery requests, Mr. Stark stated: "Oh well, tough sh*t, I'm not doing it." He also stated later during the meet and confer, on the same subject: "I don't give a sh*t what's court ordered, anymore. I don't care. There's a difference between right and wrong and I will stand my ground. For any judge to rule against me when I haven't broke the law, you and them can kiss my f*ckin' a*s. It's that simple."

5.  When I asked Mr. Stark if a veterinarian had provided care to Nera and Jomba, two Big Cats who recently died at WIN, Mr. Stark admitted: "I can't get a vet to set foot on my property." He blamed PETA for this, and said that, as a result, he blames PETA for Nera's death.

6.  I asked Mr. Stark to provide his best guess as to what caused Nera's death. The only cause of death Mr. Stark was willing to identify for Nera was "natural causes." When I asked Mr. Stark to elaborate, he stated that Nera "f*ckin' died." He added: "It's natural for everything to die. There's no way I can keep everything alive. Believe it or not, animals are not tangible evidence, I don't give a sh*t what Judge Young says."

7.  I asked Mr. Stark the same question with respect to Jomba. The only cause of death Mr. Stark was willing to identify for Jomba was "old age." Mr. Stark stated that there were no medical

treatment records for Jomba because he did not see a reason to do so given Jomba's advanced age. Mr. Stark compared Jomba to a human aged 95 years, asking if it would make sense to record medical treatments administered to a human who had reached so advanced an age.

8.  Mr. Stark stated that neither Nera nor Jomba were euthanized.

9.  Stark confirmed that he would not be performing necropsies and that he had already buried both Nera and Jomba.

10. Mr. Stark frequently raised his voice and made a number of disparaging comments during the meet and confer. He referred to me on multiple occasions as a "little c*cksucker." For example, he stated: "You want a war, you've got a war. I'm gonna bring out personal sh*t on you, Asher. I'm gonna bring out sh*t on all of you. I'm gonna put your personal sh*t on social media. Because you're in a warzone now, you little c*cksucker. You've pushed me to the limit, and you're f*ckin' with the wrong f*ckin' person."

11. At no point during the meet and confer did Mr. Culotta or Ms. Amin disagree with, clarify, or otherwise address any of Mr. Stark's statements.


I declare under penalty of perjury that the foregoing in true and correct.

Executed this 20th day of May, 2020 in New York, New York.

*/s/ Asher Smith*
Asher Smith

# Exhibit 9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL | ) | |
| TREATMENT OF ANIMALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-00186-RLY-DML |
| | ) | |
| WILDLIFE IN NEED AND | ) | |
| WILDLIFE IN DEED, INC., | ) | |
| TIMOTHY L. STARK, | ) | |
| MELISA D. STARK, AND | ) | |
| JEFF LOWE, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF JENNIFER CONRAD, D.V.M.

I, Jennifer Conrad, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1.    I am over the age of 18, of sound mind, and have freely given the testimony set forth in this Declaration.

### Qualifications and Basis of Opinion

2.    I am a doctor of veterinary medicine currently practicing in Los Angeles. I hold a Doctorate of Veterinary Medicine (1994) from the University of California, Davis, School of Veterinary Medicine, where I took the Wildlife Medicine Track, and a Bachelor of Arts in Biology (1989) from the University of California at Berkeley. I am a member of the American Veterinary Medicine Association (AVMA), the American Association of Zoo Veterinarians (AAZV), the European Association of Zoo and Wildlife Veterinarians (EAZWV), the International Veterinary Academy of Pain Management (IVAPM), the American Association of Feline Practitioners (AAFP), and the International Society of Feline Medicine (ISFM).

1

3.      I work with and provide humane care to captive wildlife. I have cared for some 200 lions and tigers over the course of my 26 years as a veterinarian. I have been the attending veterinarian, within the meaning of the Animal Welfare Act, for six USDA-licensed facilities housing lions, tigers, or hybrids thereof ("Big Cats") during those 26 years. I am experienced in all aspects of veterinary care for Big Cats, including providing adequate comprehensive veterinary care.

4.      During the hearing in this matter on the Plaintiff's Motion for Preliminary Injunction, the Court found that I am qualified to testify as an expert on the treatment of Big Cats.

5.      A copy of my curriculum vitae is attached as Exhibit 1 to this Declaration. I have testified as an expert regarding the proper care of captive tigers in the matter *Kuehl v. Sellner*, 161 F. Supp. 3d 678 (N.D. Iowa 2016).

6.      I am being compensated at a rate of $100.00 per hour, up to a maximum of $800.00 per day, for my time spent in connection with this matter.

## <u>Resources</u>

7.      In preparing this testimony, I have considered:

a.  Video statements made by the Defendant, Tim Stark, in which he discusses the death by unknown causes of a reportedly three-year-old lioness named Nera, in which video he displays her corpse;

b.  Video statements made by the Defendant, Tim Stark, in which he discusses the impending death of a reportedly 20-to-22-year-old male tiger named Jomba, in which video Mr. Stark lies upon the tiger's body;

c.  The medical treatment logs of the lioness Nera, apparently entered by Mr. Stark or his staff, which were provided to the Plaintiff in this matter;

2

     d.   Correspondence between counsel for the parties dated May 12 and May 14, 2020, regarding the deaths of these two Big Cats and related issues; and

     e.   Publicly available public health guidance and veterinary resources.

8.     A list of the materials that I consulted in preparing this Declaration and formulating my opinions—including the medical treatment logs and the correspondence of counsel described above—is attached as Exhibit B to this Declaration. It is my understanding that the videos of Mr. Stark with the corpse of Nera and the dying Jomba will be filed with the Court concurrently with this Declaration.

### Opinions

9.     Based on the information I reviewed, I conclude, to a reasonable degree of veterinary and scientific certainty, that the young lioness Nera received inadequate veterinary care that alone was sufficient to cause her death regardless of her underlying illness. And that, especially in light of the death of the male tiger Jomba the following day and the current coronavirus pandemic, necropsies of both deceased Big Cats were urgently needed for the protection of the remaining Big Cats and the public health.

10.     Nera was first recorded as ill on Thursday, April 30, 2020, according to the treatment record. On that day she was listed as lethargic with a low appetite. The records do not indicate any lab work nor radiographs taken. Nor do they indicate a veterinarian was ever consulted.

11.     The following day, Mr. Stark gave Nera Depo-Medrol 3.5 mL, which would be 70 mg of a long-acting steroid. This medication is not to be given daily; the "depo" in the name refers to the fact it is long acting. In my experience, it is not given more than once every three weeks. As a long-acting steroid injected into the body, there is no going back if severe side effects begin.

3

Common side effects for this medication include inappetence from peptic ulcer, difficulty breathing caused by heart failure, electrolyte imbalances, diabetes, Cushing's disease, muscle weakness, and gait abnormalities. In addition, this steroid is immunosuppressive. This means that any chance of Nera's immune system overcoming any initial infectious cause of illness was greatly reduced by administration of this drug. The records indicate that Nera experienced some of the common side effects noted in this paragraph. A necropsy would have determined their cause.

12.     It particularly shocked me that this steroid, which I believe most veterinarians would give sparingly only once per month, was administered to Nera daily for four days in a row and then again after one day off for three additional days. This is absolutely inappropriate. The use of this drug, unfittingly and with total disregard to its label, is a likely contributor to Nera's death. This is not how a competent veterinarian would use this drug.

13.     It is possible that the use of Depo-Medrol, in the manner administered by Mr. Stark, was alone sufficient to cause Nera's premature death. Had Mr. Stark given Depo-Medrol only once, even though it likely would have been contra-indicated by a proper veterinary diagnosis, Nera may have recovered from her underlying illness. The daily administration of the drug, which was contrary to its label and counter to competent veterinary practice, possibly caused congestive heart failure (and subsequent fluid in the lungs) in Nera.

14.     In addition, the records indicate that Nera was given PenJect. This is a preparation of penicillin, an antibiotic. The drug is made primarily for large animals—such as horses and cattle—to be given deep in the muscle and it is not recommended in doses of larger than 10 mL in one area. If larger doses are administered, the drug will become a large foreign substance within the muscle. Yet the records indicate that Mr. Stark administered to Nera—who was likely a minimum of two or three times lighter in body weight than an adult horse or cow—12 mL once a

day. While there is a forgiving therapeutic dose range, the volume alone is inappropriate. Furthermore, penicillin often causes stomach upset, which may be why Nera continued to show a lack of appetite. If Nera in fact had a peptic ulcer, then the administration of an antibiotic could further contribute to her inappetence and, thus, her demise.

15.     The records indicate that when Mr. Stark did not get results from this drug regimen, he resorted to administering Excede, another antibiotic with a similar mode of action as PenJect and therefore unlikely to increase bacterial coverage or add significantly to the treatment at this point.

16.     I am aware that SARS-CoV-2, the novel coronavirus that causes COVID-19 in humans, has been known to cause lethargy, breathing difficulties, inappetence, and weakness in Big Cats. These are symptoms that Nera exhibited.

17.     I am also aware that the Centers for Disease Control and Prevention advises that SARS-CoV-2 can spread from people to animals, and that industry bodies such as the Association of Zoos and Aquariums and the U.S. Department of Agriculture Animal and Plant Health Inspection Service have advised accredited and licensed animal exhibition facilities to take a number of precautions to guard against transmission of SARS-CoV-2 to Big Cats. I am also aware that multiple Big Cats have tested positive for SARS-CoV-2 at the Bronx Zoo.

18.     Antibiotics and steroids are not effective treatments for viruses. The course of treatment given to Nera suggests to me that Mr. Stark and his staff did not consider whether SARS-CoV-2 might be the potential cause of Nera's underlying illness, despite this having been a possibility I believe any competent Big Cat veterinarian would have considered, especially under the circumstances of the current pandemic.

19.     The records further indicate that Mr. Stark administered to Nera 10 mL of B vitamins, reported as Maxi-B. Maxi-B is a vitamin B supplement for cattle and the recommended dose is 1-2 mL per 500 lbs of body weight once or twice weekly, according to the product directions. The records indicate Nera received 10 mL daily. While B vitamins are water soluble and, generally, an overabundance will be urinated out, overdoses of vitamin B can cause dehydration, excessive urination, and ataxia. The records suggest to me that this may have occurred here. Ataxia, or abnormal gait, was reported on Friday, May 1—the second day Mr. Stark administered to Nera a massive dose of B vitamins. Mr. Stark continued to administer an inappropriate dose for a total of six out of eleven days until Nera's demise. In my experience, B vitamin supplementation is only truly necessary in cats that have malabsorption disease or are fed an incomplete diet.

20.     The records also indicate that supplementation of fluids was woefully underutilized. Mr. Stark administered a total of 1000 mL LRS, I assume subcutaneously, and 2000 mL electrolyte solution, I assume orally. Normal supplementation for dehydration would require a minimum of 20-60 mL/kg daily. This would mean that Nera, if she weighed 100 kg, or 220 lbs., should have received 2000 mL to 6000 mL per day, significantly more than she received in the eleven days she was sick. In fact, the total she received in eleven days under Mr. Stark is what a competent veterinarian would have given her daily. I believe based on the records that Nera might have recovered if she had been left with appropriate fluid supplementation, and was not administered long-acting steroids daily, or antibiotics for no reason.

21.     The records do not indicate that Mr. Stark or his staff gathered or analyzed a blood sample from Nera. I would have drawn and analyzed blood at the earliest opportunity in this case, had Nera been my patient. This would have been a proper and necessary step to diagnose Nera and

6

to determine an adequate veterinary medical response to her underlying condition. Big Cats can be trained to allow medical procedures like blood draws and fluid administration.

22.     I was unable to make additional observations about Nera's body condition—including whether she was at a normal, healthy weight when she died—because, in the video recorded by Mr. Stark and his staff, Nera's body was almost entirely covered by a Confederate battle flag. Nera's body condition, including her weight, is something I would want to analyze via a necropsy so that I could render further conclusions regarding what would have been more appropriate drug dosages, chronicity of illness, and whether or not she was being fed appropriate amounts.

23.     I strongly believe that immediate necropsies were required—not only of Nera, but also of Jomba, a male tiger aged 20-to-22 years old, who died the day after Nera and apparently suffered from respiratory distress before he succumbed. Instead, Mr. Stark buried these Big Cats without performing necropsies. This would be my opinion even in the absence of the pandemic caused by SARS-CoV-2. Lions are remarkably resilient to illness. Anytime a lion, and particularly a young lion such as Nera, who was housed with other lions, dies of unknown causes, a necropsy is indicated, and I believe required to provide adequate veterinary care. That another Big Cat died the following day of unknown causes—regardless of Jomba's advanced age—further underscores the urgent need for necropsies to determine cause of death and to contain or mitigate any transmissible pathogen that may be present at the facility. Especially in light of current conditions brought about by SARS-CoV-2, necropsies were urgently needed to rule out the novel coronavirus that is known to be transmissible to Big Cats, both for the protection of the remaining Big Cats at the Defendants' facility and for the public health.

24.   I am aware that Nera was separated from her mother and transported from Greater Wynnewood Animal Park in central Oklahoma to Mr. Stark's facility in southern Indiana within several days of her birth. I am also aware that Mr. Stark's veterinarian, Dr. Rick Pelphrey, declawed Nera when she was two weeks old. The fact that Nera was unable to nurse from her mother for an appropriate amount of time—depriving her of specific nutrients from her mother that are vital to development of a healthy and robust immune system—and was subject to a lack of maternal care, and exposed to extreme stress as a neonate and infant, likely suppressed Nera's immune system for her entire life and might have left her more vulnerable to infection, disease, and an early death.

## Conclusion

25.   In summary, my professional opinions, held to a reasonable degree of veterinary and scientific certainty, are as follows:

   a. The young lioness Nera received inadequate and highly inappropriate medical care that alone was sufficient to cause her death regardless of her underlying illness; and

   b. In light of the death of the male tiger Jomba the following day and the current coronavirus pandemic, necropsies of both deceased Big Cats were urgently needed for the protection of the remaining Big Cats at Wildlife in Need and the public health.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the preceding is true and correct.

Dated: May 18, 2020

Jennifer Conrad, D.V.M.

8