Exhibit 1

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF INDIANA
 3
      PEOPLE OF THE ETHICAL    )
 4    TREATMENT OF ANIMALS,    )
      INC.,                    )
 5                             )
               Plaintiffs,    )   No. 4:17-CV-00186-RLY-DML
 6                             )
          vs                   )
 7                             )
      WILDLIFE IN NEED AND     )
 8    WILDLIFE IN DEED, INC., )
      TIMOTHY L. STARK,        )
 9    MELISA D. STARK AND      )
      JEFF LOWE,               )
10                             )
               Defendants.    )
11
12
13        The ZOOM VIDEOCONFERENCE deposition of
14                 JEFFREY LOWE
15    called for examination pursuant to notice and
16    pursuant to the Federal Rules of Civil Procedure for
17    the United States District Courts pertaining to the
18    taking of depositions taken before JO ANN LOSOYA,
19    Certified Shorthand Reporter, within and for the
20    County of Cook and State of Illinois via ZOOM
21    VIDEOCONFERENCE on May 27, 2020 at the hour of 9:00
22    a.m. CST.
23
24
25
```

Page 2

```
 1     APPEARANCES VIA ZOOM:
 2          PETA FOUNDATION
            MR. ASHER SMITH
 3          MR. GARBRIEL WALTERS
            MS. CAITLIN HAWKS
 4          MS. BRITTANY PEET
            1536 16th Street NW
 5          Washington DC 20036
            (202) 483-7382
 6          ashers@petaf.org
            Gabew@petaf.org
 7          caitlinh@petaf.org
 8          BARNES & THORNBURG, LLP
            MR. PAUL OLSZOWKA
 9          One North Wacker Drive
            Suite 4400
10          Chicago,Illinois  60606
            (312) 357-1313
11          paul.olszowka@btlaw.com
                 Appeared on behalf of PETA.
12
                    * * * * * * * * * * * * * * * * *
13
            CULOTTA LAW
14          MR. JAMES CLAYTON CULOTTA
            815 East Market Street
15          New Albany, Indiana 47150
            (812) 941-8886,
16          clay@culottalaw.com
                 Appeared on behalf of the Defendant
17               Wildlife in Need and Wildlife in Deed;
                 Tim Stark.
18
                    * * * * * * * * * * * * * * * * *
19
       ALSO PRESENT VIA ZOOM:
20
            Ms. Jessica Amin
21          Mr. Tim Stark
            Mr. Ira Livingston
22
23
       REPORTED BY:  JO ANN LOSOYA
24     CSR LICENSE:  084-002437
25
```

Page 3

1                    EXAMINATION

2    Witness                          Page   Line

3    JEFFREY LOWE

4      By Mr. Smith                      4      7

5

6                  * * * * * * * * * * * * * * *

7                 INDEX OF EXHIBITS

8     EXHIBIT              DESCRIPTION              PAGE

9    Exhibit 1  Letter from Tim Stark              9

10   Exhibit 2  Email                             12

11   Exhibit 3  Facebook post                     17

12   Exhibit 4  Facebook post                     19

13   Exhibit 5  Facebook post                     36

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    (Witness sworn.)

2     WHEREUPON:

3                         JEFFREY LOWE,

4     called as a witness herein, having been first duly

5     sworn, was examined and testified as follows:

6                 E X A M I N A T I O N

7     BY MR. SMITH:

8          Q.    Hello, Mr. Lowe, my name is Asher Smith.

9     I'm the litigation manager with the PETA Foundation

10    and counsel for People for the Ethical Treatment of

11    Animals in this litigation.  I understand that you

12    have previously been deposed in this case by my

13    colleague Caitlin Hawks.  Because of that, I'll try

14    to keep preliminary matters and ground rules brief.

15                      If you could please speak clearly for

16    the court reporter, all your answers must be verbal,

17    no head shakes or nods.  Please wait until I have

18    finished asking a question before you answer so that

19    the court reporter has a clear record.  If we have

20    any technical difficulties, we will pause the

21    deposition and get off the record and try to get

22    back on as soon as possible.

23                      Other than that, can you please state

24    and spell your last name for the record?

25         A.    My name is Jeffrey, J-E-F-F-R-E-Y, Lowe,

```
                                          Page 5
 1    L-O-W-E.
 2         Q.    Are you aware that you're testifying
 3    under oath?
 4         A.    Yes, I am.
 5         Q.    Is there any reason, medical, physical or
 6    otherwise why you cannot provide truthful testimony
 7    today?
 8         A.    No.
 9         Q.    Do you have a lawyer with you today?
10         A.    No.
11         Q.    Has a lawyer filed an appearance on your
12    behalf in this case?
13         A.    No, not yet.
14         Q.    Today I'll be using the term "big cat" or
15    "big cats" to refer to tigers, lions, and hybrids of
16    lions and tigers; is that clear?
17         A.    Yes.
18         Q.    I'll use the acronym W-I-N or WIN to
19    refer to Wildlife in Need; is that clear?
20         A.    Yes.
21         Q.    To avoid confusion, can you tell me the
22    name you would like me to use to refer to your
23    facility where you exhibit animals?
24         A.    It doesn't matter.  Just call it my zoo.
25         Q.    Sure.
```

1      A.    You can call it my roadside zoo if you

2   want.  It doesn't bother me.

3      Q.    Okie doke.  I'd like to start off by

4   asking you about the events that gave rise to your

5   enjoinder into this litigation.

6              Can you explain how lion cubs born in

7   WIN in the summer of the 2019 ended up in your zoo?

8      A.    They were dropped off here.

9      Q.    By who?

10     A.    Tim Stark.

11     Q.    On what date?

12     A.    I have no idea.

13     Q.    When were these cubs born?

14     A.    I have no idea.  I wasn't there.

15     Q.    Did you see these cubs at WIN?

16     A.    No.

17     Q.    Did Tim Stark just suddenly arrive on

18   your property with these cubs?

19     A.    Yes.

20     Q.    Did he say anything about their birth?

21     A.    No.

22     Q.    Or the conditions under which he

23   separated them from their mother?

24     A.    No.

25     Q.    Do you know if anyone else at WIN was

```
                                        Page 7

 1    aware that these lions were born?

 2         A.    I have no idea.

 3         Q.    In what kind of vehicle did Mr. Stark

 4    drive the cubs to your property?

 5         A.    A dark Dodge dually.

 6         Q.    Do you have any idea where the cubs rode

 7    during the trip in the Dodge?

 8         A.    I don't remember.

 9         Q.    Any guess?

10              MR. CULOTTA:  Objection, calls for

11    speculation.

12              THE WITNESS:  Don't worry.  I won't

13    guess.

14    BY MR. SMITH:

15         Q.    Do you know how long the trip was?

16         A.    I have no idea.

17         Q.    Have you driven between your zoo and

18    Wildlife in Need before?

19         A.    Not directly, no.

20         Q.    Do you know approximately how long the

21    trip is?

22         A.    I don't know.

23         Q.    Do you know if Mr. Stark provided food

24    for the cubs during this trip?

25              MR. CULOTTA:  Objection, calls for
```

1    speculation.

2            MR. SMITH:  Only answer if you know.

3            THE WITNESS:  Pardon me?

4    BY MR. SMITH:

5        Q.    Do you know yourself if Mr. Stark

6    provided food for the cubs during this trip?

7        A.    I do not know.

8        Q.    Do you know if Mr. Stark provided any

9    kind of ventilation or temperature control for the

10   cubs during the trip?

11           MR. CULOTTA:  Objection, again calls for

12   speculation.

13   BY MR. SMITH:

14       Q.    When Mr. Stark arrived with the cubs, was

15   their mother with them?

16       A.    No.

17       Q.    Do you have any reason to believe that

18   the cubs were separated from their mother before the

19   trip?

20       A.    They obviously were separated from their

21   mother.

22           MR. SMITH:  Could we show what's marked

23   in the folder as Lowe Exhibit 1.

24           MR. LIVINSTON:  Sure thing.

25           MR. SMITH:  I'm going to show you a

Page 9

1    document that was filed in this case by Tim Stark on

2    September 13, 2019 that can be found in the public

3    docket at ECF No. 260.

4              MR. LIVINGSTON:  What was the exhibit

5    number again?

6              MR. SMITH:  It is going to be Lowe

7    Exhibit 1, the first document in the folder, and it

8    was ECF No. 260.

9              MR. LIVINSTON:  Gotcha.

10                      (Deposition Exhibit 1 was marked

11                       for identification.)

12             THE WITNESS:  Has anybody cleared this

13   with the Attorney General, Curtis Hill?

14   BY MR. SMITH:

15        Q.   Mr. Lowe, please read this document.

16        A.   I can't see it on the screen.  I'm

17   looking at you on a phone.  There's no possible way

18   I can read that.

19        Q.   Okay.  Well, I can tell you that this

20   document was filed in this case on the public docket

21   at number 260 and it reads, if you can hear me:  "I

22   Tim Stark would like to formally notify the Court of

23   four big cat cubs born on my property.  One being

24   born on July 9, 2019, and three more on August 7,

25   2019.  Mr. Lowe was on my property from July 11

Page 10

1   through the 13 and observed the two lionesses that

2   were pregnant.  He gave specific instructions to

3   have the cubs pulled when born and delivered to him

4   at 25803 North County Road, 3250, Wynnewood

5   Oklahoma, 73098.  It was reiterated to me multiple

6   times by Mr. Lowe that he was the rightful owner and

7   that fuck PETA and fuck that judge.  I'm not part of

8   that lawsuit and they have no jurisdiction over me.

9   I am the legal owner of those cats."

10              Again, from the document, "following

11  the instruction of their owner, Mr. Lowe, the cubs

12  were taken to his property at 25803 North County

13  Road 3250, Wynnewood, Oklahoma, 73098 on August 12,

14  2019."

15              Does anything that I just read stand

16  out to you as not being true?

17     A.    The entire thing, except I was there.  I

18  was at his facility during that date.  We didn't

19  even -- we didn't talk about cats.

20              I would like to ask my question

21  again.  Have you cleared this with Curtis Hill who

22  has told me not to discuss this criminal

23  investigation with anyone including PETA?

24              MR. CULOTTA:  I'm not exactly sure and

25  I'm not aware of any criminal investigation so...

Page 11

1              THE WITNESS:  Then I will end this if

2     nobody has cleared this as I instructed them to do.

3     Because I'm not going to -- I'm not going to violate

4     an order in a criminal suit for PETA's civil suit

5     against Tim Stark.

6              MR. SMITH:  Can the court reporter pull

7     up and we'll mark as Exhibit 2 from the Jeff Lowe

8     potential exhibits folder an email dated May 20,

9     2020.

10              MR. CULOTTA:  I heard 2020.

11              MR. SMITH:  Sure.  The PDF name should be

12     2020-05-20.

13              MR. CULOTTA:  Where would I find that

14     particular document?

15              MR. SMITH:  It's in the folder marked

16     potential exhibits.

17              MR. CULOTTA:  When was that sent because

18     I don't have it unless it was attached to something

19     that I'm not -- that I haven't seen.  I don't have

20     an email that says potential exhibits.

21              MR. SMITH:  I can send you the link right

22     now.

23              MR. CULOTTA:  Please do.

24              MR. SMITH:  That was Clay speaking,

25     correct?

Page 12

```
1            MR. CULOTTA:  That is correct.

2            MR. SMITH:  Okay.  I'm happy to send you

3    the exhibits right now.

4            MR. CULOTTA:  Thank you.

5                    (Deposition Exhibit 2 was marked

6                     for identification.)

7            MR. SMITH:  Mr. Culotta, I just emailed

8    you the exhibits.

9            MR. CULOTTA:  Okay.  Thank you.

10   BY MR. SMITH:

11      Q.    Mr. Lowe, this email, which is on the

12   screen, I'll read it for you, it is an email from

13   Philip Rizzo dated May 20, 2020, 5:43 p.m. sent to

14   me.  Subject line:  Wildlife in Need/Tim Stark.

15            It says:  "Mr. Smith, it has come to

16   my attention that Jeff Lowe has stated to you and/or

17   your co-counsels that he was advised by the Indiana

18   Office of Attorney General to not provide others

19   information about Wildlife in Need and/or Tim Stark.

20   This is not true.  The Indiana Office of Attorney

21   General never provided said direction to Jeff Lowe.

22   Sincerely Phil Rizzo."

23      A.    That is complete bullshit because I've

24   got his email telling me not to discuss this with

25   anyone.  Now what?
```

Page 13

```
 1        Q.    Now, I suggest that we continue with the

 2   deposition.

 3        A.    No.  I suggest that I have my attorney

 4   contact you and we finish it with him here because

 5   I'm not going to violate the -- and besides I wasn't

 6   speaking to Phil Rizzo.  I was talking to the

 7   Attorney General Curtis Hill.  So you're sending me

 8   an email from Phil Rizzo and what does it say about

 9   the investigation by the United States Department of

10   Agriculture against him?

11        Q.    Mr. Lowe, if you don't sit for this

12   deposition, we can compel your testimony.

13        A.    I don't care.  You guys think you scare

14   me.  I've already walked out of one of your

15   depositions, right?  Right?  What did you do?  What

16   did you do me that time?  Nothing.

17        Q.    Mr. Lowe --

18        A.    Yes.

19        Q.    Either leave and we'll compel your

20   testimony and we will seek our fees in compelling

21   that testimony or we can get through with this

22   deposition as quickly as possible.

23        A.    I'm going to give you a few more minutes,

24   and if you keep asking me questions that you know

25   the answers to, then I'm leaving.  Go.
```

Page 14

1        Q.    Were you at WIN at July 11 through the
2    13?
3        A.    I don't know if that's the exact date,
4    but I was there for a few days, yes.
5        Q.    Did you observe two lionesses that were
6    pregnant?
7        A.    No.
8        Q.    Is Mr. Stark lying when he says he gave
9    specific -- that you gave him specific instructions
10   to have the cubs pulled?
11       A.    If Mr. Stark's lips are moving, he's
12   lying, yes.
13       Q.    Did you ever reiterate to him that you
14   were the rightful owner of those cubs?
15       A.    No.  Why would I do that to him?  He's
16   the most cocky, arrogant person that you've ever met
17   and you guys know it.  Nobody tells Tim Stark what
18   to do.
19       Q.    Did you ever say to him, "fuck PETA and
20   fuck that judge, I'm not part of that lawsuit --"
21       A.    I probably said fuck PETA a thousand
22   times because I don't like PETA.  I don't even know
23   that judge.  That judge had no jurisdiction over me
24   so who knows.
25       Q.    Who was there when Mr. Stark arrived at

Page 15

1   your zoo with these cubs?

2        A.    All of my staff.

3        Q.    Did you keep a record of these arrivals?

4        A.    No.

5        Q.    Are you required by the Animal Welfare

6   Act to keep a record of any acquisitions?

7        A.    No.  Only when I put them on display, on

8   exhibit.  I can take 100 cubs in my house and I

9   don't have to put them on my inventory.

10       Q.    Are these cubs currently on exhibit at

11  your facility?

12       A.    They are in my facility.

13       Q.    Where are they at your facility?

14       A.    On my zoo, on my property.

15       Q.    Are they --

16       A.    You don't know my facility so what good

17  is it to tell you if I said enclosure 54?

18       Q.    Are these lions in an enclosure that's

19  visible to the public?

20       A.    Yes.

21       Q.    Do you currently have them listed on your

22  inventory for the USDA?

23       A.    Yes.

24       Q.    When did you place them on that

25  inventory?

1    A.    I don't know.  You didn't ask me to have

2    that information available so I did not prepare it.

3    Q.    After you decided to put these cats on

4    display, did you create acquisition records for

5    them?

6    A.    We have a -- we have them on a transfer

7    form I believe that we had to make because Tim did

8    not give health certificates to bring them into the

9    state.

10    Q.    When Mr. Stark arrived without health

11    certificates, did you ask him where those health

12    certificates were?

13    A.    No, it's not my duty.

14    Q.    What was your reaction when Mr. Stark

15    arrived with the lion cubs?

16    A.    I don't recall.  I'm not very

17    reactionary, right.

18    Q.    Did Mr. Stark say he was giving you these

19    lion cubs?

20    A.    He sat them on the ground and he says,

21    here, take care of these.

22    Q.    Was that cool with you?

23    A.    Yep, sure is.  That's what I do.

24    Q.    I'd be happy to mark and show this

25    document but I could represent to you on your

Page 17

1   Facebook account on October 1st, 2019, you said:

2   "Let me show you what a total dumb-ass Tim Stark is.

3   He lied to a federal judge by telling the judge that

4   I instructed him to pull the cubs.  What he didn't

5   know is Lauren recorded him talking about pulling

6   the cubs and asking me to lie to the USDA.  I also

7   made sure to text Stark about him pulling the cubs

8   against a court order."

9       A.    Hm-hmm.  Very true.

10      Q.    Did you understand at the time that Tim

11  taking these cubs to your property would violate

12  court orders in this litigation?

13      A.    I don't know if it was at that time or if

14  I learned it later because it's still a gray area to

15  me.  You had listed 25 or 23 big cats.  You didn't

16  say offspring thereof.  So who knew if it was legal

17  or illegal.

18              MR. SMITH:  Okay.  Actually I would like

19  to mark and show this document.  Can we mark as -- I

20  guess it's Exhibit 3 now the Facebook post from

21  October 1st.  It should be the document in the

22  exhibits folder that's listed as Exhibit 2.

23              MR. LIVINSTON:  Okay.

24                      (Deposition Exhibit 3 was marked

25                       for identification.)

Page 18

BY MR. SMITH:

1

2      Q.    I know that you have said that you can't

3   see the documents, Mr. Lowe.  Was the Facebook

4   account with the user name Jeff Negan Lowe that

5   published this on the October 1st your account?

6      A.    It belonged to my wife and I.

7      Q.    Do you remember publishing this post on

8   October -- in October 2019?

9      A.    I don't remember what I had for breakfast

10  this morning.  No.

11     Q.    You refer here to Lauren recording Tim

12  Stark talking about pulling the cubs.

13     A.    Okay.

14     Q.    Do you have access to these recordings?

15     A.    I have no idea if they're still around or

16  not.

17     Q.    How were these recordings made?

18     A.    On a phone.

19     Q.    On your phone?

20     A.    No.

21     Q.    Was it on Lauren's phone?

22     A.    I don't know whose phone she had with her

23  that night, but we have since both gotten new phones

24  so they would be gone.

25     Q.    Do you have any way to access these

Page 19

```
 1   recordings?
 2        A.    Not that I know of.
 3        Q.    You state here that you made sure to text
 4   Stark about pulling the cubs against a court order.
 5   Would you have any way to access this text message
 6   today?
 7        A.    No.  Like I said, I got new phones, which
 8   you -- you have access to it by getting Tim Stark's
 9   phone like you guys did before.
10             MR. SMITH:  Okay.  For the record, I'd
11   like us to mark as an exhibit the document in the
12   exhibits folder numbered 3.  It's a Facebook post
13   from September 8, 2019.
14             MR. LIVINSTON:  The one I just had up?
15             MR. SMITH:  No, it should be the next
16   exhibit in that folder.
17             MR. LIVINSTON:  Gotcha.
18                  (Deposition Exhibit 4 was marked
19                   for identification.)
20             MR. LIVINSTON:  This will be Exhibit 4.
21             THE WITNESS:  Who watched the Tiger King?
22   Anybody?  This is really boring, you guys.  Come on.
23   BY MR. SMITH:
24        Q.    Mr. Lowe, do you remember that in
25   September 2019, you published a Facebook post saying
```

Page 20

```
1    that Tim Stark transported approximately 100 animals
2    in an enclosed trailer to your facility?
3         A.    I don't remember posting it, but he did.
4         Q.    Do you remember making a Facebook post
5    stating that some animals Tim Stark transported were
6    chewing their tails off their bodies?
7         A.    I don't remember it, but they did.
8         Q.    Do you remember Tim Stark transporting
9    approximately 100 animals to your facility in July,
10   2019?
11        A.    Yes.
12        Q.    In what condition were these animals when
13   they arrived?
14        A.    Half dead.
15        Q.    Were most of them half dead?
16        A.    Yes.
17              MR. CULOTTA:  I'm going to object to the
18   extent that these were not big cats and it goes
19   outside the scope of this litigation.
20   BY MR. SMITH:
21        Q.    Do you remember what species of animals
22   were in this trailer?
23        A.    I mean, there were a lot of animals in
24   the trailer.  Probably -- probably of the hundred
25   animals, I would guess 60 different species.
```

Page 21

1        Q.    If we were to scroll down this post, we'd

2    see that the account of Jeff Negan Lowe posted a

3    number of photos of injured animals.  Do you

4    remember taking any such photos?

5        A.    Well, I obviously didn't take the ones of

6    Tim.

7        Q.    Can you see the images right now,

8    Mr. Lowe?

9        A.    They're very, very tiny.

10       Q.    How about this photo if we stop here?

11       A.    I can see it.

12       Q.    Do you recall this animal?

13       A.    It's a bush baby.

14       Q.    What happened to this bush baby?

15       A.    He obviously started eating himself,

16   tearing his face off.

17       Q.    Why would he do that?

18       A.    Severe stress and trauma.  No water.  100

19   degree trailer with no A/C unit.

20       Q.    Was this a different vehicle than Tim

21   Stark used to transport the lion cubs later that

22   summer?

23       A.    Same vehicle but this was a trailer.

24       Q.    Did Tim not have the trailer attached

25   when he transported the cubs later that summer?

Page 22

1       A.    He had an open trailer with heavy
2   equipment on it.
3       Q.    Does this jog your memory as to whether
4   the cubs were transported in the open trailer or in
5   the -- say on the seat?
6       A.    I don't remember.  I don't remember.  I
7   actually don't even think I saw him take them from
8   the car or from the truck.  I think by the time I
9   walked out there, they were sitting on the ground in
10  a carrier.
11      Q.    Earlier we saw that Mr. Stark represented
12  that these cubs were delivered to your zoo on
13  August 12, 2019.  Do you have any recollection as to
14  what the weather may have been in August of 2019?
15      A.    I have no idea, but I would assume it was
16  hot.
17      Q.    If I represented to you that according to
18  a Google search, temperatures of at least 100
19  degrees were reported on August 12, 2019, in central
20  Oklahoma.  Would that surprise you?
21      A.    No.  That's our Oklahoma's weather in
22  August typically.
23      Q.    Do you remember what condition the cubs
24  were in when they arrived?
25      A.    They were very, very small, and just

Page 23

```
 1    huddled together.  I brought them in and let my wife

 2    start taking care of them.

 3         Q.   Did they show any negative effects from

 4    their transport?

 5         A.   I'm not a vet.  I don't know what caused

 6    their negative effects.

 7         Q.   Earlier you told me that a number of

 8    animals Tim Stark delivered to your facility were

 9    half dead.  What did you mean by half dead?

10         A.   Say that again, please.

11         Q.   What did you mean when you told me that

12    some of the animals Tim Stark transported to your

13    zoo were half dead?

14         A.   They were near death or dead.

15         Q.   And how did you reach that conclusion?

16         A.   Because I have known animals since I was

17    six years old and I'm 55 years old.

18         Q.   In what way would they have looked half

19    dead?

20         A.   Half of them were -- well, 28 or 30 were

21    already dead, and the others were close to death

22    from dehydration.

23         Q.   Do you remember if these lions showed any

24    signs of dehydration?

25         A.   No.  Because as I said, those lions
```

Page 24

1    weren't in this trailer of death.

2         Q.    After Tim Stark arrived, did he ever ask

3    you to claim that they were born at your zoo?

4         A.    No, not that I remember.  Actually, he

5    might have.  I don't remember.  We had so many

6    conversations about so many things over the period

7    of a few months that I don't remember.

8         Q.    If we scroll up on the exhibit on the

9    screen now, you would find that you wrote:  "Not to

10   mention July 17 to 18, Tim Stark pulled five newborn

11   cubs against a federal court order and asked me to

12   claim they were born at my park."

13             Is it your testimony that that's

14   accurate and that he asked you to claim that they

15   are born at your park?

16        A.    If that's what I said then, then that's

17   what happened.

18        Q.    You also state here that Tim pulled five

19   newborn cubs.  Do you know where you got the

20   number 5 from?

21        A.    I don't know.

22        Q.    When he arrived, did he have four cubs or

23   five cubs?

24        A.    Apparently from what I'm being reminded,

25   one died at his facility before he brought it here.

Page 25

1      Q.     Who reminded you of that?

2      A.     My wife.

3      Q.     Is your wife next to you right now?

4      A.     She is.

5      Q.     When you say that one died -- I'm sorry.

6  Let me look.

7             When you say one died at his facility

8  before he brought it here, how do you know that?

9      A.     If I said it, it would have been just

10 relaying what Stark told us.  That's the only way I

11 could have known.

12     Q.     Do you have any recollection that Tim

13 told you that one cub died at his facility before

14 being transported to Oklahoma?

15     A.     I vaguely remember it but nothing

16 specific.

17     Q.     Do you have any recollection how or why

18 this cub may have died?

19     A.     I would have no idea.

20     Q.     I'd like to ask you about the living

21 situation of these four lions now that you're -- now

22 that they're at your zoo.

23            Do you know what their names are

24 currently that you or your staff identify them by?

25     A.     No.

Page 26

1      Q.    If we were at your zoo right now, would

2   you be able to, say, walk around and identify them?

3      A.    I could identify the four lion cubs.  I

4   couldn't identify them by name.

5      Q.    Do you have any other juvenile lions of

6   approximately the same age at your facility or just

7   those four?

8      A.    I have others.

9      Q.    Around the exact same age?

10     A.    Very similar.

11     Q.    If we were at your facility right now,

12  would you be able to identify all of your big cats

13  by name?

14     A.    No.  I just told you, no.

15     Q.    How do you identify your big cats?

16     A.    These cats, that's -- I'm not answering

17  that.  How do you identify your children?  Is it

18  always by name?  No, you know who your kids are.

19     Q.    What sex are these four lions?

20     A.    I think if I'm not mistaken three females

21  and a male.

22     Q.    Do you recall how soon after these four

23  lion cubs arrived in Oklahoma they first saw a

24  veterinarian?

25     A.    It would have been almost immediately.

Page 27

1    My vet comes here weekly.

2         Q.    What's the name of that veterinarian?

3         A.    It's none of your business.

4         Q.    Is this the same person as your attending

5    veterinarian for the cats at your facility?

6         A.    I have several attending veterinarians

7    and none of them are any of your business because

8    you just use that information to harass them and I

9    won't facilitate that.

10        Q.    Is the person who saw these cubs after

11   they arrived someone who signed a written program of

12   veterinary care for your zoo?

13        A.    No.

14        Q.    How many times have these cubs been

15   examined by a veterinarian?

16        A.    I don't know.  I would have to check my

17   records.

18        Q.    Do you know if the veterinarian who

19   visited them has previously treated big cats?

20        A.    Yes.

21        Q.    Big cats at your facility?

22        A.    Big cats in general, yes.

23        Q.    Where else have they treated big cats

24   other than at your --

25        A.    I could not tell you.  I have no idea.

Page 28

1      Q.    Have any of these four lions had any
2   medical issues since August 12, 2019?
3      A.    That's also none of your business.
4   Protected by HIPAA.
5      Q.    Is it your testimony that HIPAA protects
6   big cats?
7      A.    Yes.  It protects my medical records and
8   those are my medical records.
9      Q.    Has a veterinarian treated any medical
10   issues for these big cats since August 2019?
11      A.    Again, that's protected information.
12      Q.    Have these big cats been consistently
13   healthy since they arrived at your facility?
14      A.    Everything here is healthy now.
15      Q.    Have any of these lions been declawed?
16      A.    No.
17      Q.    Have you ever had a big cat cub declawed?
18      A.    No.
19      Q.    Why not?
20      A.    I do not declaw big cats.
21      Q.    Do you consider it inhumane?
22      A.    I consider it unnecessary.
23      Q.    Why is it unnecessary?
24      A.    Because I just don't believe that you
25   maim an animal because you're afraid of that animal.

Page 29

1          Q.     Have these four lions been continually

2     housed together since August of 2019?

3          A.     Yes.

4          Q.     Have they had any other enclosure mates?

5          A.     No.

6          Q.     In general, how do you decide which big

7     cats live in which enclosures?

8          A.     It is just something that you -- it's

9     just a skill that you acquire, you know, the

10    personalities of some animals versus the

11    personalities of others, and you just make that

12    evaluation as you go.

13         Q.     Do you make that evaluation?

14         A.     I do.

15         Q.     Do you have any plans to separate these

16    four lions as they grow older?

17         A.     Probably, when they reach maturity.

18         Q.     When is that?

19         A.     It depends on the particular cat.  But it

20    can be as young as two and a half years old and as

21    old as three and a half years old.

22         Q.     Do you or your staff currently monitor

23    their behavior to determine how long they can stay

24    together?

25         A.     Yes.

Page 30

1      Q.    What does that monitoring entail?

2      A.    Exactly the way you describe it.  We

3  monitor their behavior to see how long they can stay

4  together.  We observe them on a daily basis.  We

5  live here in the park amongst all of these animals.

6      Q.    Do you have a checklist of things you

7  look for?

8      A.    No.

9      Q.    Do you know the approximate dimension of

10  their enclosure?

11      A.    It's probably 160 by 30 with a 2 and a

12  half acre exercise area adjacent that they are

13  shifted in and out of.

14      Q.    How are they shifted in and out of that

15  exercise area?

16      A.    We have shift doors.

17      Q.    Is that area connected to their

18  enclosure?

19      A.    Yes, that's what I said, adjacent to.

20      Q.    Are there climbing platforms in their

21  enclosure?

22      A.    Yes.

23      Q.    Are there ways for them all to escape

24  from view at the same time?

25      A.    Yes.

Page 31

1        Q.    How high is the fencing around this

2   enclosure?

3        A.    16 feet I think, with a 3-foot 45-degree

4   kick in.

5        Q.    Does this enclosure include any swimming

6   area?

7        A.    Yes.

8        Q.    Have these lions ever gone swimming?

9        A.    No.

10        Q.    How do you know that?

11        A.    Because lions don't swim.

12        Q.    Do these enclosures include areas that

13   will provide them complete shelter from weather?

14        A.    Yes.

15        Q.    Do you know how these shelters are

16   insulated?

17        A.    They aren't insulated.  They have steel

18   structures over them.

19        Q.    And all four lions fit into this

20   enclosure at the same time?

21        A.    There is three enclosures.  It is not

22   like at Pat Craig's where they live in concrete

23   culverts.  That's where PETA sends most of their

24   cats, but this isn't like that, and they only have

25   eight-foot fences.  We have USDA regulation size

Page 32

1     fences.

2          Q.    How often is the water changed in their

3     enclosure?

4          A.    Which water?

5          Q.    The water that they drink.

6          A.    Every two hours I think we do water

7     checks on the park now this time of year.

8          Q.    Is water in this enclosure or other

9     enclosures at your facility ever allowed to turn

10    green or collect bugs?

11         A.    If it rains and it turns green instantly,

12    then there you go.  If bugs land in their water,

13    there you go, but it is changed every two hours.

14         Q.    If you or your staff see water that's

15    turned green or which bugs have accumulated, do you

16    change it immediately?

17         A.    Yes, just like Mother Nature does for

18    them in the wild.

19         Q.    In your view, would water that has turned

20    green or in which bugs have accumulated be

21    unhealthy?

22         A.    It could be or it could be perfectly

23    healthy.

24         Q.    Are the lions in the lockout areas every

25    two hours when their water is changed?

Page 33

1      A.    No.  It is changed from outside the
2    enclosure.
3      Q.    Can you describe how that process works.
4      A.    Yes.  There is water bowls hanging on the
5    sides of the cages.  Bull hooks are used to empty
6    the water and we scrub the bowls out through the 4
7    by 4 openings and then the hose is put back in to
8    refill the water tanks.
9             I have invited you guys here several
10   times.  You guys can come and observe any time you
11   want.  PETA doesn't have to send spies.  I have
12   actually offered to give them jobs here.  Then they
13   could report back to PETA every day how we do
14   things.
15     Q.    How often is the rest of the enclosure
16   cleaned?
17     A.    Several times a week.
18     Q.    Do you do this yourself?
19     A.    No.
20     Q.    Who does it?
21     A.    Our staff.  And our perfect USDA
22   inspections will verify that we keep our facility
23   very clean.
24     Q.    Are lions locked in their lockout areas
25   during this routine cleaning?

Page 34

1        A.    Yes.

2        Q.    Who chooses enrichment items for their

3    enclosure?

4        A.    They have tires, they have balls, they

5    have spools, they have boxes, they have big car wash

6    brushes.

7        Q.    I'm sorry.  You might think this is a

8    dumb question, but when you say spools --

9        A.    They all are so far.  Pardon me?

10       Q.    When you say spools, what does that refer

11   to?

12       A.    The big cable spools.

13       Q.    What kind of cable?

14       A.    There's no cable on it.  It is the spools

15   that hold cable.

16       Q.    Got it.  What kind of balls?

17       A.    Indestructible balls that are made for

18   big animals like lions, tigers, and bears.

19       Q.    Are these by any chance Boomer balls?

20       A.    They're not the brand name Boomer but

21   they're just like the Boomer balls.

22       Q.    Have you ever used balloons?

23       A.    Not with these lions, not with the cats

24   that you're concerned about.

25       Q.    Pieces of wood?

Page 35

1          A.     Pieces of wood?  Are there pieces of wood

2     in nature?  There's wood everywhere.  We build

3     things out of wood.  Their enclosure -- their cabins

4     are made out of wood.  There's trees in their --

5          Q.     Are they used as an enrichment item?

6          A.     No.  If they want to scratch on a tree,

7     do you consider that enrichment?  You know, it's up

8     to your professional Jay Pratte to figure out.

9          Q.     In what way are items like tires

10    enriching for the lions?

11         A.     Because they pick them up and throw them

12    around.

13         Q.     How long are these items left in their

14    enclosure?

15         A.     Until they are taken out.

16         Q.     How often are they taken out?

17         A.     When they have damage.  How often are

18    they damaged?  When the tigers and lions chew on

19    them.

20                These questions are getting really

21    redundant and very, very unnecessary.  I'm a busy

22    man.  You can compel me -- if you want to get to the

23    meaty questions, let's do it before I stand up and

24    leave.

25         Q.     I would like to mark and show what is in

Page 36

1    the exhibits folder as Exhibit 5.  It is a May 4,

2    2020, Facebook post from a member of the public

3    named, Mary Francis.

4          A.    So now we're looking at other people's

5    Facebook posts?  I'm supposed to determine any --

6                MR. LIVINSTON:  Which exhibit was that

7    again, 4?

8                MR. SMITH:  It's the one in the folder.

9                MR. LIVINSTON:  Number 5.  Got it.

10                     (Deposition Exhibit 5 was marked

11                      for identification.)

12               MR. SMITH:  Please scroll to the third

13    page.  Can you make the photos a little smaller so

14    we can see more of it?

15    BY MR. SMITH:

16         Q.    I'll represent to you that we pulled this

17    photo from a public Facebook post published on

18    May 4, 2020, and that these appear to be the same

19    lions that you identified to me in an email are the

20    ones from WIN.  Does this look like those lions?

21         A.    I have no idea.  All lions look alike.

22         Q.    Do you see the ball and chain near the

23    top of this photo?

24         A.    Oh, good Lord.  No.  It's too small.  I

25    can't see anything.

Page 37

1    Q.   Has a ball and chain ever been an

2    enrichment item in their enclosure?

3    A.   Yes.  Not in your -- not in Stark's

4    enclosure where Stark's cats were, but we use Boomer

5    balls or similar balls hooked through chains all the

6    time and the USDA fully approves it as long as we

7    clamp the two chains together where they can't get

8    their heads in there or their paws in there to hang

9    themselves.  But there's no evidence that those are

10   Tim Stark's cats.  And because of the day of

11   published, it doesn't mean that it was taken that

12   date.  You are asking me to speculate.

13   Q.   When enrichment items are changed, are

14   the lions also in their lockout areas?

15   A.   We don't go in.  I might go in with cats

16   but my staff doesn't go in with cats over a year

17   old.

18   Q.   How many other groups of big cats also

19   have access to this same lockout enclosure that you

20   have described?

21   A.   I didn't describe a lockout enclosure.

22   Q.   You described I believe a two-acre area

23   adjacent --

24   A.   That's not a lockout.  I said that's an

25   exercise area.

1      Q.    Okay.  How many other big cats have

2   access to that exercise area?

3      A.    What does that matter?  Several.  Maybe

4   10, 12, 15.  But those aren't the lions that were

5   the scope of this deposition.

6      Q.    Are groups of big -- are different groups

7   of big cats from different enclosures ever rotated

8   through that area at the same time?

9      A.    Are what?

10      Q.    Are different groups of big cats from

11   different enclosures ever rotated into the exercise

12   area at the same time?

13      A.    No.

14      Q.    Does your zoo have a formal written lion

15   or big cat nutrition plan?

16      A.    Yes.

17      Q.    Who put together that plan?

18      A.    We did.

19      Q.    Who is we?

20      A.    We -- we -- the people here at the zoo

21   who do it every single day.  You have already filed

22   a FOIA request for all of this from the USDA because

23   I got the notice.

24      Q.    Is this a document that you keep at your

25   facility?

Page 39

1        A.     Nope, I keep it in my home.

2        Q.     Does your zoo have a formal written lion

3    or big cat nutrition plan?

4        A.     Yes, we do.

5        Q.     Are these --

6        A.     You just -- you just FOIA requested it

7    from the USDA.  You know I have one.

8        Q.     Are these lions fed a diet in accordance

9    with that written plan?

10        A.     Yes, they are.

11        Q.     Do you or your staff monitor the big cats

12    at your zoo using any kind of body condition

13    guidelines?

14        A.     Yes, we do.  And my vet is here every

15    week like I told you.

16        Q.     What guidelines are those?

17        A.     You know what, this is getting completely

18    ridiculous.  Because I have already told you guys

19    I'm not sharing my years and years of hard work and

20    research with PETA to put in a public record.  Let

21    someone else spend the money to develop their diets

22    and their plans.  You guys have already requested

23    this from the United States Department of

24    Agriculture.  So sitting here trying to stump me

25    with your stupid questions isn't going to work

Page 40

1    because this is why I will leave.

2         Q.    Mr. Lowe, I'm not trying to stump you.

3         A.    Yes, you're throwing out stupid

4    questions, Asher.

5         Q.    Excuse me.  Don't interrupt me.

6         A.    I will.  Don't fucking do that, dude.  I

7    will get up and leave.  Tim Stark, I know there's a

8    big smile on your face because you have seen this

9    shit happen before.  Asher, don't tell me what to

10   do.  I'll turn this phone off just like that.

11        Q.    You testified that four lions from WIN

12   are at your facility.  Those big cats are the

13   subject of this litigation.  I'm obviously entitled

14   to ask about the conditions under which those lions

15   live.

16        A.    What does that have to do with my other

17   cats that you're asking about?

18        Q.    Who just spoke?

19        A.    None of your fucking business.  I don't

20   ask you who is speaking in the room behind you.

21        Q.    I would like to remind you that you're

22   the one under oath here.

23        A.    I don't give a shit, Asher.  I'm also the

24   one who is in control as always.  I will get up and

25   leave.  You can compel my testimony.  They'll put

Page 41

1    sanctions on me, and I have no assets deliberately

2    so you'll never get anything from me.  You want to

3    keep playing this game over and over, or do you want

4    the information to take out an animal abusing

5    asshole like Tim Stark.  You decide.  I can either

6    help you or I can completely fuck your day up.  It's

7    up to you.

8              MR. CULOTTA:  I just want to note -- this

9    is Clay Culotta.  I just want to note for the record

10   that to the extent --

11             THE WITNESS:  He's not an asshole, is

12   that what you're going to say, Clay?

13             MR. CULOTTA:  I'm only going to say this:

14   To the extent that if there's any kind of collusion

15   or any other kind of activity between Mr. Lowe and

16   PETA, I would like to know what communications there

17   have been and what --

18             THE WITNESS:  They reached out to me --

19             MR. CULOTTA:  -- quid pro quo has been

20   offered.

21             THE WITNESS:  All the time they reach out

22   to me, and you are never included in the emails, and

23   I brought it to their attention several times.  And

24   I've also questioned as to why Tim Stark didn't

25   receive these communications.  Haven't I?

Page 42

1    BY MR. SMITH:

2         Q.    Mr. Lowe, you just testified --

3         A.    Now what are you going to do?  You guys

4    just fucked up, right?

5         Q.    You just testified "I can either help you

6    or I can completely fuck up your day, it's up to

7    you."

8         A.    Yeah, fuck up your day by getting up and

9    quitting and you won't get the information that I

10   have.  That's what I mean.  Because ask real

11   questions with substance.  Don't ask about --

12   obviously, my cats here are in excellent health

13   because I have perfect USDA inspections.  I don't

14   have cats dropping dead left and right like Tim

15   Stark does.  My cats are fine and they're in much

16   better enclosures than PETA sends them to at Pat

17   Craig's facility in Colorado.  So if you guys want

18   to keep jerking each other off, that's fine.  Do it

19   but do it without me.  But if you want real

20   questions answered about the condition of the

21   animals that Tim brings here or that he brought here

22   and the animals that died, then let's get to those

23   questions, but don't ask me about balls and chains

24   hanging in my fucking cages because they are

25   perfectly legal.  You guys are just trying to make

Page 43

1    something out of nothing.  That's what pisses me

2    off.  I don't tolerate people wasting my time.

3                 By the way, did I tell you that I did

4    hire an attorney for this and he is not here so if

5    you guys want to continue questioning me now that I

6    have advised you that I have retained counsel, then

7    go ahead, keep asking.

8        Q.    Has your counsel entered an appearance in

9    this case?

10       A.    He has not filed any paperwork that I'm

11   aware of.

12       Q.    What's the name of this counsel?

13       A.    You will find out.  I have six of them,

14   in fact.

15       Q.    Okay.  You just said "if you want real

16   questions answered about the condition of the

17   animals that Tim brings here or that he brought here

18   and the animals that died, then let's get to those

19   questions."

20       A.    Exactly.  Don't ask me about balls and

21   chains hanging from the ceilings that we use for

22   enrichment.  That has nothing to do with Tim Stark's

23   animals.

24       Q.    What should I be asking you about the

25   lions that Tim brought to your facility?

Page 44

1          A.     Ask him why he brought them here.  You

2     guys obviously know he's a liar because you've

3     accused him of lying in every court paper that I

4     have read, but you want to ask -- you want to ask if

5     he's telling you the truth that I instructed him to

6     bring those cats here.  What do you think the answer

7     to that is?

8                  You guys put him through a seven-hour

9     deposition when he was in Thackerville, that gave

10    him a mild heart arrhythmia.  He was put into the

11    hospital.  During his hospital visit or stay, he had

12    somebody go to his truck and get a transfer form and

13    put all of his animals into my name because he

14    thought he was going to die.  Had he died, those

15    animals would be here.  He didn't die.  I

16    transferred the animals back to him.  That's the end

17    of my involvement.  You guys want to bring me into

18    this because you know you can't get me on anything

19    else because my record is spotless.  So PETA's only

20    attempt or PETA's only effort to tarnish my name is

21    to include me in with Tim Stark and his animal

22    abuse.  I'm not falling for it.  And neither will my

23    attorneys and neither will the general public and a

24    jury.  Nor will they on Tiger King Season 2 when I

25    expose all of you guys.

Page 45

1    Q.    Is there anything that I haven't asked

2  you about the transport of these lions?

3    A.    Yeah.   Where do you get -- is there

4  anything what?

5    Q.    Is there anything I haven't asked you

6  about the transport of these lions to your facility

7  that I should know?

8    A.    No.   Because I wasn't involved in that

9  transport.   Tim was.

10   Q.    How often did these lions have access to

11  the exercise area we were talking about?

12   A.    Every other day.   They get shifted in

13  every other day.   And on top of it, they're in a

14  cage that's about 16 times the size of the USDA

15  regulated cage.

16   Q.    What are these lions fed?

17   A.    They are fed red meat.   They are fed

18  chicken.   They are fed pork.   Actually scratch the

19  pork.   They are fed red meat and chicken and

20  vitamins.

21   Q.    What vitamins?

22   A.    Oasis or Wild Trax.   We alternate.

23   Q.    When they're fed meat, are they fed whole

24  carcasses?

25   A.    Sometimes.   I mean, we also feed rabbits

Page 46

1      to them, whole carcass rabbits.

2            Q.     How do you get these carcasses?

3            A.     We -- from farmers, from -- we have

4      people hunting the animals for us.  We have -- we're

5      in the middle of Oklahoma with dairy farms

6      everywhere.  Cows, we pick up cattle every single

7      day.

8            Q.     Do you ever feed them roadkill?

9            A.     No, I won't touch roadkill.

10           Q.     Do you do anything to determine that the

11     carcasses you feed the lions are safe to eat?

12           A.     You mean like -- yeah because we kill

13     them usually.  We won't take cows that have been put

14     down with drugs.  People drop off cows and horses

15     here all the time.

16           Q.     Does anyone monitor the lions to ensure

17     they don't fight over the carcasses?

18           A.     Are you serious?  Serious?  What do you

19     do if they do?  Do you step in there and break it

20     up?  This is what I'm talking about.  Don't ask

21     dumb-ass questions.

22           Q.     Is that a "no"?

23           A.     That's a dumb-ass question.

24           Q.     How long is raw meat allowed to stay in

25     there before being removed?

Page 47

1          A.      Excuse me?

2          Q.      For how long is raw meat allowed to stay

3     in the lions' enclosure before being removed?

4          A.      We pull it out after a couple of hours if

5     they do not eat it because it draws ants.

6          Q.      When did these lions transition to eating

7     raw meat?

8          A.      Every one is different, but I'm going to

9     say that it was probably around seven weeks,

10    eight weeks that we start introducing it, and

11    they're still on their formula bottles at that time

12    and then they fully transition at about six or

13    seven months.

14         Q.      Did each lion have an assigned bottle?

15         A.      No.  We sterilize all of our bottles so

16    they don't need to be assigned to a particular cat.

17         Q.      Did members of the public ever feed them

18    from bottles or just you or your staff?

19         A.      Just us.

20         Q.      Do you do anything to insure that the big

21    cats don't consume fluids from the bottles too

22    quickly?

23         A.      Yes, we do.

24         Q.      What do you do?

25         A.      We make sure they don't have nipples with

Page 48

1    big holes in them so they aspirate.

2         Q.    Would the contents of each bottle change

3    as the lions grow older?

4         A.    We stick to the -- to the formula

5    specifications.

6         Q.    Where do those specifications come from?

7         A.    From the vet and from the bag.

8         Q.    Is anyone at GW -- is anyone at your zoo

9    particularly responsible for caring for your big

10   cats, in particular these lions?

11        A.    Yes, our cat crew.

12        Q.    Who is on the cat crew?

13        A.    You don't know them.

14        Q.    What kind of training do they have?

15        A.    They've been trained on the job with

16   thousands of hours of training.

17        Q.    Do you have a formal training program?

18        A.    We do.

19        Q.    Who devised that program?

20        A.    It was devised by Joe years and years

21   ago.

22        Q.    Have you ever had your training program

23   evaluated by anyone from outside your zoo?

24        A.    Our vets look at everything.

25        Q.    Did anyone other than your vets look at

Page 49

1    the program?

2         A.    Like who?  You?  You wouldn't know what

3    you're looking at.  Vets.  I don't think you need

4    anyone more than a vet to evaluate the care of your

5    animals.

6         Q.    Does the big cat crew personnel receive

7    any external training?

8         A.    No.

9               This has nothing to do with those

10   lions.  So I'm about ready to stand up and leave.

11   You're just using this is a fishing expedition,

12   Asher, and it's not going to work.

13        Q.    Is there a big cat -- has your training

14   program for the big cat crew changed at all since

15   Joe devised it?

16        A.    Yes, but I can't tell you how because I

17   would have to go up and look at the edits and the

18   additions.

19        Q.    You believe these were significant

20   changes?

21        A.    Asher, next question.

22        Q.    Do you use any big cat husbandry manuals

23   or guides published from anyone outside your zoo?

24        A.    We do.  Laura Gage.  You might have heard

25   her name.

Page 50

1      Q.    Is there a specific level of knowledge or
2  qualification that someone working at your zoo needs
3  to be on the big cat crew?
4      A.    Yes, they have to be trained.  And this
5  has nothing to do -- I'm -- you're dangerously close
6  to me walking away.
7      Q.    For how long do they have to be trained?
8      A.    All right.  I'm leaving.  See you later,
9  guys.  Bye, Tim.
10                     (Whereupon, Jeff Lowe
11                      disconnected from the ZOOM
12                      deposition at 10:03 a.m.)
13          MR. SMITH:  This is Asher Smith.  I'd
14  like to note for the record that Jeff Lowe appears
15  to have just hung up and left the deposition while
16  it is still on the record and it had been ongoing
17  for approximately an hour.  We're going to take a
18  break and go off the record right now and determine
19  how and if we want to reconvene.  Thank you.
20                     (Whereupon, a break in the
21                      proceedings was taken.)
22          MR. SMITH:  This is Asher Smith.  I'd
23  just like to add for the record that counsel for
24  PETA consulted with chambers for Magistrate Judge
25  Lynch.  The Court requested that we establish for

Page 51

1    the record what occurred.  Mr. Lowe hung up and left

2    the deposition after slightly under an hour on the

3    record after I asked him about the training

4    undertaken by staff at his facility that cared for

5    the four lions taken from WIN.

6                    We will not be closing the

7    deposition, and we will be filing a motion with the

8    Court to compel Mr. Lowe to complete this

9    deposition.

10                    With that, we can go off the record

11   for the rest of the day.

12                         (Off the record at 11:04 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 52

1                    REPORTER CERTIFICATION

2

3

4            I, JO ANN LOSOYA, a Certified Shorthand

5    Reporter of the State of Illinois, do hereby certify

6    that I reported in shorthand the proceedings had at

7    the deposition aforesaid, and that the foregoing is

8    a true, complete and correct transcript of the

9    proceedings of said deposition as appears from my

10   stenographic notes so taken and transcribed under my

11   personal direction.

12           IN WITNESS WHEREOF, I do hereunto set my

13   hand at Chicago, Illinois, this May 27, 2020.

14

15

16

         JO ANN LOSOYA

17       C.S.R. No. 084-002437

18

19

20

21

22

23

24

25

Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL | ) | |
| TREATMENT OF ANIMALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| WILDLIFE IN NEED AND | ) | Case No. 4:17-cv-186 |
| WILDLIFE IN DEED, INC., | ) | |
| TIMOTHY L. STARK, | ) | |
| MELISA D. STARK, and JEFF LOWE | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION TO DEFENDANT JEFF LOWE**

Plaintiff People for the Ethical Treatment of Animals, Inc. ("***PETA***"), by and through its undersigned counsel, hereby provides the following Interrogatories and Requests for Production to Defendant Jeff Lowe pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure.

**INSTRUCTIONS**

A.      Mr. Lowe shall separately answer each Request on the basis of his entire knowledge from all sources after conducting an appropriate and good faith inquiry and search for all documents (as defined herein) within his possession, custody, or control.

B.      In the event any document is withheld on a claim of the attorney-client privilege or other protection, Mr. Lowe is to provide a description of the documents withheld that meets the requirements of Fed. R. Civ. P. 26(b)(5).

C.      The singular includes the plural and vice versa.

D.      Unless otherwise specified, the relevant time period for each request and interrogatory is from January 1, 2018, to the present date.

## **DEFINITIONS**

A.     "You" and "your" means the corresponding Defendant answering the discovery requests below and their agents, partners, employees, volunteers, and any veterinarian or veterinarian technician retained by that Defendant.

B.     "Wildlife In Need" means Defendant Wildlife In Need and Wildlife In Deed, Inc., and its officers (including Tim Stark and Melisa Lane), directors, employees, volunteers, consultants, affiliates, subsidiaries, parents, partners, joint ventures, related entities, predecessors and successors in interest, agents, and other people or entities under its direct or indirect control.

C.     "Big Cats" means any lions, tigers, and hybrids thereof, including cubs or individuals of any age, currently and/or previously in the possession, custody, or control of any Defendants.

D.     "Communication" means any transmission of information by one person or entity to another person or entity by any means, including email, text messaging, Facebook or other social media posts or messages, telephone, and facsimile.

E.     "Document" is equal in scope and usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a).  A draft or non-identical copy is a separate document within the meaning of the term. Please note that including terms in the requests describing specific types of documents, such as "agreement", "records", "file", "drawings" and "policy", is intended only to aid in Your understanding of the types of documents called for by the request.

F.     Any response to a request to "identify" a Person or Big Cat shall include the following, if applicable:

      a.   known current or prior names;

      b.   approximate ages and dates of birth;

      c.   business address and telephone number;

2

    d.   home address and telephone number; and

    e.   title, occupation, and current or last known employer.

G.      The phrase "party" or "parties" refers to any individuals or entities signing, assenting to, or who are otherwise bound by an agreement, transaction, contract, or other business arrangement.

H.      The phrase "relating to" or "related to" means constituting, defining, describing, containing, discussing, embodying, reflecting, identifying, stating, referred to, dealing with, associated with or in any way pertaining to.

I.      "USDA" means the U.S. Department of Agriculture and its respective offices and departments.

## INTERROGATORY NOS. 1 THROUGH 5

<u>INTERROGATORY NO. 1.</u> Please identify:

    a.   Each Big Cat you provided, directly or indirectly, to Wildlife in Need and/or Tim Stark since January 1, 2018; and

    b.   Each Big Cat that you received, directly or indirectly, from Wildlife in Need and/or Tim Stark since January 1, 2018.

<u>INTERROGATORY NO. 2.</u> Please identify the "newborn lion cubs" and the "lion cubs" you reference in the September 9, 2019 Facebook post attached as **Exhibit A** and the October 1, 2019 Facebook post attached as **Exhibit B**.

INTERROGATORY NO. 3. Please identify the Big Cats shown in the nine Instagram posts from August, September, and October 2019 attached collectively as **Exhibit C**.

<u>INTERROGATORY NO. 4.</u> Please identify any communications or other documents, including those  text messages and audio and/or video recordings you reference in the October 1, 2019 Facebook post attached as **Exhibit B**, you have exchanged with Tim Stark, Lauren Lowe, and/or the Office of Indiana Attorney General Curtis Hill regarding the Big Cats referenced in Interrogatories Nos. 1 and 2.

INTERROGATORY NO. 5. For the Big Cats referenced in Interrogatories Nos. 1 and 2, please identify:

    a.  The make and model of any vehicle in which these Big Cats have been moved or otherwise transported;

    b.  The duration of any period of time in which these Big Cats have been moved or otherwise transported in a vehicle;

    c.  The current USDA Animal Welfare Act license number(s) related to these Big Cats, or under which the Big Cats are currently kept;

    d.  Any states, venues, addresses, buildings, and/or enclosures at which these Big Cats have been held, or are currently being kept;

    e.  Any states, venues, addresses, buildings, and/or enclosures at which you intend to keep these Big Cats;

    f.  The dates of any known transactions, including transfers or donations, involving these Big Cats;

    g.  The parties to any known transactions, including transfers or donations, involving these Big Cats;

    h.  Any communications between the parties to any such transactions;

    i.  Any terms or documents memorializing any such transactions;

    j.  The dates and reasons for any veterinary examinations or treatments of these Big Cats;

    k.  The identity of any veterinarians who examined or treated these Big Cats;

    l.  Any photographs, videos, or other depictions of these Big Cats

    m.  Whether these Big Cats have been declawed as that term is defined in the preliminary injunction issued by the court in *PETA v. Wildlife In Need and Wildlife in Deed, et al.*, No: 4:17-cv-0186, ECF No. 89;

    n.  If declawed, state the date of declawing and identify the individual who performed the declawing of these Big Cats;

    o.  Whether these Big Cats have participated in any public encounters or displays as those terms are defined in the preliminary injunction issued by the court in *PETA v. Wildlife In Need and Wildlife in Deed, et al.*, No: 4:17-cv-0186, ECF No. 89;

    p.  If these Big Cats have participated in public encounters or displays, the approximate date of the encounters or displays;

q.  If these Big Cats have participated in public encounters or displays, the names and any known contact information of anyone who attended or participated in the encounters or displays; and

r.  If these Big Cats have participated in public encounters or displays, the revenue generated by these events.

## REQUEST FOR DOCUMENTS NOS. 1 THROUGH 4

REQUEST NO. 1. Any and all documents and other information referred to in or relating to Interrogatories Nos. 1 through 4, including but not limited to any and all related documents, records, photographs, audio recordings, videos, and communications.

REQUEST NO. 2. Any and all other documents kept by you pursuant to law, regulation, or in the normal course of business relating to the Big Cats referenced in Interrogatories Nos. 1 and 2, including but not limited to any USDA required documents; any documents relating to the purchase, acquisition, transport, disposition, transfer, sale, donation, or trade of these Big Cats; any documents relating to these Big Cats' diet or enrichment; any documents relating to the provision of veterinary services for these Big Cats; any photographs, videos or other depictions of these Big Cats; any documents identifying or describing enclosures used to house these Big Cats; and any documents identifying, promoting, or otherwise describing public encounters or displays in which these Big Cats have participated.

REQUEST NO. 3: Any and all communications or other documents sent between you and Wildlife in Need since January, 2018, including, without limitation, communications regarding Big Cats.

REQUEST NO. 4: All communications or documents in your possession regarding Wildlife in Need since January, 2018.

Dated: April 1, 2020

Respectfully submitted,

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.

By:  /s/  Brian W. Lewis

Brian W. Lewis
Paul Olszowka
BARNES & THORNBURG LLP

One North Wacker Drive, Suite 4400
Chicago, IL 60606-2833
Phone: (312) 357-1313
Facsimile: (312) 759-5646
brian.lewis@btlaw.com
paul.olszowka@btlaw.com

Caitlin Hawks
Gabriel Walters
Asher Smith
PETA FOUNDATION
1536 16th Street NW
Washington, DC 20036
Telephone: 202-483-7382
Facsimile: 202-540-2208
CaitlinH@petaf.org
GabeW@petaf.org
AsherS@petaf.org

## <u>CERTIFICATE OF SERVICE</u>

I, Brian Lewis, an attorney, certify that on April 1, 2020, the foregoing document was

served via email to J. Clayton Culotta, 815 E. Market Street, New Albany, IN 47150,

clay@culottalaw.com, and Defendant Timothy L. Stark, pro se, 3320 Jack Teeple Road,

Charlestown, IN 47111, wildlifeinneed@aol.com, and via courier, and email to Jeff Lowe, 25803

N County Road 3250, Wynnewood, OK 73098, returnprice@hotmail.com.

Dated: April 1, 2020                           */s/ Brian W. Lewis*

Brian W. Lewis
  Brian.Lewis@btlaw.com
Paul T. Olszowka
  Paul.Olszowka@btlaw.com
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: 312- 357-1313
Facsimile: 312-759-5646

Caitlin Hawks
  CaitlinH@petaf.org
Gabriel Walters
  GabeW@petaf.org
Asher Smith
  AsherS@petaf.org
PETA FOUNDATION
1536 16th Street, NW
Washington, DC  20036
Telephone: (202) 483-7382
Facsimile: (202) 540- 2208

*Attorneys for People for the Ethical
Treatment of Animals, Inc.*

Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,

Plaintiff,

v.

WILDLIFE IN NEED AND                                    Case No. 4:17-cv-186
WILDLIFE IN DEED, INC.,
TIMOTHY L. STARK,
MELISA D. STARK, and JEFF LOWE

Defendants

<u>**ANSWERS TO FIRST SET OF INTERROGATORIES**</u>
<u>**AND REQUEST FOR PRODUCTION FROM DEFENDANT JEFF LOWE**</u>

<u>**INTERROGATORY NOS. 1 THROUGH 5**</u>

   **a.)** None
   **b.)** Four lion cubs were dropped off by Tim Stark approximately August 1st 2019.

INTERROGATORY NO. 2.

I was speaking of the four lion cubs Stark dropped off approximately August 1st 2019

INTERROGATORY NO. 3.

We had li-liger cubs born during this same time frame, so I'm unable to identify with any degree
of certainty

INTERROGATORY NO. 4.

To the best of my knowledge I have no communications or recordings or test messages with
Stark or my wife regarding the big cats referenced in Interrogatories Nos. 1 and 2.

Any communication I have had with the Office of Indiana Attorney, specifically, General Curtis
Hill, cannot be handed over to Plaintiff at the specific order of Curtis Hill, not to reveal any
details of his investigation.

INTERROGATORY NO. 5

a.) 2019 Dodge Pick-up (black)

b.) None

c.) 73-C-0230

d.) 25803 NCR 3250 Wynnewood OK 73098

e.) 25803 NCR 3250 Wynnewood OK 73098

f.) None

g.) None

h.) None

i.) None

j.) Privileged information. The State of Oklahoma protects the release of medical records of any animals, unless presented a subpoena.

k.) Privileged information. The State of Oklahoma protects the release of medical records of any animals, unless presented a subpoena

l.) I have no specific knowledge of photographs or videos that specifically identify the 4 lions cubs dropped here by Stark.

m.) I have never declawed or permitted the declawing of any animal

n.) Not applicable

o.) To the best of my knowledge, the cubs dropped off by Tim Stark were not used in public encounters

p.) Not applicable

q.) Not applicable

r.) Not applicable

## REQUEST FOR DOCUMENTS NOS. 1 THROUGH 4

REQUEST NO. 1.

I have no documents, videos, audio recordings, or communications with regard to these 4 lion cubs.

REQUEST NO. 2

No such documents exist. Medical records are privileged.

REQUEST NO. 3

No such documents are available to me any longer. I got a new phone and lost my text messages.

REQUEST NO. 4

No such documents are available to me any longer. I got a new phone and lost my text messages.

Respectfully submitted,
Jeff  Lowe

Exhibit 4

| | |
|---|---|
| **From:** | Jeff Lowe <returnprice@hotmail.com> |
| **Sent:** | Thursday, May 7, 2020 3:12 AM |
| **To:** | Asher Smith |
| **Cc:** | Lewis, Brian; Olszowka, Paul; Gabriel Walters; Caitlin Hawks |
| **Subject:** | Re: PETA v. WIN, et al. Case No: 4:17 CV 186 |

---

**From:** Asher Smith <AsherS@petaf.org>
**Sent:** Wednesday, May 6, 2020 1:26 PM
**To:** Jeff Lowe <returnprice@hotmail.com>
**Cc:** Lewis, Brian <Brian.Lewis@btlaw.com>; Olszowka, Paul <Paul.Olszowka@btlaw.com>; Gabriel Walters <GabeW@petaf.org>; Caitlin Hawks <CaitlinH@petaf.org>
**Subject:** RE: PETA v. WIN, et al. Case No: 4:17 CV 186

Mr. Lowe,

Thank you for your response. If you can clarify a small number of issues by **Monday, May 11**, we believe we will be able to proceed without needing to file a motion to compel with the Court.

These issues are as follows:

1.   In your response to PETA's second Interrogatory, you state that you were referring to "four lion cubs Stark dropped off approximately August 1st 2019." We ask that, consistent with PETA's instructions, you identify these four cubs by their known current or prior names and approximate ages/dates of birth. According to Mr. Stark, one cub was born on July 29, 2019 and three were born on August 7, 2019. *See* ECF No. 260.

Mr. Smith,
when I was able to answer your questions, I provided answers. I don't know how old the lion cubs were. I couldn't begin to tell you what names if any, our staff calls those lions.  I have no clue when they were born.  I approximate they were born in mid to late July of 2019. Sometime in early August of 2019, four lion cubs were dropped off one rainy night and Stark told us to take care of them then he left. He didn't tell me their birthday unless he did it in a text message that you would already have. I don't have access to my old text messages.

2.   In your response to PETA's third Interrogatory, you state that you cannot identify the cubs shown in Exhibit C. We ask that you confirm, on a yes or no basis, if any of these cubs are among the four dropped off by Mr. Stark. If yes, we ask that you please identify which cubs, by name, correspond to which photographs in Exhibit C.

Sir, my answer is my answer. I have no clue what pictures represent what cubs. They change in appearance in a matter of weeks and I cannot identify from old pictures, who's who. I refuse to say yes, or no because I simply don't know. Had you asked me this question nine months ago, I might have been able to help you with that. As I explained in my first answer to this question, we recycle photographs all the time. Those pictures could be from any one of several lion or liger cubs born here in the last four years.

3.   Your response to PETA's fourth Interrogatory appears inconsistent with your statement, in Exhibit B, that "I also made sure to text Stark about him pulling cubs against a court order." We ask that you confirm, on a yes or no

basis, if this statement from Exhibit B is true. If yes, we ask that you produce screenshots of these text messages and any similar communications.

I told you that I have NOTHING to provide you. I have nothing to reference time frame either. You captured my Facebook Posts, so you have far more than I have, because I deleted my social media accounts. It's possible that I provided more information to the State of Indiana for their case against Stark Demand that Curtis Hill share that material with you, if you feel entitled to it. Even if I still had that information, I was told not to share information about their investigation into Stark with ANYONE. They even asked me to remove FB posts that revealed too much. So I deleted my social media completely.

4.   We ask that you state the duration of time the four lion cubs at issue were transported in any vehicle, including in the vehicle referred to in your response to Interrogatory No. 5(a) and the duration of any travel between Mr. Stark's facility in Indiana and your facility in Oklahoma.

I have no idea what day or what time Tim Stark left Indiana, nor did I pay attention to what day or time he arrived in Oklahoma.  That's an answer that only Tim Stark can give you.

5.   We ask that, consistent with your obligations under the Animal Welfare Act and PETA's second Request for Documents, that you provide documents pertaining to the diet and enrichment plans that apply generally to Big Cat cubs at your facility, which would include the four lion cubs at issue.

Those documents are privileged information that we refuse to share with anyone. If you feel you are entitled to them, file a FOIA request and let the USDA decide if this is appropriate information for PETA to obtain. We spend a great deal of time and money perfecting our diets and they will not be distributed to the general public. Furthermore, my big cat diets are not the same as my cub diets. We have specific diets for cubs. My obligation under the Animal Welfare Act isn't to provide that information to PETA, but to the USDA.

6.   We ask that, consistent with your responses to PETA's third and fourth Requests for Documents, you confirm the date on which you got a new phone and lost access to your prior text messages, and state the model and carrier of your old phone and model and carrier for your new phone.

PETA already has my entire text conversation with Tim Stark from the phone dump you performed on his phone. My new iPhone was purchased shortly after Netflix released my cell number on the TIGER KING documentary . My old phone was also an iPhone. ATT is the carrier. I don't what model phone I have now, whatever the new one is. They aren't marked, so I don't know. I think my old iPhone was an iPhone 8, but I'm not positive.

7.   Finally, we ask that you provide the precise legal basis for your objection that veterinary records are exempt from civil discovery as contemplated by Fed. R. Civ. P. 34, and for your confirmation, on a yes or no basis, if you are withholding any responsive materials on the basis of this objection.

There are two lawsuits besides yours involving Tim Stark. In one of those lawsuits, I have been instructed by the Attorney General of Indiana not to share ANY information regarding their investigation into Tim Stark. Medical records of any of Stark's animals under my care, are definitely part of their criminal investigation.  The same medical records are part of a Garvin County OK civil lawsuit between Tim Stark and myself.

If you believe any of these matters can be more efficiently addressed over the phone, please suggest a time this week or next at which we can get on a call.

Sincerely,

Asher Smith

**Asher Smith** | Litigation Manager
**PETA Foundation**
1536 16th St. NW
Washington, DC 20036
M: (516) 528-3109
AsherS@petaf.org

Admitted to practice law only in New York.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

**From:** Jeff Lowe <returnprice@hotmail.com>
**Sent:** Tuesday, May 5, 2020 9:13 PM
**To:** Asher Smith <AsherS@petaf.org>
**Cc:** Lewis, Brian <Brian.Lewis@btlaw.com>; Olszowka, Paul <Paul.Olszowka@btlaw.com>; Gabriel Walters <GabeW@petaf.org>; Caitlin Hawks <CaitlinH@petaf.org>
**Subject:** Re: PETA v. WIN, et al. Case No: 4:17 CV 186

Please note: I deleted all my personal social media. Any accounts associated to my name are fraudulent. Please establish the authenticity of any claims in the future, that the accounts and postings that you rely on to draw your conclusions, are in fact my legitimate accounts.

Jeff Lowe

---

**From:** Asher Smith <AsherS@petaf.org>
**Sent:** Monday, May 4, 2020 6:46 PM
**To:** Jeff Lowe <returnprice@hotmail.com>
**Cc:** Lewis, Brian <Brian.Lewis@btlaw.com>; Olszowka, Paul <Paul.Olszowka@btlaw.com>; Gabriel Walters <GabeW@petaf.org>; Caitlin Hawks <CaitlinH@petaf.org>
**Subject:** PETA v. WIN, et al. Case No: 4:17 CV 186

Mr. Lowe,
We have not received any responses to PETA's *First Set of Interrogatories and Requests for Production* which we sent to you by email on April 1, 2020 and which were delivered to you by Federal Express the next day.

For your reference, another copy is attached.
By rule, your written responses were due last Friday. We are willing to provide you additional time—until **Thursday, May 7, 2020**—to respond. If we do not hear from you, we are prepared to seek relief from the Court, including costs and fees.

Sincerely,

Asher Smith

**Asher Smith** | Litigation Manager
**PETA Foundation**
1536 16th St. NW
Washington, DC 20036
M: (516) 528-3109
AsherS@petaf.org

Admitted to practice law only in New York.

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

Exhibit 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) |
| Plaintiff, | ) |
| v. | ) ) |
| WILDLIFE IN NEED AND WILDLIFE IN DEED, INC., TIMOTHY L. STARK, MELISA D. STARK, AND JEFF LOWE, | ) ) ) ) ) ) |
| Defendants. | ) |

Case No. 4:17-cv-186

<u>**NOTICE OF VIDEOTAPE DEPOSITION OF JEFF LOWE**</u>

**PLEASE TAKE NOTICE** that, pursuant to Rule 30 of the Federal Rules of Civil

Procedure, Plaintiff, People for the Ethical Treatment of Animals, Inc. will take the deposition

upon oral examination of Jeff Lowe commencing at 9:00 a.m. CST on May 27, 2020.

The deponent, Jeff Lowe, at the time of this deposition, may be located at 25803 N

County Road 3250, Wynnewood, OK 73098, or at any location of his choosing.

**NOTICE IS FURTHER GIVEN** that this deposition will be taken remotely by Internet-

based video teleconferencing, or by telephone if Internet service is not available. Parties wishing

to participate in the deposition will have the option to do so by the Internet or telephone.

The deposition shall be taken before a certified court reporter authorized to administer

oaths who will be remote and will not be in the presence of the deponent.  At least three (3)

calendar days before the deposition undersigned counsel, will provide necessary log in

credentials and call-in numbers.

Dated: May 12, 2020

**PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.**

By: */s/   Paul Olszowka*
One of its Attorneys

| | |
|---|---|
| Caitlin Hawks | Brian W. Lewis |
| Gabriel Walters | Paul Olszowka |
| Asher Smith | BARNES & THORNBURG LLP |
| PETA FOUNDATION | One North Wacker Drive |
| 1536 16th Street NW | Suite 4400 |
| Washington, DC 20036 | Chicago, Illinois 60606 |
| Phone: (202) 483-7382 | Telephone: 312- 357-1313 |
| caitlinh@petaf.org | brian.lewis@btlaw.com |
| gabew@petaf.org | paul.olszowka@btlaw.com |
| ashers@petaf.org | |

## CERTIFICATE OF SERVICE

I, Paul Olszowka, an attorney, certify that on May 12, 2020, the foregoing document was served via electronic mail to the attorney of record for the Defendants in this case, J. Clayton Culotta, 815 E. Market Street, New Albany, IN 47150, clay@culottalaw.com, and Defendant Timothy L. Stark, pro se, 3320 Jack Teeple Road, Charlestown, IN 47111, wildlifeinneed@aol.com, and via email and overnight courier to Defendant, Jeff Lowe, 25803 N County Road 3250, Wynnewood, OK 73098, returnprice@hotmail.com.

*/s/ Paul Olszowka*

Paul T. Olszowka
  Paul.Olszowka@btlaw.com
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: 312- 357-1313
Facsimile: 312-759-5646

Exhibit 6

## Asher Smith

| | |
|---|---|
| **From:** | Rizzo, Philip <Philip.Rizzo@atg.in.gov> |
| **Sent:** | Wednesday, May 20, 2020 5:43 PM |
| **To:** | Asher Smith |
| **Subject:** | Wildlife in Need / Tim Stark |

Mr. Smith:

It has come to my attention that Jeff Lowe has stated to you and/or your co-counsels that he was advised by the Indiana Office of Attorney General to not provide others information about Wildlife in Need and/or Tim Stark. This is not true; the Indiana Office of Attorney General never provided said direction to Jeff Lowe.

Sincerely,
Phil Rizzo

**Phil Rizzo**
Deputy Attorney General
Consumer Protection Division
Office of Attorney General Curtis Hill
302 West Washington Street
IGCS-5th Floor
Indianapolis, IN 46204
p: 317-234-4662 | f: 317-232-7979
Philip.Rizzo@atg.in.gov



CONFIDENTIALITY NOTICE: This communication and any attachments are for the exclusive and confidential use of the intended recipient and may contain privileged or other confidential information. If you are not the intended recipient, please do not read, distribute or take action in reliance upon this message. If you have received this in error, please notify us immediately by return email and promptly delete this message and its attachments from your computer system. We do not waive attorney-client, work product or other applicable privilege by the transmission of this message.